UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

05 CV 9934

------------------------------------------------------X

FOOD HOLDINGS LIMITED and DAIRY HOLDINGS LIMITED, both Cayman Islands Companies in Liquidation, through their JOINT OFFICIAL LIQUIDATORS, G. JAMES CLEAVER and GORDON I. MACRAE,

    Plaintiffs,

-against-

BANK OF AMERICA CORPORATION;
BANK OF AMERICA, N.A.;
BANC OF AMERICA SECURITIES, LLC;
BANK OF AMERICA "DOES" 1-20;
DELOITTE TOUCHE TOHMATSU;
DELOITTE & TOUCHE S.p.A.;
DELOITTE & TOUCHE TOHMATSU AUDITORES INDIPENDENTES (BRAZIL);
DELOITTE "DOES" 1-20;
GRANT THORNTON INTERNATIONAL;
GRANT THORNTON S.p.A.;
GRANT THORNTON "DOES" 1-20;

    Defendants.

------------------------------------------------------X

COMPLAINT

(For Fraud, Negligent Misrepresentation, Breach of Fiduciary Duty/Constructive Fraud, Aiding and Abetting Breach of Fiduciary Duty, Breach of Contract, Unjust Enrichment, Civil Conspiracy, and Declaratory Judgment)

(Jury Trial Demanded)



RECEIVED NOV 2 3 2005 U.S.D.C. S.D.N.Y. CASHIERS

Food Holdings Limited ("FHL") and Dairy Holdings Limited ("DHL"), through their Joint Official Liquidators, bring this action against Bank of America, Deloitte and Grant Thornton for their fraud and breaches of fiduciary duties that robbed FHL and DHL of hundreds of millions of dollars.

## SUMMARY OF THIS ACTION

1.     The collapse of Italy's Parmalat Finanziaria, Parmalat S.p.A., and their affiliated companies (collectively, "Parmalat") beginning in late 2003 was one of the largest bankruptcies in European history. As the dust from Parmalat's collapse began to settle, it became clear that

1

company insiders had looted Parmalat and artificially kept it out of bankruptcy through fraudulent financial and accounting schemes that gave the false appearance of financial stability. Italian authorities have indicted at least eleven of Parmalat's insiders – including the former CEO and CFO – for their abuse of Parmalat, and the Extraordinary Commissioner of Parmalat (broadly the Italian equivalent of a bankruptcy trustee) has brought breach of fiduciary duty, RICO, and other claims against various Parmalat-related parties for the damage they wrought on the company. According to Italian authorities, the Parmalat accounting fraud was the "swindle of the century."

2. Parmalat's insiders acting together with Bank of America (through Bank of America, NA, and Banc of America Securities, LLC, under the direction of and supervision of Bank of America Corp.) were at the center of the Parmalat fraud and orchestrated a series of transactions designed to conceal Parmalat's insolvency while reducing Parmalat's indebtedness to Bank of America and generating millions in fees and interest for Bank of America. Italian prosecutors have brought criminal charges against Bank of America for the role its employees played in these fraudulent schemes.

3. FHL and DHL (collectively, the "Companies") were two "special purpose vehicles" ("SPVs") that Bank of America helped create to carry out, unwittingly, part of the scheme to hide Parmalat's growing insolvency. They are not, and have never been, a part of the Parmalat group of companies. In December 1999, Bank of America directed the incorporation of the Companies, purportedly to provide certain institutional investors with a vehicle through which they could invest in Parmalat's Brazilian operations. Bank of America intended that FHL and DHL would each issue approximately $150 million in notes (the "Notes"), sell them to various institutional investors (the "Noteholders"), then use the proceeds to purchase stock in

Parmalat's Brazilian operations (specifically a holding company known as Parmalat Administracao S.A. ("Parmalat Admin")). When the Notes came due, the plan called for the Companies to sell their Parmalat Admin stock to another Parmalat affiliate and use the resulting funds to retire the Notes. Parmalat, S.p.A. (the primary operating company) effectively acted as a surety on the Notes, guaranteeing that when the Notes came due, Parmalat S.p.A. would ensure that its affiliate would purchase the stock from the Companies at a price sufficient to enable FHL and DHL to repay their Note obligations.

4. In late 1999, pursuant to Bank of America's plan and in reliance upon information Bank of America provided to them, FHL and DHL each sold approximately $150 million in Notes and purchased stock in Parmalat Admin with the proceeds. This investment helped conceal Parmalat's crippling financial problems because (1) Parmalat's Brazilian operation appeared to receive a large capital injection, and (2) the Companies' investment in Parmalat provided the public markets with some assurance that Parmalat was financially sound. The day Bank of America and Parmalat publicly announced that the Noteholders had made an "equity investment" in Parmalat Admin, Parmalat's stock jumped 17%.

5. The trouble with Bank of America's plan was that it was all a fraud. At all times when Bank of America solicited the Noteholders, arranged for the formation of the Companies, and oversaw the issuance and sale of the Notes, Bank of America knew that Parmalat's actual financial condition was much worse than its financial statements indicated and that Parmalat was, and would be, incapable of honoring its contractual guarantees relating to the Note transactions. Moreover, documents Bank of America presented to the Companies indicated a $1.35 billion value for Parmalat Admin at a time when Bank of America knew its true value was only a fraction of that amount. Furthermore, Bank of America knew, but never disclosed to the

Companies, that the funds they invested in Parmalat Admin would be improperly funneled to Parmalat insiders and/or companies they controlled. Finally, contrary to the impression given by a press release authored in part by Bank of America, the Noteholders had not purchased an equity interest in Parmalat Admin; instead, they had purchased debt instruments from FHL and DHL, and even FHL's and DHL's "investment" in Parmalat Admin was effectively a financing arrangement, given the Parmalat S.p.A.'s obligation to guarantee the repurchase of FHL's and DHL's shares in Parmalat Admin once the Notes came due.

6. Had Bank of America not made such fraudulent omissions and misrepresentations, the Companies would not have (1) issued the Notes and incurred over $400 million in debt, interest, and fees, (2) purchased any interest in, or otherwise provided any funds to, Parmalat Admin, and (3) lost hundreds of millions of dollars.

7. Bank of America's purposeful omissions and misrepresentations to the Companies were not only fraudulent, but also a breach of Bank of America's fiduciary duties to the Companies. Bank of America purposefully assumed responsibility for acting in the Companies' best interests with respect to these transactions – as agent, manager, and otherwise. The Companies' innocent directors reasonably relied on Bank of America's superior knowledge and expertise with respect to the transactions, and they reasonably believed that Bank of America would not knowingly lead the Companies into transactions that doomed them to insolvency. Bank of America knew the Companies' directors were trusting and relying on it when approving the transactions in question, but it abused that trust and reliance for its own gain – to the Companies' detriment.

8. At different times, the Grant Thornton and Deloitte defendants served as Parmalat's global auditors, and they continually issued unqualified audit opinions for Parmalat's

4

financial statements under circumstances when they knew (or at least should have known) those statements were false and/or misleading. Both sets of auditor defendants issued such opinions knowing they would be provided to FHL and DHL (in Deloitte's case) or to SPVs like them that Parmalat intended to influence with the information (in Grant Thornton's case). FHL's and DHL's directors reasonably relied on Parmalat's false financial statements and on the auditor defendants' false audit opinions in making their decisions to issue the Notes, purchase Parmalat Admin stock with the proceeds, and subsequently refrain from taking any actions to recover the value of their investments.

9. If the Companies' innocent directors had known of Defendants' wrongful conduct, they could and would have acted to stop the scheme that eventually led to the Companies' multi-million dollar loss. Any of the directors could have stopped Defendants' wrongful course of conduct immediately simply by bringing such actions to the attention of the Noteholders and/or the proper authorities.

10. Although Bank of America wrongfully manipulated FHL and DHL, neither Company was ever a subsidiary or affiliate of either Parmalat or Bank of America. Instead, they were (and remain) independent Cayman Islands companies whose innocent directors were intentionally misled into approving the Companies' issuance of the Notes and investment in Parmalat Admin. As a result of Defendants' wrongful conduct, the Companies have suffered more than $400 million in damages.

11. Parmalat's Extraordinary Commissioner in the Italian reorganization proceedings, Dr. Enrico Bondi, previously has alleged claims relating to the same transactions described below on behalf of Parmalat in various suits brought in the United States (most of which are now being overseen by the United States District Court for the Southern District of New York in

connection with cause number 04 MD 1653 (LAK)). In some of those suits, Parmalat purports to seek damages for losses actually sustained by FHL and DHL, neither of which was a subsidiary or affiliate of Parmalat. Neither the Extraordinary Commissioner nor Parmalat has any legal right to FHL's and DHL's damages, and any prior claims they may have made to such amounts are unsupportable. Nor are FHL or DHL any part of the extraordinary administration proceedings in Italy.

## PARTIES

### The Plaintiffs

12. G. James Cleaver and Gordon I. MacRae ("Cleaver and MacRae") have been duly appointed and empowered as official liquidators for Plaintiffs FHL and DHL by the Grand Court of the Cayman Islands (the "Cayman Court"). FHL and DHL maintain their registered offices at PO Box 1102GT, 4th Floor, Bermuda House, Dr. Roy's Drive, George Town, Grand Cayman, Cayman Islands.

13. Plaintiff FHL is an exempted limited liability company organized and incorporated under the laws of the Cayman Islands. FHL is in official liquidation under Cayman law.

14. On 24 December 2003 the Cayman Court, following the filing of a "winding up" petition, placed FHL into provisional liquidation and appointed Cleaver and MacRae as Joint Provisional Liquidators. A number of FHL's Noteholders, following FHL's failure to pay amounts owing to them in accordance with note purchase agreements dated 17 December 1999, filed the petition. FHL entered official liquidation on 1 April 2005, at which time Cleaver and MacRae became FHL's official liquidators.

15. Plaintiff DHL also is an exempted limited liability company organized and

incorporated under the laws of the Cayman Islands. Like FHL, DHL is in official liquidation under Cayman law.

16. On 24 December 2003 the Cayman Court placed DHL into provisional liquidation and appointed Cleaver and MacRae as Joint Provisional Liquidators. A number of DHL's Noteholders, following DHL's failure to pay amounts owing to them in accordance with note purchase agreements dated 22 June 2001, filed the petition. DHL entered official liquidation on 1 April 2005, at which time Cleaver and MacRae became its official liquidators.

17. As the Companies' Joint Official Liquidators, Cleaver and MacRae have the authority and duty to locate, protect, secure and take into their possession and control all assets and property to which the Companies are or appear to be entitled, and to carry out such investigations as they may consider appropriate into the promotion, formation, business, dealings, affairs or property of the Companies. This lawsuit is the result of such investigations, and the Companies, through the Joint Official Liquidators, bring these causes of action, owned by the Companies, for the benefit of the Companies' estates.

### The Bank of America Defendants

18. Defendant Bank of America Corporation ("BA Corp.") is a Delaware corporation with its headquarters in North Carolina. BA Corp. is the ultimate parent of the other Bank of America entities named in this suit, exercised control over them, and is vicariously liable for the wrongful conduct of such entities. BA Corp regularly transacts business in New York.

19. Defendant Bank of America, N.A. ("BA NA") is a National Banking Association incorporated under the laws of the United States, with its headquarters in North Carolina. BA NA has branch offices in New York and throughout the world, and regularly transacts business in New York.