A. Robert Pietrzak (AP-6711)
Thomas McC. Souther (TS-6615)
Daniel A. McLaughlin (DM-2688)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300
(212) 839-5599 (fax)

Joseph B. Tompkins, Jr.
Alan C. Geolot
Mark P. Guerrera
Robert D. Keeling
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000
(202) 736-8711 (fax)

*Attorneys for Defendants Bank of America Corporation, Banc of America Securities LLC and Bank of America, N.A.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re PARMALAT SECURITIES LITIGATION | MASTER DOCKET<br>04 MD 1653 (LAK) ECF Case |
| This document relates to: 05 CV 9934 | |
| FOOD HOLDINGS LIMITED and DAIRY HOLDINGS LIMITED, acting by their Joint Official Liquidators, Gordon I. MacRae and G. James Cleaver,<br><br>        Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA CORPORATION, et al.<br><br>        Defendants. | BANK OF AMERICA'S TRIAL BRIEF<br><br>**REDACTED** |

## DEFENDANT BANK OF AMERICA'S TRIAL BRIEF

### – REDACTED –

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iv

STATEMENT OF THE CASE .................................................................................................1

THE PBRAZIL TRANSACTION .............................................................................................6

A.    Structure Of The Transaction ......................................................................................7

B.    The Limited Role And Life-Span Of The SPVs............................................................9

C.    The History Of The PBrazil Transaction....................................................................11

D.    BoA's Due Diligence In The PBrazil Transaction. .....................................................13

E.    Valuations Of Parmalat's Brazilian Operations. ........................................................16

F.    Efforts To Extend The PBrazil Transaction. ..............................................................18

ARGUMENT .......................................................................................................................19

I.    THE SPVS CANNOT PROVE THAT THEY SUFFERED ANY LEGALLY
      COGNIZABLE DAMAGES. ...........................................................................................20

      A.    The SPVs Suffered No Out-Of-Pocket Losses. ..................................................20

            1.    Amounts Owed To Bankruptcy Creditors Are Not Out-Of-Pocket
                  Losses Incurred By The SPVs. ................................................................22

            2.    The SPVs Made No "Investment" Of Their Own. ....................................25

            3.    Special Policy Considerations In This Case Preclude Any Finding
                  Of Damages On Behalf Of These SPVs. ..................................................28

      B.    The SPVs Incurred No Benefit-Of-The-Bargain Damages. .............................29

      C.    The SPVs Cannot Prove Damages In Connection With Their Unjust
            Enrichment Claim. ............................................................................................30

II.   THE SPVS' FRAUD AND NEGLIGENT MISREPRESENTATION
      CLAIMS FAIL BECAUSE, AMONG OTHER REASONS, THERE IS NO
      EVIDENCE THAT BOA KNEW OR SHOULD HAVE KNOWN ABOUT
      PARMALAT'S FRAUD. ..................................................................................................31

      A.    The SPVs Cannot Show That BoA Either Knew Or Should Have
            Known About Parmalat's Fraud.........................................................................32

            1.    BoA Did Not Know About Parmalat's Fraud. .........................................33

**(a)**    BoA Believed In Parmalat. ............................................................33

**(b)**    BoA Believed In The PBrazil Transaction. ....................................41

**(c)**    There Is No Evidence That Luca Sala Or Anyone Else At Bank Of America Knew That Parmalat Was Committing Fraud.  43

    **(i)**    Diversions Prove Only That Sala Was Stealing Money..................................................................................44

    **(ii)**    There Is No Evidence That Sala's Diversions Were "Bribes From Parmalat."......................................................45

    **(iii)**    None Of The Individuals Alleged To Have Received Funds From Sala Knew The Truth About Parmalat............45

    **(iv)**    If Sala Or Others Did Know The Truth About Parmalat, Then Their Knowledge Is Not Attributable To BoA. ..............................................................................46

**2.**    BoA Had No Reason To Know The Truth About Parmalat's Financial Condition. ..............................................................................48

**(a)**    BoA Was The Victim Of Parmalat's Fraud....................................49

**(b)**    Parmalat's Fraud Fooled The World...............................................51

**(c)**    BoA Reasonably Relied On Parmalat's Audited Financial Statements......................................................................................53

**(d)**    BoA Conducted Extensive Due Diligence On Parmalat................56

    **(i)**    BoA Conducted Extensive Credit Due Diligence. ...............56

    **(ii)**    BoA Simultaneously And Separately Conducted Extensive Private Placement Due Diligence.........................58

    **(iii)**    The Private Placement Investors Also Conducted Due Diligence........................................................................60

**(e)**    The SPVs' Attempts To Discredit BoA's Due Diligence Fail. ...............................................................................................60

**B.**    BoA Did Not Act With Fraudulent Intent.........................................................64

**C.**    BoA Made No Misstatement Of Fact To The SPVs. .........................................65

| | 1. | The Alleged Misstatements In The Private Placement Memoranda Were Made By Parmalat, Not BoA | 66 |

| | 2. | The Alleged Misstatements In The Support And Inducement Agreements Were Made By Parmalat, Not BoA | 67 |

| | 3. | The June 2000 Email Is Not Material To The SPVs' "Decision" To Enter Into The PBrazil Transaction. | 68 |

**D.** BoA Is Not Liable For Mistaken Opinions Or Predictions. ... 69

**E.** BoA Did Not Omit Any Information That Was Material To The SPVs. ... 70

**F.** There Is No Evidence That The SPVs Reasonably Relied On Any Alleged Misrepresentation Or Omission ... 72

**III.** THE SPVS' CLAIMS OTHER THAN FRAUD ARE PREEMPTED BY THE MARTIN ACT. ... 75

**IV.** THE EVIDENCE DOES NOT SUPPORT THE SPVS' CLAIM FOR BREACH OF CONTRACT. ... 80

**A.** The SPVs Cannot Show That BoA Was Grossly Negligent Or That BoA Willfully Breached Any Obligation. ... 80

**B.** BoA Did Not Breach The Management Agreement. ... 81

**C.** The SPVs Cannot Predicate Their Claim On Conduct That Occurred Subsequent To The Closing Of The PBrazil Transaction. ... 82

**V.** THE EVIDENCE DOES NOT SUPPORT THE SPVS' CLAIM FOR BREACH OF FIDUCIARY DUTY. ... 83

**A.** The SPVs Reposed No Special Trust In BoA. ... 84

**B.** BoA Did Not Accept The Supposed Trust Or Confidence That Plaintiffs Claim To Have Placed In It. ... 87

**C.** A Contractual Relationship Is Not A Fiduciary One. ... 89

**D.** Fiduciary Duties Should Not Be Recognized For Pass-Through Entities Such As These. ... 90

**E.** The SPVs Cannot Show That BoA Breached Any Standard Of Care. ... 90

**VI.** THE EVIDENCE DOES NOT SUPPORT THE SPVS' CLAIM FOR UNJUST ENRICHMENT. ... 91

CONCLUSION ... 92

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*236 Cannon Realty, LLC* v. *Ziss,*
   No. 02 Civ. 6693(WHP), 2005 WL 289752 (S.D.N.Y. Feb. 8, 2005)....................................65

*A.I. Trade Fin., Inc.* v. *Centro Internationale Handelsbank,*
   926 F. Supp. 378 (S.D.N.Y. 1996).................................................................................35, 44

*Adelphia Recovery Trust* v. *Bank of Am., N.A.,*
   624 F. Supp. 2d 292 (S.D.N.Y. 2009).....................................................................................87

*Am. Fed. Group, Ltd.* v. *Rothenberg,*
   136 F.3d 897 (2d Cir. 1998)....................................................................................................20

*Am. Tissue, Inc.* v. *Donaldson,*
   351 F. Supp. 2d 79 (S.D.N.Y. 2004).......................................................................................24

*AmBase Corp.* v. *SDG Inc.,*
   2005 U.S. Dist. LEXIS 16164 (D. Conn. Aug. 3, 2005) .........................................................85

*AT&T Co.* v. *City of New York,*
   83 F.3d 549 (2d Cir. 1996)................................................................................................80, 81

*Atl. Gypsum Co.* v. *Lloyds Int'l Corp.,*
   753 F. Supp. 505 (S.D.N.Y. 1990)..........................................................................................64

*Auchincloss* v. *Allen,*
   211 A.D.2d 417, 621 N.Y.S.2d 305 (N.Y. App. Div. 1995) ...................................................70

*B.G. Equip. Co.* v. *American Ins. Co.,*
   61 A.D.2d 247, 402 N.Y.S.2d 479 (N.Y. App. Div. 1978) .....................................................47

*Beltrone* v. *Gen. Schuyler & Co.,*
   223 A.D.2d 938, 636 N.Y.S.2d 917 (N.Y. App. Div. 1996) ...................................................70

*Bennett* v. *Verizon Wireless,*
   No. 04-CV-6314 CJS.................................................................................................................48

*BNY Capital Mkts., Inc.* v. *Moltech Corp.,*
   No. 99 Civ.................................................................................................................................85

*Bondi* v. *Bank of America Corp.,*
   383 F. Supp. 2d 587 (S.D.N.Y. 2005) ("*Bondi III*")..............................................................23

*Broussard* v. *Meineke Discount Muffler Shops, Inc.,*
   155 F.3d 331 (4th Cir. 1998) ...................................................................................................90

*Bullmore* v. *Ernst & Young Cayman Islands*,
   20 Misc. 3d 667, 861 N.Y.S.2d 578 (N.Y. 2008) ................................................................73

*Campo* v. *Sears Holdings Corp.*,
   No. 06 Cir. 4053 (LAK), 2009 WL 2151289 (S.D.N.Y. July 21, 2009) ................................36

*Capital Wireless Corp.* v. *Deloitte & Touche*,
   216 A.D.2d 663, 627 N.Y.S.2d 794 (N.Y. App. Div. 1995) ...................................................48

*Chill* v. *Gen. Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996)...................................................................................................81

*City of New York* v. *Cyco.Net, Inc.*,
   383 F. Supp. 2d 526,564 (S.D.N.Y. 2005)..............................................................................64

*Clark* v. *Daby*,
   300 A.D.2d 732, 751 N.Y.S.2d 622 (N.Y. App. Div. 2002) ............................................31, 91

*Continental Airlines, Inc.* v. *Lelakis*,
   1997 WL 701363 (2d Cir. Nov. 10, 1997).............................................................................72

*Creative Waste Mgmt.* v. *Capitol Envtl. Servs.*,
   495 F. Supp. 2d 353 (S.D.N.Y. 2007)....................................................................................20

*Denney* v. *Jenkens & Gilchrist*,
   230 F.R.D. 317 (S.D.N.Y. 2005) .....................................................................................32, 64

*Dooner* v. *Keefe, Bruyette & Woods, Inc.*,
   157 F. Supp. 2d 265 (S.D.N.Y. 2001)....................................................................................69

*Dover Ltd.* v. *A.B. Watley, Inc.*,
   423 F. Supp. 2d 303 (S.D.N.Y. 2006)...............................................................................77, 78

*EBC I, Inc.* v. *Goldman, Sachs & Co.*,
   5 N.Y.3d 11, 832 N.E.2d 26 (N.Y. 2005)...............................................................................92

*Emergent Capital Inv. Mgmt., LLC* v. *Stonepath Group, Inc.*,
   343 F.3d 189 (2d Cir. 2003)...................................................................................................75

*Feinberg* v. *Katz*,
   No. 01 Civ. 2739 (CSH), 2007 WL 4562930 (S.D.N.Y. Dec. 21, 2007) ................................72

*Feiner Family Trust* v. *Xcelera.com, Inc.*,
   No. 07 Civ. 1914 (RPP), 2008 U.S. Dist. LEXIS 102019 (S.D.N.Y. Dec. 15, 2008).........7, 36

*Florida Department of Insurance* v. *Chase Bank of Texas National Association*,
   274 F.3d 924 (5th Cir. 2001) .................................................................................................22

*Foxley* v. *Sotheby's Inc.*,
  893 F. Supp. 1224 (S.D.N.Y. 1995)......................................................................................75

*Golden Budha Corp.* v. *Can. Land Co. of Am., N.V.*,
  931 F.2d 196 (2d Cir. 1991)..............................................................................................72

*Granite Partners, L.P.* v. *Bear, Stearns & Co.*,
  17 F. Supp. 2d 275 (S.D.N.Y. 1998)..........................................................................75, 76, 78

*Grede* v. *McGladrey Pullen LLP*,
  No. 08 C 2205, 2008 WL 4425447 (N.D. Ill. Sept. 26, 2008)..................................................21

*Grubb* v. *FDIC*,
  868 F.2d 1151 (10th Cir. 1989) .........................................................................................27

*Guaman* v. *Industry City Management*,
  40 A.D.3d 698 (N.Y. App. Div. 2007) ..............................................................................32, 80

*Henneberry* v. *Sumitomo Corp. of Am.*,
  415 F. Supp. 2d 423 (S.D.N.Y. 2006)............................................................................ *passim*

*High View Fund, L.P.* v. *Hall*,
  27 F. Supp. 2d 420 (S.D.N.Y. 1998).....................................................................................32

*Hirsch* v. *Arthur Andersen & Co.*,
  178 B.R. 40 (D. Conn. 1994)...............................................................................................24

*Hirsch* v. *Arthur Andersen & Co.*,
  72 F.3d 1085 (2d Cir. 1995)................................................................................................24

*Hydro Investors, Inc.* v. *Trafalgar Power Inc.*,
  227 F.3d 8 (2d Cir. 2000) ...................................................................................................69

*In re Dublin Sec. Inc.*,
  197 B.R. 66 (S.D. Ohio 1996), *aff'd* 133 F.3d 377 (6th Cir. 1997).........................................28

*In re Eugenia Vi Venture Holdings, Ltd.*,
  2008 U.S. Dist. LEXIS 101703 (S.D.N.Y. Dec. 15, 2008) .....................................................91

*In re Eugenia Vi Venture Holdings, Ltd. Litig.*,
  No. 05 CIV 5277(DAB), 2008 WL 5274578 (S.D.N.Y. Dec. 15, 2008) ............................20, 21

*In re Grumman Olson Indus.*,
  329 B.R. 411 (S.D.N.Y. 2005)........................................................................................77, 90

*In re Hampton Hotel Investors, L.P.*,
  289 B.R. 563 (S.D.N.Y. 2003).............................................................................................23

*In re Parmalat Sec. Litig.,*
    414 F. Supp. 2d 428 (S.D.N.Y. 2006)................................................................................41, 65

*In re Parmalat Sec. Litig.,*
    477 F. Supp. 2d 602 (S.D.N.Y. 2007)............................................................................... *passim*

*In re Parmalat Sec. Litig.,*
    501 F. Supp. 2d 560 (S.D.N.Y. 2007), *aff'd sub nom. Pappas* v. *Bank of America
    Corp.*, 309 Fed. App'x 536 (2d Cir. 2009) ...............................................................24, 64, 83

*In re Parmalat Sec. Litig.,*
    570 F. Supp. 2d 521 (S.D.N.Y. 2008)......................................................................................65

*In re Refco, Inc. Sec. Litig.,*
    609 F. Supp. 2d 304 (S.D.N.Y. 2009)......................................................................................67

*In re Sharp Int'l Corp.,*
    403 F.3d 43 (2d Cir. 2005).......................................................................................................84

*In re WRT Energy Sec. Litig.,*
    No. 96 Civ. 3610 (JFK), 1999 WL 178749 (S.D.N.Y. Mar. 31, 1999) ...................................47

*Indep. Asset Mgmt. LLC* v. *Zanger,*
    538 F. Supp. 2d 704 (S.D.N.Y. 2008)......................................................................................84

*Jobe* v. *ATR Mktg., Inc.,*
    87 F.3d 751 (5th Cir. 1996) .....................................................................................................23

*Joyce* v. *Morgan Stanley & Co.,*
    538 F.3d 797 (7th Cir. 2008) ...................................................................................................89

*Kagan* v. *K-Tel Entm't, Inc.,*
    172 A.D.2d 375, 568 N.Y.S.2d 756 (N.Y. App. Div. 1991) ....................................................91

*Kassover* v. *UBS AG,*
    619 F. Supp. 2d 28 (S.D.N.Y. 2008)........................................................................................76

*Kramer* v. *W10Z/515 Real Estate Ltd. P'ship,*
    44 A.D.3d 457, 844 N.Y.S.2d 18 (N.Y. App. Div. 2007) ........................................................76

*Lama Holding Co.* v. *Smith Barney Inc.,*
    88 N.Y.2d 413 (N.Y. 1996) ......................................................................................................20

*Levenfeld* v. *Boyd,*
    No. 02 C 4735, 2003 WL 22532801 (N.D. Ill. Nov. 6, 2003).................................................27

*Maines Paper & Food Serv. Inc.* v. *Adel,*
    256 A.D.2d 760, 681 N.Y.S.2d 390 (N.Y. App. Div. 1998) ....................................................73

*Marketplace LaGuardia Ltd. P'ship* v. *Harkey Enters.*,
No. 07-CV-1003 (CBA), 2008 WL 905188 (E.D.N.Y. Mar. 31, 2008)...................................91

*Miller* v. *Steinbach*,
268 F. Supp. 255 (S.D.N.Y. 1967)..........................................................................................35

*N.Y. State Urban Dev. Corp* v. *Marcus Garvey Brownstone Houses, Inc.*,
98 A.D.2d 767, 469 N.Y.S.2d 789 (N.Y. App. Div. 1983) ......................................................68

*Nairobi Holdings Ltd.* v. *Brown Brothers Harriman & Co.*,
No. 02 Civ. 1230 (LMM), 2002 WL 31027550 (S.D.N.Y. Sept. 10, 2002)......................76, 78

*Nam Tai Elecs., Inc.* v. *UBS PaineWebber Inc.*,
46 A.D.3d 486, 850 N.Y.S.2d 11 (N.Y. App. Div. 2007) .................................................72, 74

*O'Connor & Assocs.* v. *Dean Witter Reynolds, Inc.*,
529 F. Supp. 1179 (S.D.N.Y. 1981).........................................................................................47

*Okraynets* v. *Metro. Transp. Auth.*,
555 F. Supp. 2d 420 (S.D.N.Y. 2008).....................................................................................20

*Pollio* v. *MF Global, Ltd.*,
608 F. Supp. 2d 564 (S.D.N.Y. 2009)......................................................................................32

*Posner* v. *Minn. Mining & Mfg. Co.*,
713 F. Supp. 562 (E.D.N.Y. 1989) ..........................................................................................77

*Precision Testing Labs., Ltd.* v. *Kenyon Corp. of Am.*,
No. 84 Civ. 5424 (IBC), 1988 WL 34825 (S.D.N.Y. Apr. 6, 1988)........................................30

*Primavera Familienstifung* v. *Askin*,
130 F. Supp. 2d 450 (S.D.N.Y. 2001)......................................................................................83

*Pro Bono Invs., Inc.* v. *Gerry*,
No. 03 Civ. 4347 (JGK), 2005 WL 242.............................................................................29, 76

*Regions Bank* v. *Wieder & Mastroianni, P.C.*,
423 F. Supp. 2d 265 (S.D.N.Y. 2006)......................................................................................87

*Roberts Real Estate* v. *N.Y. State Dep't of State, Div. of Licensing Servs.*,
80 N.Y.2d 116 (N.Y. 1992) ......................................................................................................47

*Sedona Corp.* v. *Ladenburg Thalmann & Co.*,
2005 WL 1902780 (S.D.N.Y. Aug. 9, 2005)...........................................................75, 76, 77, 78

*Shields* v. *Citytrust Bankcorp., Inc.*,
25 F.3d 1124 (2d Cir. 1994).............................................................................................64, 81

*Singer Co.* v. *Stott & Davis Motor Express, Inc.*,
  79 A.D.2d 227, 436 N.Y.S.2d 508 (N.Y. App. Div. 1981) ................................................68, 74

*Societe Nationale D'Exploitation Industrielle Des Tabacs Et Allumettes* v. *Salomon Bros. Int'l Ltd.*,
  251 A.D.2d 137, 674 N.Y.S.2d 648 (N.Y. App. Div. 1998) ............................................85, 87

*South Cherry St., LLC* v. *Hennessee Group LLC*,
  573 F.3d 98 (2d Cir. 2009)................................................................................................32, 65

*T.T. Exclusive Cars, Inc.* v. *Christie's Inc.*,
  No. 96 Civ. 1650 LMN, 1996 WL 737204 (S.D.N.Y. Dec. 24, 1996)......................................75

*Trafalgar Power Inc.* v. *Aetna Life Ins. Co.*,
  396 B.R. 584 (N.D.N.Y. 2008)..............................................................................................92

*United States* v. *Pluta*,
  176 F.3d 43 (2d Cir. 1999)....................................................................................................68

*Universal City Studios, Inc.* v. *Nintendo Co.*,
  797 F.2d 70 (2d Cir. 1986)..............................................................................................77, 91

*V.S. Int'l, S.A.* v. *Boyden World Corp.*,
  No. 90 Civ. 4091 (PKL), 1993 WL 59399 (S.D.N.Y. Mar. 4, 1993) ......................................83

*Village on Canon* v. *Bankers Trust Co.*,
  920 F. Supp. 520 (S.D.N.Y. 1996)...................................................................................85, 86

*Walther* v. *Maricopa Int'l Inv., Corp.*,
  No. 97 Civ. 4816 (HB), 1999 WL 64280 (S.D.N.Y. Feb. 9, 1999).........................................27

*Walton* v. *Morgan Stanley & Co.*,
  623 F.2d 796 (2d Cir. 1980)............................................................................................85, 90

*Wight* v. *BankAmerica Corp.*,
  219 F.3d 79 (2d Cir. 2000)....................................................................................................48

*William Kaufman Org.* v. *Graham & James L.L.P.*,
  269 A.D.2d 171, 703 N.Y.S.2d 439 (N.Y. App. Div. 2000) ...................................................89

*World Wrestling Entm't, Inc.* v. *Jakks Pac., Inc.*,
  530 F. Supp. 2d 486 (S.D.N.Y. 2007), *aff'd*, No. 08-0118-cv, 2009 WL 1391807 (2d Cir. May 19, 2009)................................................................................................................89

*Wright* v. *Ernst & Young LLP*,
  152 F.3d 169 (2d Cir. 1998)..................................................................................................65

*Yoss* v. *Sacks*,
  26 A.D.2d 671, 272 N.Y.S.2d 387 (N.Y. App. Div. 1966) .....................................................70


**STATUTES**

12 C.F.R. § 1.5(a) .................................................................................................................84, 90


**SCHOLARLY AUTHORITIES**

77 U.S.L.W. 3657 (May 18, 2009) ..............................................................................................24

J.B. Heaton, *Deepening Insolvency*, 30 Iowa J. Corp. L. 465 (2005)...............................23

N.Y. Gen Bus. Law, Art. 23-A ....................................................................................................75

N.Y. Gen. Bus. Law § 352-c(1)...................................................................................................77

Wilett, *The Shallows of Deepening Insolvency*, 60 Bus. Law 549 (2005) ...........................25

The Plaintiffs in this case, special purpose vehicles ("SPVs") Food Holdings Limited ("FHL") and Dairy Holdings Limited ("DHL"), have no economic substance, employed no workers, owned no real estate, produced no goods and maintained no physical presence. In the transaction that comprises the entirety of their claims, these SPVs had no discretion, made no investments, paid no interest, received no funds, had no prospect of making a profit, suffered no pecuniary losses, incurred no unreimbursed expenses, and never faced a future other than liquidation. Despite serving only as pass-through vehicles to facilitate investments by real parties in interest, the SPVs nevertheless claim that Bank of America ("BoA") somehow owes their liquidation estate more than a half billion dollars in losses they allegedly suffered in connection with the transaction at issue. But after nearly four years of litigation, they have no evidence to support their allegations and no actual damages. Their claims have no basis, and this case should be dismissed prior to trial.

## STATEMENT OF THE CASE

When Parmalat went into bankruptcy after the revelation of its massive fraud, thousands of investors around the world suffered billions of dollars of economic loss. Near the top of the list was Bank of America, which as of December 2003 had more than $450 million of unsecured credit exposure to Parmalat. Like the many other financial institutions, rating agencies, analysts, regulators and investors that carefully analyzed Parmalat's financial statements during the years of its fraud, BoA was deceived by the false picture of financial well-being that Parmalat, with the active assistance of its auditors, had presented. Parmalat's fraud was deep, well-orchestrated and, particularly in light of the auditors' confessed complicity, undetectable.

This case arises out of a single transaction: a $300 million financing for Parmalat's Brazilian subsidiary – Parmalat Administração S.A. ("PBrazil") – that took place in December 1999 (the "PBrazil transaction"). BoA coordinated investments in PBrazil from investors in the

1

U.S. private placement market (the "Noteholders"), primarily large insurance companies, which in turn received investment-grade notes guaranteed by Parmalat S.p.A.

BoA lost more on this transaction than any other investor – a total of $54.5 million in notes it held and $98.4 million it advanced to fund interest payments to the Noteholders. Notwithstanding these losses, BoA finds itself a defendant in this lawsuit – brought by two SPVs that had no financial stake in the transaction and did no more than serve as financial intermediaries or "pass-through" entities between Parmalat and the Noteholders.

Plaintiffs' theory is that BoA was aware or should have been aware of Parmalat's fraud and disastrous financial condition and thus knew that the PBrazil transaction would likely fail, and that BoA nevertheless deceived the SPVs into participating in the transaction. This theory makes no sense. If BoA had known that the PBrazil transaction would fail, it never would have invested its own money in the transaction; and if it had known Parmalat's financial statements were false, it never would have put itself in the position of having $450 million at risk when Parmalat declared bankruptcy.

There is no need for a trial in this case. The parties have stipulated to the vast majority of salient facts regarding the transaction at issue. *See* Stipulation of Facts, filed under seal August 3, 2009 ("*Stipulation*"). On this record alone, it is clear that judgment should be granted in BoA's favor. First, the SPVs cannot prove they suffered any cognizable damages under any theory of recovery recognized under New York law.

2

The only parties that could have been damaged by the PBrazil transaction were the parties that put up the money – BoA and the other Noteholders, some of whom are now creditors of the SPVs. Although the liquidators claim that they are pursuing this action for the benefit of these creditors, that is not a basis for a damages claim, nor is it true. The bulk of any litigation recoveries will not be distributed to any of the investors in the PBrazil transaction, but rather to a

Furthermore, BoA is the largest of the SPVs' creditors,


The damages issue is dispositive. But even if it were not, Plaintiffs cannot prove that BoA knew or should have known about Parmalat's fraud. The proof on this point is overwhelming and devastating for Plaintiffs' case. In addition to the undisputed evidence, BoA will present testimony from three former BoA employees who were key participants in the transaction at issue:

(1) Mike Lau – a managing director in BoA's Private Placement Group, who led BoA's private placement efforts in the PBrazil transaction;

(2) Greg Johnson – Lau's boss, the Senior Managing Director and head of international origination in the Private Placement Group at the time of the PBrazil transaction;

(3) David Chalk – an officer in BoA's Credit Risk Management group, who approved BoA's investment in the transaction, and who later became the head of BoA's Global Financial Institutions Risk Management Group, overseeing credit for financial institutions globally.

---

3

These senior Bank officers were responsible for evaluating Parmalat and concluded that Parmalat was a strong company with a bright future. Not one thought that Parmalat was anything other than what was portrayed on its audited financial statements or what was described in numerous meetings with Parmalat's management. Indeed, not one of the more than 30 BoA witnesses deposed in this case testified that BoA knew of or even had reason to doubt Parmalat's true financial condition. Nor has a single fact witness from any other party in the Parmalat multi-district litigation testified that Bank of America ever knew of Parmalat's fraud, and the sworn testimony of Parmalat CFO Fausto Tonna confirms that Parmalat never revealed the true state of its finances to anyone at BoA. The overwhelming testimony and evidence proves that Parmalat defrauded BoA along with the rest of the global financial community.

The evidence also shows that various groups within BoA conducted extensive due diligence on Parmalat throughout the relationship, including in regard to the PBrazil transaction underlying this action. Most fundamentally, BoA, like hundreds of other banks, financial institutions, investors and analysts, relied first and foremost on Parmalat's financial statements, which at all relevant times were accompanied by unqualified opinions from independent auditors. In addition, BoA relied on Parmalat's public statements, such as its press releases regarding its financial and operational state. BoA's officers also met with Parmalat representatives and asked pertinent questions about Parmalat's finances and business and relied on their reasonable responses. Through these various statements, Parmalat carefully manufactured an image of respectability and creditworthiness.

We now know that Parmalat's representations were all lies. Those lies duped BoA into believing that Parmalat was a healthy, investment-grade going concern, and based on this false belief, BoA provided and arranged over one billion dollars in financing for Parmalat and risked a

significant amounts of its own funds. So complete was BoA's belief in Parmalat's creditworthiness that it had over $450 million in unsecured credit exposure to Parmalat at the time of the company's collapse. Indeed, BoA continued to consider Parmalat an acceptable credit risk up until the Company's collapse in 2003. In September 2003, it extended one Parmalat subsidiary a $3 million line of credit; in early December 2003, it increased its exposure to Parmalat by $10 million; and, on December 17, 2003, moments before the fraud was revealed, BoA extended another $5 million to Parmalat. Any contention that BoA somehow knew of Parmalat's true financial state simply is not supported by the record.

It is also important to consider what the SPVs will not present. The SPVs will present no internal BoA documents showing that BoA knew about the Parmalat fraud – because there are none. The SPVs will present no communications by anyone at BoA acknowledging that Parmalat was committing a fraud – because there are none. Given the magnitude and duration of Parmalat's fraud, not to mention the massive volume of discovery exchanged in this case, one would expect to find – if BoA really were aware of Parmalat's true condition – at least *one* document in which someone at BoA wrote something about the Parmalat scheme. Yet no such document exists. Similarly, the SPVs will not present a single person at trial – whether an investor, a BoA employee or anyone else – who can say that they knew or even suspected that Parmalat was a fraud before the truth was publicly revealed. The simple reason for this is that, outside of Parmalat's insiders and auditors, those people do not exist.

In fact, the SPVs will not bring a single witness to trial who has first-hand knowledge of the relevant facts. Instead, the SPVs hope to bring to Court purported "experts" who, rather than giving testimony based on scientific or technical knowledge, improperly attempt to divine the

thoughts and knowledge of Bank employees who participated in transactions with Parmalat.[2]
But BoA's actions speak louder than these experts' words, and the evidence will show that BoA
did not know, and had no reason to know, Parmalat's true financial condition.

### THE PBRAZIL TRANSACTION

The PBrazil transaction – which is the sole basis for Plaintiffs' claims – closed in
December 1999. The transaction was designed to allow Parmalat to receive a $300 million
equity infusion in its Brazilian subsidiary in a manner that would appeal to U.S. private
placement investors, who are predominantly large insurance companies.[3] To accomplish this
objective, the transaction was structured as a securitization in which the equity investment in
PBrazil was converted into a marketable debt that institutional private placement investors could
purchase and a residual equity interest held principally by BoA. Two special purpose vehicles –
FHL and DHL – were created to effectuate the legal structure of the transaction.

The parties to the PBrazil transaction were sophisticated players represented by legal
counsel well-versed in the practice of creating and using SPVs for this purpose. All the parties,
and their counsel, designed the transaction specifically so that the SPVs themselves would have
nothing at stake. Their effort was successful. Based on the transaction structure, described
below, the SPVs bore no risk in the PBrazil transaction, and thus lost nothing when Parmalat
failed to honor its commitments.

---

[2] Concurrently with the filing of this trial brief, BoA is filing a *Daubert* motion to preclude or limit this purported
expert testimony.

[3] A private placement is an offering of restricted securities made to a small group of qualified institutional investors.
*Johnson Testimony* ¶ 4. Because securities in private placements are offered to sophisticated investors deemed
capable of making informed investment decisions based on their independent due diligence, private placements have
no SEC registration requirements and are not subject to the disclosure requirements of public offerings. *Id.* ¶¶ 5, 13.
BoA is the market's leading private placement agent, *id.* ¶ 8, and

## A.    Structure Of The Transaction

The PBrazil transaction was structured as follows:[4]

### The Note Issuances to the SPVs

- 

- 

- 

### The Flow of Funds

- 

- 

### The Role of the Trustee

- 

---

[4] A graphical depiction of the PBrazil transaction can be found at DX-319.

7

Interest Payments on the Notes and Equity Upside

- 

- 

- 

Repayment

- 

The Guarantee was a critical component of the transaction. Because of the risk-based capital standards that insurance companies must meet, a transaction that was subject to the inherent uncertainties of an IPO would not have been acceptable to the private placement investors. *Lau Testimony* ¶¶ 95-96. The Put and the Guarantee transformed this risk into investment-grade credit exposure to Parmalat S.p.A. *Id.* ¶¶ 95-96, 104-08

Many parties invested funds in the PBrazil transaction, but FHL and DHL were not among them.  The investments in the transactions were as follows:

| Investments in the PBrazil Transaction | | | |
|---|---|---|---|
| **FHL Noteholders** (December 1999) | $ in millions | **DHL Noteholders** (June 2001) | $ in millions |
| Bank of America | $15 | Bank of America | $49.498 |
| Pacific Life | $30 | GE Life | $20 |
| Allstate | $25 | First Colony | $10 |
| Lincoln National | $10 | Transamerica | $30 |
| New York Life | $10 | Prudential | $22.5 |
| Monumental | $10 | Hartford Life | $5 |
| PCFL (UnumProvident) | $30 | Jefferson-Pilot | $20 |
| Principal | $20 | DHL | $0 |
| FHL | $0 | | |
| **FHL Interest Payments** (December 2003) | $ in millions | **DHL Interest Payments** (December 2003) | $ in millions |
| Bank of America | $56.47 | Bank of America | $41.93 |
| FHL | $0 | DHL | $0 |

**B.    The Limited Role And Life-Span Of The SPVs.**

Many structured finance transactions involve the use of SPVs.

9

10

**C.**    **The History Of The PBrazil Transaction.**

---

[6] Another restructuring was carried out in late 1999, but Parmalat did not notify BoA about that restructuring until 2000. *Lau Testimony* ¶ 143.

Over the next two years, various groups at BoA were involved in the effort to complete this transaction, including the Credit Group, the Private Placement Group in New York, the Milan office, BoA's European Senior Management, Trading Credit Administration and the Legal Department. *Chalk Testimony ¶¶ 51-64; Johnson Testimony ¶¶ 81-82; Lau Testimony ¶¶ 93-95*

During that time, Parmalat and BoA discussed a number of different transaction structures. *Chalk Testimony ¶¶ 65-71; Lau Testimony ¶¶ 91-95; Johnson Testimony ¶ 81*

**D.    BoA's Due Diligence In The PBrazil Transaction.**

BoA's Private Placement Group conducted extensive due diligence in regard to the

PBrazil transaction.[7] Given that investors in the transaction were focused on Parmalat S.p.A. as

the relevant credit, *Lau Testimony* ¶¶ 95-96, the Private Placement Group's due diligence efforts

included principally an analysis of Parmalat S.p.A. and its ability to honor its commitments on

the Guarantee, *id.* ¶ 100. This fundamentally focused on Parmalat S.p.A.'s audited financial

statements, and from those statements the Group created and analyzed a series of cash flows and

financial ratios. *Id.* ¶ 101. The Group's due diligence also involved a number of conversations

with Parmalat's senior management, including Parmalat's CFO, Fausto Tonna, regarding the

Company's financial and business strategies. *See Lau Testimony* ¶ 100; DX-70. It further

included a March 1999 trip to Parmalat's headquarters in Collecchio to meet in-person with

Parmalat's senior management and tour its facilities. *Lau Testimony* ¶ 101.

The Private Placement Group also conducted due diligence on Parmalat's Brazilian

operations. As the potential holder of the equity upside in the transaction, BoA was uniquely

interested in the business prospects for Brazil and the likelihood of a Brazilian IPO. *Lau*

*Testimony* ¶ 131. In October 1998, Mike Lau and Luca Sala, BoA's former relationship manager

for Parmalat, traveled to Brazil and met with Parmalat's senior Brazilian management, and

visited two plants, a distribution center in São Paulo, and several supermarkets carrying

Parmalat's products. *Lau Testimony* ¶¶ 119-122, 127; DX-58 at BOFA-1855459. During a

meeting with the chairman of Parmalat's Brazilian operations, Lau and Sala were told about the

success of the Parmalat brand, the benefits of recent acquisitions and new products, and the

---

[7] This due diligence, and the separate due diligence performed by the credit department in connection with the
PBrazil transaction, were consistent with BoA's due diligence efforts throughout its nearly 10-year relationship with
Parmalat. *See infra* at 56-58.

increasingly favorable market. *Lau Testimony* ¶¶ 121-122; DX-58. Impressed with Parmalat's new facilities and the prominence of Parmalat's products, Lau and Sala identified Brazil as a growing market with vast potential. *Lau Testimony* ¶¶ 119, 125; DX-58 at 1855463.

the Private Placement Group

decided to conduct additional due diligence to determine the devaluation's impact on Parmalat S.p.A. on a consolidated basis, *Lau Testimony* ¶ 126. Immediately following the Real devaluation, the Private Placement Group worked with the Milan branch to conduct a series of "stress tests" to test Parmalat's past performance as reported in its audited financial statements against a series of downside future scenarios. *See* DX-65, DX-66, DX-67. One such test assumed that Parmalat's South American revenues fell to 50% of their 1998 levels in 1999 and totally disappeared in 2000. *See* DX-66 at BOFA-2049893. Even in such a downside scenarios, BoA's analysis indicated that Parmalat S.p.A. would be able to meet its obligations. *See* DX-66 at BOFA-2049896 (indicating that Parmalat S.p.A. would remain profitable through at least 2002 even if its South American revenues disappeared)

In addition to conducting these stress tests, Lau and Sala made a second due diligence trip to Brazil to assess first-hand Parmalat's performance in Brazil in the post-devaluation market. *Lau Testimony* ¶ 127. While there, Chairman Giovanni Grisendi described the various impacts of the Real devaluation, including a positive impact: inflation had rendered competitors vulnerable to acquisition by Parmalat and enabled Parmalat to raise prices on its products, which continued to sell steadily because staples such as milk remained necessities in a recession. *Lau Testimony* ¶¶ 127-128. In addition, even though the devaluation increased interest payments related to the dollar-denominated debt held by Parmalat's Brazilian subsidiaries, the dollar debt

14

cost was still cheaper than the cost of local Brazilian funding due to the high Brazilian interest rates. DX-70 at BOFA-2003371. With this evidence in mind, Lau and Sala continued to conduct due diligence to assess the viability of a future private placement. *Lau Testimony* ¶ 129.

Other senior managers from Parmalat S.p.A. and its Brazilian subsidiaries reaffirmed Grisendi's assessment of the Real devaluation's likely impact on Parmalat's Brazilian operations, including that PBrazil's profits would recover in dollar terms by 2000. *See* DX-70 at BOFA-2003370. Prior currency devaluations in Brazil made foreign milk imports more expensive but did not affect the cost of Parmalat's Real-based, domestic milk supplies. *Id.* In addition, recessions and high interest rates were expected to force competitors out of the market, which would allow Parmalat to increase both its market share and its prices. *Id.* Finally, Parmalat's managers anticipated that the Brazilian government would re-inflate the economy by expanding the money supply. *Id.* The outlook for Parmalat's Brazilian operations thus seemed positive. *Id.* at BOFA-2003372; *Lau Testimony* ¶ 129.

Based on the positive outcome of the stress tests and the information gathered in the due diligence trip to Brazil, members of the Private Placement Group continued discussing the details of the PBrazil transaction, performing their due diligence based on an analysis of Parmalat S.p.A.'s audited financial statements and other publicly available information, and began working with Parmalat on drafting an offering memorandum. *Lau Testimony* ¶¶ 101-102.

After it was distributed, potential investors began to review the proposed transaction and conduct their own due diligence. *Lau Testimony* ¶ 104. The investors' due diligence concentrated on Parmalat S.p.A., which they viewed as the relevant credit. *See Lau Testimony* ¶ 72                     Throughout the

15

Summer of 1999, the Private Placement Group responded to investor questions on Parmalat's behalf, which almost uniformly focused on Parmalat S.p.A. *See, e.g., Lau Testimony* ¶ 104; DX-77. The Private Placement Group arranged for investors to attend a due diligence trip in Italy in September. *Lau Testimony* ¶¶ 104-105. Fitting with their view of the relevant credit, the investors turned down a due diligence trip to São Paulo to meet with PBrazil management. *Lau Testimony* ¶105.

BoA's credit department engaged in an independent, extensive due diligence analysis of the various iterations of the PBrazil Transaction. After reviewing the final transaction structure and the various sources of repayment, David Chalk approved the Credit Approval Memoranda ("CAMs") for both BoA's purchase of $15 million of FHL notes, and BoA's purchase of $150 million of DHL notes. *Chalk Testimony* ¶¶ 62-68                    In addition, Rob Thomson, the Head of BoA's EMEA Trading Credit Administration, approved BoA's extension of credit pursuant to the FHL Swap Agreement. *Chalk Testimony* ¶ 61

**E.    Valuations Of Parmalat's Brazilian Operations.**

Two separate valuations of Parmalat's Brazilian operations were performed in the second half of 1998.

BoA's Private Placement Group viewed these valuations as data points in negotiating the terms of the PBrazil transaction and performing its due diligence. *Lau Testimony* ¶¶ 115-117. What was more important to Lau in terms of his confidence in the transaction were his visits to Brazil in late 1998 and early 1999, his numerous meetings with Brazilian upper management, and Parmalat's willingness to provide the Put and Guarantee for the PBrazil shares. *Id.* ¶¶ 118-129. Although these valuations helped substantiate the commonly held view that Parmalat was an up-and-coming operation in Brazil,[8] Parmalat S.p.A.'s agreement to buy the shares of PBrazil at a price consistent with the previous valuations was the strongest point in favor of this transaction and minimized, if not eliminated, the potential Brazilian country risk that would otherwise exist. *Id.* ¶¶ 104-108; 116.

--------

In fact, the PBrazil transaction was structured to eliminate the equity risk in Brazil, given the volatility in the market, and replace it with credit risk of Parmalat S.p.A. *Lau Testimony* ¶¶ 104-108. As a result, the only party with an interest in the implied value of the PBrazil shares was BoA itself, which held the equity upside in the transaction through its ownership of the Class B Notes.                    *Lau Testimony* ¶¶ 130-133.

## F.      Efforts To Extend The PBrazil Transaction.

By the summer of 2002, it appeared that an IPO of the Brazilian subsidiary was unlikely to occur by the end of 2003, given the state of Brazil's equity markets at the time. *Chalk Testimony* ¶ 93. Parmalat began to look into options for extending the transaction. Consistent with this desire, BoA reached out to the Noteholders, on behalf of Parmalat, to reach an extension of the PBrazil transaction. *See* DX-202; *Johnson Testimony* ¶¶ 94-96. The FHL and DHL Directors were informed of this plan, *see* DX-202, and no objections were raised.

The extension of the PBrazil transaction did not occur in mid-2002 because the Noteholders did not want to extend the transaction 18 months prior to its scheduled repayment. *See Johnson Testimony* ¶ 96; *McCormick Dep. at* 3645:14-3646:21. Although the PBrazil transaction was not extended, Parmalat and BoA continued to pursue a transaction that would permit Parmalat to extend the terms of the Swap Agreements. This effort resulted in the Cur Holdings transaction.

---

[9] Three of the directors of FHL and DHL also served as directors of Cur. DX-218.

In early 2003, Parmalat contacted the Private Placement Group about agenting another private placement, which was circled in September 2003 when investors agreed to invest $165 million in the transaction. *Johnson Testimony* ¶ 97, 99. Given the subsequent events at Parmalat, however, this transaction never closed. *Id.* ¶ 100.

## ARGUMENT

BoA respectfully submits that the facts and evidence submitted by both parties demonstrate that this case can be resolved without a trial. BoA first addresses Plaintiffs' damages – or, more accurately, lack thereof – because this case can be disposed of on this basis alone. All of the significant facts regarding Plaintiffs' damages theory have been stipulated by the parties. Ultimately, Plaintiffs have not – and cannot – prove damages under any applicable measure. No evidence presented at trial will alter this.

Even if the damages issue were not dispositive, Plaintiffs cannot prove that Bank of America knew or should have known about Parmalat's fraud. This failure of proof not only undercuts the fundamental theme of their case, but also proves the inadequacy of their individual causes of action. In addition, New York's blue sky law – the Martin Act – preempts all of Plaintiffs' claims with the exception of fraud. Finally, Plaintiffs' specific causes of action are insufficient for a variety of additional reasons, including that BoA did not make any affirmative misstatements or omit any facts the directors would have considered material, that BoA did not

19

owe the SPVs a fiduciary duty, and that – even under their tenuous damages theory – the SPVs could not have been damaged by any conduct that occurred after the transaction closed.

## I. THE SPVS CANNOT PROVE THAT THEY SUFFERED ANY LEGALLY COGNIZABLE DAMAGES.

Every plaintiff must prove damages. *Okraynets* v. *Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 444 (S.D.N.Y. 2008). Monetary damages must be proven to a reasonable certainty and may not be speculative. *Id.* While the SPVs have five remaining claims, *see generally In re Parmalat Sec. Litig.*, 477 F. Supp. 2d 602, 608 (S.D.N.Y. 2007), the stipulated facts and evidence show that the SPVs do not have cognizable damages under any of the relevant damages standards and, therefore, judgment for BoA should be granted.

### A. The SPVs Suffered No Out-Of-Pocket Losses.

The SPVs' claims for fraud, negligent misrepresentation and breach of fiduciary duty[10] are all subject to the "out-of-pocket" rule. *In re Eugenia Vi Venture Holdings, Ltd. Litig.*, No. 05 CIV 5277(DAB), 2008 WL 5274578, at *13 (S.D.N.Y. Dec. 15, 2008); *Creative Waste Mgmt.* v. *Capitol Envtl. Servs.*, 495 F. Supp. 2d 353, 361 (S.D.N.Y. 2007). To recover, the SPVs must prove actual pecuniary losses. *Lama Holding Co.* v. *Smith Barney Inc.*, 88 N.Y.2d 413, 421 (N.Y. 1996). Plaintiffs cannot make the required showing for the simple reason that they incurred no out-of-pocket losses.

The only parties with money at risk in the PBrazil transaction were BoA and the other Noteholders. The flow of transaction funds was as follows:

---

[10] Plaintiffs' breach of fiduciary duty claim clearly sounds in fraud and fraudulent inducement. *Compare Compl.* ¶¶ 199–206, *with id.* ¶ 229. The amount of recoverable damages therefore should be limited in the same fashion as the fraud claim. Even were that not the case, the only other recovery available under New York law for breach of fiduciary duty would be lost profits. *See Am. Fed. Group, Ltd.* v. *Rothenberg*, 136 F.3d 897, 907 (2d Cir. 1998). The parties have stipulated that neither FHL nor DHL ever had any expectation of profit. *Stipulation* ¶ 217.

- A $300 million payment wired by BoA and the other Noteholders directly to PBrazil in December 1999. *See* DX-111; DX-116.

-

-

Out-of-pocket damages are limited to the amount "necessary to restore a party to the position it occupied before commission of the fraud." *Eugenia*, 2008 WL 5274578, at *14.

Thus no damages can be awarded to return the SPVs to the *status quo ante*. They are already there.

There is no possible justification for allowing the SPVs to claim as damages an amount they never possessed or had any legal right to claim. *See, e.g., Grede* v. *McGladrey Pullen LLP*, No. 08 C 2205, 2008 WL 4425447, at *8 (N.D. Ill. Sept. 26, 2008) (noting that a half-billion dollar damages claim was without adequate support where the party suing for that amount did

21

not lose, and was apparently never worth, the half-billion dollars claimed).[11]

### 1. Amounts Owed To Bankruptcy Creditors Are Not Out-Of-Pocket Losses Incurred By The SPVs.

Having suffered no pecuniary losses of their own, the SPVs' alleged damages are really based on the pecuniary losses of others, including BoA.

Yet the SPVs' potential liability to some or all of these asserted creditors is the damages theory they relied on when they filed their case, *see Compl.* ¶¶ 6, 10, 119, 195, and is the damages theory they are still advocating today.

---

[11] This point is illustrated by *Florida Department of Insurance v. Chase Bank of Texas National Association*, 274 F.3d 924 (5th Cir. 2001). In that case, an insurer executed a trust, with the defendant Chase Bank acting as trustee, for the purpose of selling insurance in California. The insurer funded the trust with a $5.4 million certificate of deposit that turned out to be worthless. When it became clear that the trust had no funds, the insurer was placed in receivership. The receiver sued Chase Bank for the $5.4 million for common law fraud and breach of fiduciary duty. The Fifth Circuit dismissed the case because the receiver had not proven cognizable damages – that is, that it had "lost assets" from the defendant's alleged tortious conduct. *See id.* at 936. The court recognized that the trust never actually had any money – explaining, "the start and end value of the trust was $ 0.00" – and thus the claim that it had "lost" $5.4 million was "not grounded in reality." *See id.* at 933-34. The court said that "[t]here is no reason that $5.4 million, an amount of money that never existed except in ink on the face of a piece of paper, bears any connection to anyone's actual damages." *Id.* at 934. Although in this case the $300 million transferred to PBrazil did exist, it was paid by BoA and the other Noteholders, not by FHL or DHL. Those funds do not bear any connection to any actual pecuniary loss suffered by the SPVs.

In other words, the SPVs' damages calculation tracks the claims of their creditors under the notes and Swap Agreements.

While this Court found the SPVs' allegations based on their obligations to creditors sufficient to withstand a motion to dismiss on standing grounds, *Parmalat*, 477 F. Supp. 2d at 608, they do not constitute cognizable damages.[13] A corporation's damages must be distinguished from those of its creditors, *see, e.g., In re Hampton Hotel Investors, L.P.*, 289 B.R. 563, 574 (S.D.N.Y. 2003), and this Court has already held that these Plaintiffs may not recover for alleged injuries to the Noteholders. *Parmalat*, 477 F. Supp. 2d at 608; *see also Bondi* v. *Bank of America Corp.*, 383 F. Supp. 2d 587, 594-95 (S.D.N.Y. 2005) ("*Bondi III*") (holding trustee may not sue for, and a company may not recover for, damages that were sustained only by the company's creditors).

Economic harm to a corporation – as opposed to its creditors – can occur through the dissipation of corporate assets, reduced income, or increased expenses. *See* J.B. Heaton, *Deepening Insolvency*, 30 Iowa J. Corp. L. 465, 483-84 (2005). The amount a company owes to

---

[13] The "injury" inquiry required under an Article III standing analysis is distinct from the question of damages. *See Jobe* v. *ATR Mktg., Inc.*, 87 F.3d 751, 753-54 n. 2 (5th Cir. 1996); *see also* 4 Restatement (Second) of Torts § 902, comment (a), p. 453 (1979) ("Damages flow from an injury."). Furthermore, the SPVs' allegations are no longer presumed true and the SPVs are no longer entitled to the benefit of any inferences in their favor. *Cf. Parmalat*, 477 F. Supp. 2d at 607. Allegations of injury do not prove – as the SPVs must now do – the existence of an actual pecuniary loss.

its creditors does not fall within any of those categories and is not a measure of corporate harm. *See id.* at 491-94; *see also Am. Tissue, Inc.* v. *Donaldson*, 351 F. Supp. 2d 79, 90 (S.D.N.Y. 2004) (company may not claim "money owed to creditors" as damages); *Hirsch* v. *Arthur Andersen & Co.*, 178 B.R. 40, 43 (D. Conn. 1994) ("[T]he extent of the [debtor's] unpaid obligations" in bankruptcy are not damages incurred by the debtor); *Hirsch* v. *Arthur Andersen & Co.*, 72 F.3d 1085, 1091 (2d Cir. 1995) (affirming district court ruling that "[a]ny damages suffered in connection with [the overvalued assets purchased by the debtor] was ultimately passed on to the investors").

In the circumstances of this case, any damages were necessarily incurred by the SPVs' creditors, BoA and the Noteholders, not the SPVs themselves. The fact that the SPVs went into liquidation with outstanding obligations on the notes did not affect them in any way. Although insolvency may be a worse outcome than zero net worth for an entity that has a possible future, these SPVs had no possible future. Whether they closed their books in December 2003 with zero after paying off their creditors, or with unpaid obligations and a negative net worth, had no bearing on their prospects, which were naught in either case.

As this Court has recognized, at the moment a company's liquidation becomes inevitable, it is the company's creditors that bear the burden of any damages ostensibly suffered by the company. *See In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 576 (S.D.N.Y. 2007), *aff'd sub nom. Pappas* v. *Bank of America Corp.*, 309 Fed. App'x 536 (2d Cir. 2009), *petition for cert. filed*, 77 U.S.L.W. 3657 (May 18, 2009). If liquidation is inevitable, then a company has "nothing to lose." *Id.* Put another way, if "liquidation is the inevitable best case, the corporation

is defunct. . . . All of [the] attributes of corporate life are gone, and once again we are adding insult only to death." Willett, *The Shallows of Deepening Insolvency*, 60 Bus. Law 549, 566 (2005). To the extent anyone is damaged in the case of inevitable liquidation, it is "the beneficiaries of that liquidation – the creditors. The corporation is no more one of them than the deceased is a beneficiary at the reading of his own will." *Id.*

The SPVs' theory of damages reduces to the proposition that their actual liquidations are different from the liquidations that would have occurred had the PBrazil transaction gone according to plan. Of course, the only difference between the hypothetical liquidations and those that exist today are the losses suffered by BoA and the Noteholders. That difference is not damage to the SPVs.

### 2.    The SPVs Made No "Investment" Of Their Own.

The basic parameters of the transaction were established between the Noteholders

and Parmalat before the SPVs were even incorporated.[14]  The SPVs were merely a mechanism to allow the transaction – and only this transaction – to be carried out.

Beyond being erroneously premised on the SPVs' purported ability to have done something different with the $300 million, Plaintiffs' alternative theory also erroneously portrays the SPVs as the victims of the loss that resulted when Parmalat failed to honor its obligations. This theory assumes, incorrectly, that the shares of PBrazil belonged to the SPVs.

---

[14] The transaction was "circled" in August 1999.  DX-327.

Finally, the Trustee also held the physical certificates representing the PBrazil shares. *See* DX-293. As one would expect for mere pass-through entities, the SPVs retained neither possession of, nor any interest in, the PBrazil shares.

Given that the SPVs never: (a) contributed any assets to the PBrazil transaction; (b) retained any assets from the PBrazil transaction; (c) stood to gain from the PBrazil transaction; (d) bore any risk from the PBrazil transaction; or (e) had any control or discretion as to how the money provided by BoA and the other Noteholders was to be used, they cannot claim it as their own investment. *Cf. Grubb* v. *FDIC*, 868 F.2d 1151, 1161-62 (10th Cir. 1989) (individual purchasing stock through holding company was actual party at risk); *Walther* v. *Maricopa Int'l Inv., Corp.*, No. 97 Civ. 4816 (HB), 1999 WL 64280, at *2 (S.D.N.Y. Feb. 9, 1999) (actual purchaser was individual who contributed funds used by shell entities to make investment); *Levenfeld* v. *Boyd*, No. 02 C 4735, 2003 WL 22532801, at *5-6 (N.D. Ill. Nov. 6, 2003) (persons having money at risk are actual purchasers). It follows that any pecuniary loss stemming from the inability to sell the PBrazil shares was felt exclusively by BoA and the other Noteholders, and the SPVs cannot claim that pecuniary loss as their damages.

### 3.    Special Policy Considerations In This Case Preclude Any Finding Of Damages On Behalf Of These SPVs.

The object of any damages remedy is to compensate parties who suffered a real pecuniary loss – here, the investors (including BoA) who purchased the notes, and who made the interest payments (BoA alone) before Parmalat's default. To the extent any of the other note purchasers seek to hold BoA legally responsible for those losses, they have already sued BoA. *Stipulation* ¶¶ 245-248. They will not be significant beneficiaries of any damages award in this action, however, as most of any such award would go to entities who had nothing to do with the PBrazil transaction and who are only gambling on the outcome of this litigation.

It is not a proper use of judicial resources to entertain a liquidator's suit where such suit would "serve only to line the pockets of non-creditors, who stand in a position to receive payment from any recovery off-the-top." *In re Dublin Sec. Inc.*, 197 B.R. 66, 74 (S.D. Ohio 1996), *aff'd* 133 F.3d 377 (6th Cir. 1997).

Nevertheless, the SPVs are still including the claims of BoA and its affiliate Blue Ridge – with which updated interest accruals now total $242 million – in the "obligations" upon which their damages claim is premised.  BoA is thus not only being asked to compensate total strangers to the transaction, but to do so on the basis of inflated amounts reflecting what BoA itself lost.  Such a perverse result cannot be justified.

**B.**    **The SPVs Incurred No Benefit-Of-The-Bargain Damages.**

The measure of damages for the SPVs' breach of contract claim is the "benefit-of-the-bargain" principle, which seeks to give a plaintiff the profits it would have made if the contract

had been performed.  3 Dobbs, *Law of Remedies* 6 (2d ed. 1993).  The goal is to place the plaintiff as close as possible to the position it would have been in had the contract not been breached.

That BoA and the other Noteholders suffered losses, or have filed claims against the SPVs, does not amount to the loss of a benefit that should have accrued to the SPVs.

In addition, there was never any circumstance in which the SPVs could have benefited from any funds after the transactions were over.

Either way, the SPVs could not come out ahead of where they were at the outset given that they did not make any investment of their own or bear any risk in the transaction. *Stipulation* ¶¶ 187, 217-20; *see also Mayer Testimony* ¶ 9, 16.  Having never bargained for a benefit, they cannot now claim the benefit of the bargain.

**C.    The SPVs Cannot Prove Damages In Connection With Their Unjust Enrichment Claim.**

Nor can Plaintiffs prove cognizable damages on their unjust enrichment claim. "[D]amages for unjust enrichment are calculated by reference to the actual value of the benefit to the defendant." *Precision Testing Labs., Ltd.* v. *Kenyon Corp. of Am.*, No. 84 Civ. 5424 (IBC),

1988 WL 34825, at *2 (S.D.N.Y. Apr. 6, 1988). Plaintiffs originally premised their unjust enrichment claim on the allegation that proceeds of the PBrazil transaction were somehow transferred back to BoA after they had been received by PBrazil. *See Parmalat*, 477 F. Supp. 2d at 613; *Compl* ¶¶ 90, 100, 131, 156, 178(a), 186(a), 247.

But the fees BoA obtained in the PBrazil transaction pale in comparison to the more than $150 million it has lost. Under no circumstances can it be said that BoA was "enriched" in the transaction.

the SPVs did not make those payments, and therefore, Plaintiffs may not claim restitution based on them. *See Clark* v. *Daby*, 300 A.D.2d 732, 732-33, 751 N.Y.S.2d 622, 624 (N.Y. App. Div. 2002).

## II.    THE SPVS' FRAUD AND NEGLIGENT MISREPRESENTATION CLAIMS FAIL BECAUSE, AMONG OTHER REASONS, THERE IS NO EVIDENCE THAT BOA KNEW OR SHOULD HAVE KNOWN ABOUT PARMALAT'S FRAUD.

To establish a claim for negligent misrepresentation, the SPVs must prove, *inter alia*, that: (1) BoA had a special relationship with the SPVs sufficient to impose a duty of correct disclosure; (2) BoA made a false representation that BoA "should have known" was false; and (3) the SPVs reasonably relied on BoA's false representation to their detriment. *See Henneberry* v. *Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 450-51 (S.D.N.Y. 2006).[18] To establish a cause of action for fraud, the SPVs must not only prove the existence of a material, false representation

---

[18] As this Court previously noted, the SPVs have implicitly consented to the application of New York law through their nearly exclusive reliance on New York law in their motions practice. *See In re Parmalat*, 477 F. Supp. 2d 602, 609 n.42 (S.D.N.Y. 2007); *see also FHL/DHL's Memo. in Opp. to BoA's Motion to Dismiss* at 22-34 (advocating that New York law governed each of the SPVs' common law causes of action).

and reasonable, detrimental reliance, but also that: (a) BoA "knew" the false representation to be false; and (b) BoA "intended" to defraud the SPVs. *Id.* at 454 n.17. The SPVs cannot come close to establishing any of the elements for either claim.

### A. The SPVs Cannot Show That BoA Either Knew Or Should Have Known About Parmalat's Fraud.

A negligent misrepresentation claim requires a showing that BoA failed to use the level of care generally exercised in its field. *Denney* v. *Jenkens & Gilchrist*, 230 F.R.D. 317, 336 (S.D.N.Y. 2005) (question is whether the defendant departed from "the standard of care of a practitioner in his or her field"); *see also Guaman* v. *Industry City Management*, 40 A.D.3d 698, 699 (N.Y. App. Div. 2007)). A fraud claim requires a showing that BoA acted with "actual knowledge of falsity or reckless disregard of the truth." *Pollio* v. *MF Global, Ltd.*, 608 F. Supp. 2d 564, 572 (S.D.N.Y. 2009); *see also High View Fund, L.P.* v. *Hall*, 27 F. Supp. 2d 420, 427 n.3 (S.D.N.Y. 1998).

"Reckless disregard" should not be confused with negligence, and requires much more than accusations that the defendant "should have known." As the Second Circuit explained:

> By reckless disregard for the truth, we mean conscious recklessness—*i.e.,* a state of mind *approximating actual intent, and not merely a heightened form of negligence.* In elaborating as to what may constitute recklessness . . . we have referred to conduct that at the least is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that *the danger was either known to the defendant or so obvious that the defendant must have been aware of it,* or to evidence that the defendants failed to review or check *information that they had a duty to monitor,* or ignored *obvious* signs of fraud, and hence should have known that they were misrepresenting material facts.

*South Cherry St., LLC* v. *Hennessee Group LLC*, 573 F.3d 98, 108 (2d Cir. 2009) (quotation marks and citations omitted; emphases in original). Relevant here, allegations that the defendant "ignored clear red flags" do not establish scienter for a fraud claim. *See id.* at *38-40.

### 1.    BoA Did Not Know About Parmalat's Fraud.

The SPVs originally premised their case on the allegation that BoA *actually knew* about Parmalat's massive fraud. *See, e.g., Compl.* ¶¶ 5, 59, 76, 90, 94, 116-17, 121, 123, 137, 197, 200;                                          That allegation was without evidentiary support when made, and has since been shown to be demonstrably false.

BoA's decision to invest ever-increasing amounts of its own capital in Parmalat is dispositive of the SPVs' unfounded accusations of actual knowledge. Second, even were the Court inclined to accept the SPVs' arguments that defy economic reason, ten current or former BoA employees – all of whom were directly involved in BoA's transactions with Parmalat – either will testify or have testified that they had no idea that Parmalat was committing fraud and/or was insolvent. *See e.g., Lau Testimony* ¶ 47; *Chalk Testimony* ¶ 41; *Johnson Testimony* ¶ 31. No person has testified otherwise.

### (a)    BoA Believed In Parmalat.

BoA                                                                         never accounted for more than 10% of Parmalat's outside financing, DX-317.

BoA's exposure to Parmalat thus increased every year from 1998 to 2003:



DX-318.

This simple fact – that BoA continuously invested in Parmalat from 1998 to 2003 – is fatal to the notion that BoA knew the truth about Parmalat's financial condition.  As the Court of Milan recently put it:

> Not only is it not true that [BoA] progressively guaranteed itself with regard to the exposure accumulated in the past; but the exact opposite is true.  *After having carried out some typical commercial bank transactions, [BoA] decided to directly assume Parmalat risk, expanding and allowing its exposure to increase from year to year. . . .*
>
> [A]t the time of Parmalat's default, [BoA] was exposed for more than USD $300 million.  This is frankly a strange situation . . . for a party which [is said] to have known that it was dealing with a group that had been virtually bankrupt for at least ten years. . . .
>
> As we saw, BofA considered Parmalat to be one of its best clients and it trusted in it so much as to justify an exposure guaranteed only by Parmalat S.p.A. for more than USD 300 million, which could have potentially risen to 500 . . . .  This figure places BofA among those credit institutions – especially the foreign institutions – which are most committed with the [Parmalat] group.

DX-310 at 316-23 (emphasis in original).  The Milan Court's determination that BoA did not have actual knowledge of Parmalat's true financial condition stands as *prima facie* proof that BoA believed Parmalat to be creditworthy.  *A.I. Trade Fin., Inc.* v. *Centro Internationale Handelsbank*, 926 F. Supp. 378, 387 (S.D.N.Y. 1996) ("Rule 201 permits a court to take judicial notice of a foreign judgment. . . .  Once a foreign judgment is admitted, it is treated as prima facie evidence of the facts and opinions contained therein . . . .").[19]

---

[19] The Court of Milan's case is also highly persuasive authority given the similarity of the records at issue.  *See Miller* v. *Steinbach*, 268 F. Supp. 255, 277 (S.D.N.Y. 1967) (finding conclusion reached by court in another jurisdiction on same facts "is most persuasive").

In any event, juxtaposing the SPVs' allegations with reality creates more than just a "strange situation." The two are entirely irreconcilable: no financial institution would extend increasing amounts of credit to a borrower known to be hopelessly insolvent. *Cf. Campo* v. *Sears Holdings Corp.*, No. 06 Cir. 4053 (LAK), 2009 WL 2151289, at *7-8 (S.D.N.Y. July 21, 2009) ("[I]t defies logic and common sense to suggest" that parties will act against their economic interest.); *Feiner Family Trust* v. *Xcelera.com, Inc.*, No. 07 Civ. 1914 (RPP), 2008 U.S. Dist. LEXIS 102019, at *16-17 (S.D.N.Y. Dec. 15, 2008) (claim that defendants would knowingly take losses "defies economic reason") (internal quotation and citation omitted).

While BoA's credit decisions stand as the best evidence of what BoA believed about Parmalat, the rest of the record dictates this same conclusion. For example:

- **David Chalk**, the BoA credit officer who approved BoA's transactions with Parmalat, including the PBrazil transaction, will testify as follows:

    During the course of the Bank's relationship with Parmalat, I never suspected that Parmalat or its managers were engaged in a massive fraud, or that Parmalat's financial statements were fraudulent. If I had, I obviously never would have approved any extension of credit to Parmalat. Parmalat appeared to be a financially healthy and successful Italian company, with strong branding and a diversified product base. As a result, I approved several different transactions between the Bank and Parmalat.

    [As of December 15, 2003] we did not know of the massive fraud at Parmalat and still had confidence that Parmalat would resolve what we believed were accessibility issues with its liquid assets. Had we believed that Parmalat did not have the ability to repay its obligations to the Bank, we would not have extended this additional $5 million in exposure on December 17.

*Chalk Testimony* ¶¶ 41, 106; *see also id.* ¶ 10.

- **Gregory Johnson**, the former head of BoA's international Private Placement Group who worked on all seven of Parmalat's placements with BoA, will testify as follows:

    From my first contact with Parmalat in 1996 until December 2003, I believed Parmalat to be a growing, thriving going concern with much potential. I had no indication that Parmalat was perpetrating a fraud or that its financial condition was anything other than Parmalat represented it to be. I am not aware of anyone at Bank of America who had any suspicions about Parmalat's true financial state

prior to the company's collapse in December 2003. I never believed, nor did any colleague I know of, that any of Parmalat's offering materials or any other information Parmalat provided to investors in connection with BAS-agented transactions contained misrepresentations or were otherwise untrue.

Ultimately, I believe that BoA, including BAS, was the victim of a well-orchestrated fraud perpetrated by Parmalat and its senior management on the financial community. Parmalat's senior managers were very effective at what they did – duping the international financial community into providing them billions of dollars of financing. They were consummate liars; they always replied to our questions quickly and with rational and believable responses, which, as it turns out, were complete fabrications. It was painful when the truth came out, but I did not know of the fraud and had no means to expose it.

*Johnson Testimony* ¶¶ 31, 109; *see also id.* ¶¶ 44, 46, 101.

- **Michael Lau**, the former BoA employee who was the lead Bank officer in marketing the PBrazil transaction to the Noteholders, will testify as follows:

  Through my time working on Parmalat transactions, and up to the revelation of the Parmalat fraud in December 2003, I had absolutely no idea that any information contained in the PPMs for any of the Parmalat transactions was inaccurate. As head of the private placement team that was marketing these transactions, it was my belief that the information we passed from Parmalat to the investors was accurate. I never would have knowingly misled investors. Doing so would not only have violated numerous Bank policies and my professional standards, it would have tarnished the Bank's and my personal reputation in the industry. No single transaction, no matter how lucrative, is worth that.

  Looking back, it is now clear that Parmalat and its senior management lied to all of us, repeatedly, in transaction after transaction. Unfortunately, I, the Bank, the sophisticated private placement investors, and, indeed, the entire financial community, were all deceived by Parmalat's lies.

*Lau Testimony* ¶¶ 47-48; *see also id.* ¶¶ 45, 52, 63.

- **Patrizia Medvedich**, a former employee who worked in BoA's Milan office and who prepared several Parmalat Credit Approval Memoranda, testified as follows:

  Q. At any time prior to Parmalat's collapse, did you have knowledge that Parmalat's financial statements were false?

  A. No, I didn't.

  Q. At any time prior to Parmalat's collapse, did you have any knowledge that Parmalat was committing a fraud?

  A. I did not.

*Medvedich Dep.* at 472:10-23.

- **Antonio Luzi**, the BoA employee who succeeded Medvedich in the Milan office and prepared several Parmalat Credit Approval Memoranda, testified as follows:

  Q. . . . [D]id you have any suspicion whatsoever that there was something wrong at Parmalat?

  A. No, no suspicion whatsoever.

  Q. Notwithstanding everything that's happened, everything we've showed you, even in looking back, nothing looked suspicious to you?

  A. No. I can tell you that I have looked at this many times and I always arrived to the conclusion that I couldn't do anything different from what I did to understand that the company was bankrupt, just as anybody else in the market.

*Luzi Dep.* at 149:4-15; *see also id.* at 89:22-90:18.

- **Stephen Mernick**, a senior BoA credit officer who supervised the Parmalat account from the end of 2002 until Parmalat's collapse, testified as follows:

  Q. Did you ever look into whether or not – did you ever investigate whether or not it was true that Parmalat was maintaining these high cash levels to maintain some financial flexibility?

       \* \* \*

  A. I understood that being the reason for the large cash balances. That seemed to be a reasonable justification.

*Mernick Dep.* at 484:22-485:18.

- **William White**, a senior member of BoA's Private Placement Group and the group's current head of sales, testified as follows:

  Q. Did you do anything to verify the existence of those highly liquid, short-term, high-quality investments?

  A. No, we had no reason to doubt the veracity of that information. We had the audited statements from Deloitte & Touche. We had representation from the company about how those accounts were kept. And we satisfied ourselves that their statements were true and accurate.

       \* \* \*

  . . . We believed [in November 2003] that while the company could be downgraded, we felt that it had sufficient liquidity to meet its near term obligations and that it was more of a temporary financial management problem than it was a fundamental business problem.

*White Dep.* at 133:17-134:9, 221:9-13.

- **Colin McClary**, a member of the BoA Private Placement Group working on the PBrazil transaction, testified as follows:

    Q. Did you ever ask why there was that difference?

    A. Yes, investors asked me that question, they asked the question – the company that question many times, and again, it's – the response from the  company was that the company would buy back its debt from time to time, particularly the shorter maturities, and that's why the debt listed on Bloomberg was greater than the debt listed on their balance sheet.

    Q. Did the bank do anything to verify that?

       * * *

    THE WITNESS: No. It was – investors looked  - you know, trusted the company on their response, and then its – also they would reconcile that to the company's audited financial statements. You know, debt is something that should be easily counted up and reconciled, and so it was  not – investors did not, to my – my dealings with them, they never went beyond that question and the company's response.

       * * *

    Q  And the bank wasn't concerned at all?

       * * *

    THE WITNESS: No, I was not concerned based on the company's response and the audited financial statements."

*McClary Dep.* at 142:5-143:8.

- **Joshua Fiedler**, the junior member of the BoA Private Placement Group working on the PBrazil transaction, testified as follows:

    Q. So you were always satisfied with the answers provided by Parmalat?

       * * *

    A. Being that they came from the most senior officers of the organization, I was satisfied that those answers were sufficient, true and correct.

       * * *

    Q. And you were satisfied?

    A. And I can't recall a specific instance where I was not satisfied with the answer.

       * * *

    Q. Did you ever attempt to reconcile what you were told by the company beyond looking at the financial statements?

       * * *

39

THE WITNESS: Beyond direct inquiry to them and beyond reviewing the financial statements, no.

      * * *

Q. And what direct inquiry did you make to them?

A. The direct inquiry would consist of, but not limited to, the items that you would see in the investor due diligence questions that were presented to the company.

Q. Were you always comfortable with the due diligence you engaged in when it was complete?

THE WITNESS: Yes. Because during the due diligence sessions, investors had two full days, or thereabouts, to engage in conversation and inquiry with management. They had an opportunity to talk with the CFO, CEO, various plant managers, various managers that were on the finance team, and have unrestricted access to the company. . . .

*Fiedler Dep.* at 49:23-50:18, 237:10-238:9.

- **Louis Sampanis**, a former employee who worked in BoA's Private Placement Group on Parmalat's first few private placements, testified as follows:

    Q. While you were an employee of Bank of America, did you have any knowledge that Parmalat insiders were perpetrating a financial fraud?

    A. No. There was never any indication whatsoever in our dealings with Parmalat that anything unusual or amiss was going on at the company.

    Q. And during the period after your employment at Bank of America until the period of December 2003, did you have any knowledge that Parmalat insiders were perpetrating a financial fraud?

    A. No.

*Sampanis Dep.* at 233:25-234:15.

Ten different current and former BoA employees have thus given sworn testimony that

they believed Parmalat's financial condition to be what Parmalat claimed it to be.[20] This

---

[20] The unequivocal testimony by BoA employees is buttressed by Fausto Tonna – Parmalat's longtime CFO – who testified during the Milan criminal proceedings (in which Tonna appeared as a prosecution witness) that:

    Q. Listen, with reference to the matter of the perception of Parmalat's situation . . . did you ever speak with Mr. Sala or with other Bank of America executives about Parmalat's actual situation or the financial problems you were having?

    A. No, I never spoke directly, no.

*(Footnote Continued)*

includes the individuals in BoA's Milan office who performed the periodic review of Parmalat's financials (Medvedich and Luzi); those in London responsible for overseeing the Parmalat account (Chalk and Mernick); and the U.S. Private Placement Group (Johnson, Lau, White, McClary, Fiedler and Sampanis). There is no evidence in the record that could possibly rebut the combined weight of this testimony and BoA's actions in extending credit to Parmalat.

### (b)    BoA Believed In The PBrazil Transaction.

A frequent refrain of the SPVs is that BoA specifically knew that the PBrazil transaction could not succeed, either because it knew that an IPO of Parmalat's Brazilian operations would never occur, or because it knew that Parmalat as a whole was incapable of honoring the Guarantee. *See, e.g., Compl.* ¶¶ 5, 76, 90, 95-97, 178, 186, 197, 201, 203-04;

This is false. After extensive due diligence and analysis, BoA concluded that Parmalat was creditworthy and capable of covering its obligations under the Guarantee.

*Cf. In re Parmalat Sec. Litig.,* 414 F. Supp. 2d 428, 435 n.31 (S.D.N.Y. 2006) (noting that the fact that the PBrazil transaction "involved a significant risk for BoA" "casts doubt on whether BoA actually designed the transaction as [class] plaintiffs have alleged").

The SPVs' claim that BoA knew the PBrazil shares to be "overvalued" and that Parmalat would never be able to conduct a public offering of its Brazilian operations, *Compl.* ¶¶ 76(i), 96; is equally false.

---

DX-301 at 96-97; *see also id.* at 108 (Tonna never discussed using the 1999 Brazil restructuring to clean up Parmalat's balance sheet with anyone from Bank of America);

This was a significant feature of the transaction that had been extensively negotiated with Parmalat, and BoA fully expected both that an IPO would occur and that it would cash in on the equity upside. *Lau Testimony* ¶¶ 89, 97, 111, 130-33; *Johnson Testimony* ¶ 91; *Bouhadiba* at 260:13-19; *McCormick 30(b)(6) Dep.* at 4050:7-4051:14. That belief was based on, among other things, first-hand observations made during BoA's due diligence visits to Parmalat Brazil. *Lau Testimony* ¶¶ 118-33; *Fiedler Dep.* at 301:16-302:1; *Chalk Testimony* ¶ 82. Indeed, Mike Lau believed so strongly that there would be a successful IPO with significant upside potential that he wrote three separate memoranda to his superiors urging that BoA should negotiate to obtain the equity upside and that the Private Placement Group be credited with a share of such upside if it occurred. *Lau Testimony* ¶¶ 130-33; DX-72; DX-79; DX-94. Such real-time enthusiasm for the transaction by BoA's deal team leader fatally undercuts any claim that BoA was "overvaluing" the PBrazil shares, for there could be no equity upside for BoA unless the PBrazil shares increased in value.

Furthermore, the value of the PBrazil shares was of no interest to any party other than BoA and Parmalat, as discussed *supra* at 13. It was certainly of no interest to the institutional investors who purchased the notes. From their perspective, the transaction was a straightforward Parmalat S.p.A. credit. *Schwartz Testimony* ¶¶ 9-34; *Lau Testimony* ¶ 72

They did not stand to benefit from any "equity upside" of a successful IPO, and their investment was guaranteed by Parmalat S.p.A in Italy. The investors understood this, as evidenced by the fact that they asked very few questions about Parmalat's Brazilian operations, declined an invitation to conduct a due diligence trip to Brazil, and never asked about or received the valuations prepared regarding PBrazil. *Lau Testimony* ¶¶ 97, 103-

42

06, 109;

Thus, even if the PBrazil shares were overvalued, that was of no consequence to anyone but BoA.

     **(c)**     **There Is No Evidence That Luca Sala Or Anyone Else At Bank Of America Knew That Parmalat Was Committing Fraud.**

(i)    Diversions Prove Only That Sala Was Stealing Money.

      (ii)    **There Is No Evidence That Sala's Diversions Were "Bribes From Parmalat."**

      (iii)   **None Of The Individuals Alleged To Have Received Funds From Sala Knew The Truth About Parmalat.**

(iv)    **If Sala Or Others Did Know The Truth About Parmalat, Then Their Knowledge Is Not Attributable To BoA.**

---

[23] Luzi gave the same testimony under oath in Milan. DX-308 at 131-32. Moreover, according to a document submitted as evidence *by Plaintiffs*, Luzi stated:

> When I accepted Sala's proposal, it was with the conviction, which I still have, of not doing anything criminal. In fact, I only thought that I was taking part *in an operation in potential conflict of interest with the bank for which I worked [i.e., BoA]*, not having any possibility of influencing the bank's approval mechanisms or negotiating with the Parmalat client.

PX-299 at P01473355 (emphasis added).

### 2.    BoA Had No Reason To Know The Truth About Parmalat's Financial Condition.

Just as they cannot show that BoA actually knew about Parmalat's fraud, the SPVs also cannot show that BoA *should have known* about the truth about Parmalat.

Assuming the SPVs are even entitled to proceed on a negligence theory,[24] their "should have known" argument also fails.

---

[24] "New York courts do not recognize a cause of action for negligent misrepresentation in the absence of some special relationship of trust or confidence between the parties," *Henneberry* v. *Sumitomo Corp. of Am.*, 415 F. Supp.
*(Footnote Continued)*

48

The SPVs cannot plausibly maintain that

BoA "should have" detected Parmalat's fraud when the entire market came to the same mistaken

conclusion that Parmalat was a thriving corporation.

(a)    **BoA Was The Victim Of Parmalat's Fraud.**

BoA was one of the largest

victims of Parmalat's fraud.

---

2d 423, 451 (S.D.N.Y. 2006), and "an arms-length commercial transaction, without more, does not give rise to a special duty," *id.* at 452. The SPVs' right to proceed on a negligence theory thus hinges on their claim that BoA owed them a fiduciary duty, *see Compl.* ¶ 217, which fails for the reasons discussed below.

Plaintiffs' negligence claim is also precluded by the transaction documents. Under the 1999 Note Purchase Agreements, the Noteholders are contractually barred from pursuing a negligence claim against any "representative" of the SPVs. *See* PX-24 ¶ 8.8 ("No director, officer or other representative of the Company shall be personally liable to any Noteholder as a result of an action or failure to act by such person in such capacity . . . unless such person acts fraudulently. . . ."); PX-25 ¶ 8.8 (same for DHL). Plaintiffs' own expert Patricia Caldwell will testify that BoA was a "representative" of FHL and DHL. *See* Caldwell Dep. at 265:5-22  The Liquidators should not have rights that are superior to the parties they claim to represent, and their negligence-based claim is thus barred.

For example, the financial statements that Parmalat published from 1996 to 2003 reflected the following positive results:

### Parmalat Finanziaria S.p.A.



### Parmalat S.p.A.





**(b)** **Parmalat's Fraud Fooled The World.**

DX-2 at BOFA-1857124-25 (May 1994 CAM noting both that Parmalat had

relationships "with the major banks in Italy, including a preferential one with Chase," and that in

1993 Parmalat raised about €220 million in equity and $585 million in debt).  By the time

Parmalat collapsed, it was very active in the capital markets.

51

Finally, Parmalat was the subject of a 2003 investigation by CONSOB, the Italian securities regulator, based in part on specific questions about discrepancies in Parmalat's reported debt levels, and CONSOB's investigation failed to discover Parmalat's fraud or its true financial condition. *See* DX-310 at 38-45, 141-43, 152.

Any argument that BoA failed to use the level of care exercised in its industry is thus belied by the fact that *the entire financial community* was duped by Parmalat's fraud.

The SPVs have not identified any information at BoA's disposal that was not also provided to the other financial institutions who collectively provided or arranged 90% of Parmalat's financing. Perhaps most importantly, there is no basis to allege that BoA had more access to Parmalat than CONSOB did while conducting its investigation. Once again, in the words of the Court of Milan:

_____

> Why should [BoA] have been upset, when CONSOB had carried out a careful inspection – and it had powers that were much broader than those of a contractual counterpart – and upon its conclusion had not only not made any charges . . . but had actually vouched for the reliability of [Parmalat's] accounting statement balances . . . . Let us be clear. This question is not intended as a direct criticism of the supervisory authority. But one certainly cannot point the finger at the financial institution that maintained business relations with the group, claiming . . . that merely by reading the financial statements one could predict the arcane mystery that was concealed in the Parmalat entries.

DX-310 at 325. Put another way, if BoA "should have" discovered the truth about Parmalat, presumably at least one of the hundreds of institutions and analysts that examined Parmalat's creditworthiness and financial situation on a continuous basis from 1990 through 2003 would have done so. But that is not what happened. As the Court of Milan found, "no one, not even CONSOB following its [] inspection, found elements of obvious falsehoods in [Parmalat's] balance sheet figures." *Id.* at 152.

### (c) BoA Reasonably Relied On Parmalat's Audited Financial Statements.

A mountain of evidence proves that BoA relied on Parmalat's audited financial statements. *See Lau Testimony* ¶¶ 11, 35-37; *Johnson Testimony* ¶¶ 39-40, 44, 48-49; *Chalk Testimony* ¶¶ 8, 15, 39-40, 114, 122

BoA employees conducted specific reviews of Parmalat's audited financial statements every time they were released and analyzed Parmalat's financials to determine if changes to BoA's view of Parmalat's financial situation were appropriate.

Parmalat's audited financials were also the basis of BoA's financial review undertaken in connection with its activities as Parmalat's placement agent, including BoA's efforts in connection with the PBrazil transaction. *Lau Testimony* ¶¶ 11, 35-36; *Johnson Testimony* ¶¶ 39, 48-49.

BoA's reliance on Parmalat's audited financial statements was manifestly reasonable. Audited financial statements accompanied by "clean" audit opinions – such as Parmalat's – carry several layers of assurance.

Given these layers of assurance, BoA was entitled to rely on Parmalat's audited financials.

Reliance on audited financial statements

is the industry standard, and that practice is followed by BoA, *Chalk Testimony* ¶¶ 39-40; *Lau Testimony* ¶¶ 35-36; *Johnson Testimony* ¶¶ 39-40,

Nor can it be said that there was any indication that Parmalat's audited financial statements were untrue or unreliable. While wholly false, the picture Parmalat presented was supported by real and substantial global operations.

As Greg Johnson will testify:

> I visited Parmalat's headquarters several times. Parmalat's operations were impressive. I saw firsthand that it maintained state-of-the-art facilities, manufactured milk through a unique and valuable process, produced yogurt, cheese, juice and other products, and distributed those products in innovative packaging with distinctive marketing. I also saw first-hand that Parmalat's products were on the shelves of stores around the world. For example, the store across the street from my office in New York sold Parmalat milk; a delicatessen I frequented in London sold Parmalat juice.

*Johnson Testimony* ¶ 45; *see also Lau Testimony* ¶¶ 119, 123. Parmalat's impressive real-world presence made its reported financial condition all the more plausible and its fraud all the more difficult to detect.

Finally, the complicity of Parmalat's auditors stood as an additional and nearly impenetrable obstacle to discovering Parmalat's fraud. As one of the investors in the PBrazil transaction put it:

### (d)    BoA Conducted Extensive Due Diligence On Parmalat.

BoA's reliance on Parmalat's financial statements was real, but it was further supported by its extensive due diligence beyond its analysis of Parmalat's financials. In fact, two separate groups within BoA conducted independent due diligence. *Chalk Testimony* ¶ 15; *Johnson Testimony* ¶¶ 41-42. BoA more than met the applicable standard of care.

### (i)    BoA Conducted Extensive Credit Due Diligence.

BoA added Parmalat as a client in 1994, when Parmalat appeared to be a strong, growing company. *Chalk Testimony* ¶ 9; DX-2 at BOFA-1857125. For example, BoA's first credit review of Parmalat noted that Parmalat possessed strong revenues, margins and profit. DX-2 at BOFA-1857126.

In the succeeding years, BoA's credit department conducted substantial and continuous due diligence on Parmalat. "The credit analyses and due diligence procedures are designed to allow [BoA] to determine the overall credit risk of a client and to provide financial services appropriate for that client and that risk profile." *Chalk Testimony* ¶ 12. Every year, BoA credit teams prepared an in-depth annual review of Parmalat and documented their findings in a Credit

Approval Memorandum (also known as Standard Credit Memoranda or "SCM"), that summarized the wide range of information on Parmalat collected and analyzed by BoA's Portfolio Management Group. *Chalk Testimony* ¶¶ 15-16; *see also, e.g.,* DX-9; DX-15; DX-32. The information considered during such annual reviews included, *inter alia,* Parmalat's financial statements; other publicly available information, such as credit rating agency and analyst reports; an assessment of Parmalat's management and business strategy; and forecasts of Parmalat's future performance. *Chalk Testimony* ¶ 15

In addition to annual reviews, the Portfolio Management Group also prepared CAMs for each proposed Parmalat transaction. *Chalk Testimony* ¶ 17; *e.g.,* DX-2, PX-116; PX-117; DX-18. The transaction CAMs contained updated information about Parmalat, updates on BoA's exposure to Parmalat, a description of the transaction, and the expected risk-adjusted rate of return. *Chalk Testimony* ¶ 17.

A fundamental consideration in each CAM – both for transactions and annual reviews – was the Portfolio Management Group's risk rating for Parmalat. *Chalk Testimony* ¶¶ 20-21. Such ratings were under constant review throughout the approval chain, *id.* ¶¶ 22-23, by an independent review department, *id.* ¶ 24, and by federal regulators, *id.* At the time of the PBrazil transaction, Parmalat's risk rating was a 5 (*i.e.,* BoA's lowest investment-grade rating), reflecting BoA's view that Parmalat was an investment-grade credit. *Chalk Testimony* ¶ 28. Parmalat's risk rating improved over time as a result of positive changes in Parmalat's audited financial statements, additional publicly available information, and other third party analyses of Parmalat. *Id.* ¶ 30. These changes were eventually reviewed and approved by senior credit officers in London. *Id.; see also, e.g.,* DX-221.

Beginning in 2002, BoA's credit group also conducted what were known as "Key Risk Reviews." *Chalk Testimony* ¶¶ 26, 31-33. The Key Risk Review process stood as another independent review of credit issues relating to BoA's largest exposures. *Id.* ¶¶ 26, 31. From January 2002 through July 2003, Parmalat was among the names reviewed by BoA's most senior managers. *Id.* ¶ 32; DX-181. Parmalat's risk rating was found to be appropriate every time. *Chalk Testimony* ¶ 33.

Other aspects of BoA's credit due diligence on Parmalat included:

- 

- 

Finally, as a supplement to its internal analysis, the Portfolio Management Group reviewed credit measures provided by a third-party vendor known as KMV.[29] *Chalk Testimony* ¶ 37. KMV's ratings for Parmalat always equated to investment grade, with KMV often showing Parmalat as better rated than did BoA. *Id.*; *see also* DX-159, DX-200.

### (ii)    BoA Simultaneously And Separately Conducted Extensive Private Placement Due Diligence.

---

[29] Using KMV ratings in this manner is also a standard industry practice. KMV currently describes itself as:

> [T]he world's leading provider of quantitative credit analysis tools to lenders, investors and corporations. . . . KMV products are used by more than 2,000 leading commercial and investment banks, insurance companies, money management firms, and corporations in over 80 countries. Our products and services are used by most of the 100 largest financial institutions in the world.

Http://www.moodyskmv.com/about/index.html (last visited Aug. 26, 2009). The KMV product used by BoA – the Expected Default Frequency ("EDF") credit measure – has been used by the credit industry since the late 1980s. *Id.*

For every Parmalat private placement, BoA's Private Placement Group undertook due diligence separate from the extensive and ongoing due diligence performed by the credit department. *Johnson Testimony* ¶¶ 32-52; *Lau Testimony* ¶¶ 7, 10-14, 33-41. The purpose of private placement due diligence is to evaluate the proposed transaction and the proposed issuer to assess the viability of bringing the transaction to market. *Lau Testimony* ¶ 9; *Johnson Testimony* ¶ 32.

Private placement due diligence on Parmalat was quite extensive and involved an independent review of Parmalat's audited financials, visits to Parmalat's facilities both in Italy and abroad, meetings with Parmalat's managers both in Italy and abroad, and the collection and review of publicly available information, such as S&P ratings, analyst reports and information about Parmalat's capital markets activity. *Lau Testimony* ¶¶ 30-74, 94, 99-129; *Johnson Testimony* ¶¶ 34-52;

BoA focused on Parmalat S.p.A. as the credit because it provided a guarantee in all but one of the private placement transactions.

One goal of BoA's private placement due diligence was to assist Parmalat in preparing the private placement memorandum ("PPM") distributed to potential investors. *Johnson Testimony* ¶ 53; *Lau Testimony* ¶¶ 42, 54-56. Every PPM that was distributed to investors contained information from Parmalat and was expressly approved by Parmalat. *Johnson Testimony* ¶¶ 54-56. The Private Placement Group's due diligence – including its analysis of financial statements and other public information, and conversations with Parmalat's managers – confirmed its belief that the contents of Parmalat's PPMs were true and accurate. *Johnson Testimony* ¶ 31.

59

### (iii)    The Private Placement Investors Also Conducted Due Diligence.

Once the PPM was circulated to potential investors, investors began their own, independent due diligence. *Johnson Testimony* ¶ 59; *Lau Testimony* ¶ 42. Investors generally reviewed and analyzed the public information available on the issuer, including SEC filings, analyst and credit ratings agency reports, trade publications, economic forecast reports on the major markets in which the issuer operated, and news reports on the company. *Johnson Testimony* ¶ 14;

In connection with all of the Parmalat private placements, investors were given the opportunity to meet in person with Parmalat's senior managers and tour the company's facilities. BoA facilitated these investor due diligence trips. *Johnson Testimony* ¶ 61; *Lau Testimony* ¶¶ 42, 48. Through this process, investors had the opportunity to put any questions they wanted directly to Parmalat's senior managers. *Johnson Testimony* ¶¶ 62-63; *Lau Testimony* ¶ 42, 48.

The private placement investors are among the most sophisticated in the world. *Lau Testimony* ¶ 10. That those investors also did not detect Parmalat's fraud shows that where a company's managers and external auditors conspire together, there is little to no hope of uncovering their fraud through due diligence.

### (e)    The SPVs' Attempts To Discredit BoA's Due Diligence Fail.

Ultimately, the SPVs are left to attack the quality of BoA's due diligence and to argue that BoA was somehow derelict in its evaluation and consideration of the PBrazil transaction. This attack fails because it is based on a fundamental mischaracterization of the nature of the transaction and accepted industry practice.

First, the SPVs' arguments regarding the importance of a potential IPO in the PBrazil transaction ignore the basic economics of the transaction.

In fact, the transaction was expressly structured to eliminate any PBrazil risk, including any risk inherent in the value of the PBrazil shares.

Finally, no party actually investing its own funds in the transaction, including the undisputedly sophisticated private placement investors, considered the transaction as entailing PBrazil risk of any kind. *Lau Testimony* ¶¶ 100, 104; DX-88, DX-117, DX-149

Second, the SPVs' arguments that BoA was derelict by not analyzing the ability of PCFL to cover the Put also ignore the basic economics of the transaction. That PCFL could not of its own accord cover the Put is irrelevant. An intermediary Put counterparty was only included in the transaction structure to ensure Parmalat S.p.A.'s liabilities would rank *pari passu* with

---

Parmalat's other unsecured creditors.

In other words, PCFL was included only *to create* enforceable Parmalat S.p.A. obligations; it was not included to enhance or supplant Parmalat S.p.A. as the credit risk.

Third, the "opinions" offered by the SPVs' purported experts amount to nothing more than Monday morning quarterbacking.[32]  BoA's witnesses – who have the advantage of having actually lived through the due diligence efforts at issue – will testify that whenever issues arose with respect to Parmalat, they sought and received reasonable explanations from the company.  *Lau Testimony* ¶¶ 45, 63-64; *Johnson Testimony* ¶¶ 49-51, 66; *Chalk Testimony* ¶¶ 11, 109-14.

─────────────

Parmalat's cash balances

were the subject of constant discussion, and Parmalat had a reasonable response every time a

question was asked. *Chalk Testimony* ¶¶ 109-14; *Lau Testimony* ¶¶ 60-69; *Johnson Testimony*

¶¶ 50-51;

That Parmalat's

justifications were accepted proves nothing more than that no one doubted that the cash reported

on Parmalat's audited financial statements existed.

Recreating the

work done by a company's external auditors is simply never done.

*Chalk Testimony* ¶ 114; *Lau Testimony* ¶ 62; *Johnson Testimony* ¶ 40.

Finally, the fact that some demand not made, or some metric not used, *could* have

revealed the fraud does not amount to evidence that BoA *should* have discovered it. Due

diligence does not guaranty against the possibility that Parmalat was committing fraud, let alone

63

that Parmalat's external auditors were knowingly certifying fraudulent financial statements. Put
another way, what was required of BoA is the same level of care exercised by BoA's peers in the
field. *Denney*, 230 F.R.D. at 336. Given that the entire field was fooled, the SPVs cannot
possibly show that BoA deviated from the required standard of care. Their "should have known"
allegations must fail.

## B.     BoA Did Not Act With Fraudulent Intent.

The SPVs' fraud claim fails for the separate and independent reason that they cannot
show fraudulent intent. *See City of New York* v. *Cyco.Net, Inc.*, 383 F. Supp. 2d 526,564
(S.D.N.Y. 2005) (noting separate requirements that the defendant know the representation to be
false *and* specifically intend to defraud the plaintiff). The principal fraudulent motive alleged by
the SPVs was that BoA was conspiring to reduce its exposure to Parmalat. *Compl.* ¶ 211;
*Interrog. Resp.* # 1 (DX-325). The premise of that allegation is false—the PBrazil transaction
essentially quadrupled BoA's exposure to Parmalat. *See* DX-318.

The SPVs essentially accuse BoA of intending to defraud itself.

Nor is the desire to earn fees a fraudulent motive. *See, e.g.*, *Shields* v. *Citytrust
Bankcorp., Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994).

*See Atl. Gypsum Co.* v. *Lloyds*

*Int'l Corp.*, 753 F. Supp. 505, 514 (S.D.N.Y. 1990) ("Plaintiffs' view of the facts defies
economic reason, and therefore does not yield a reasonable inference of fraudulent intent."); *see
also Parmalat*, 501 F. Supp. 2d at 583 ("The mere expectation of ordinary fees is not a sufficient
motive to raise a strong inference of culpable intent."). Indeed, "[i]t is far less plausible that an
industry leader" – like BoA, which was the leader in the private placement market – "would

64

deliberately jeopardize its standing and reliability, and the viability of its business," by engaging

in the conduct that Plaintiffs allege. *South Cherry Street*, 573 F.3d at 113. In fact, the record is

directly to the contrary. *Chalk Testimony* ¶ 14; *Lau Testimony* ¶ 47; *Johnson Testimony* ¶ 93.[34]

### C.    BoA Made No Misstatement Of Fact To The SPVs.

Not only do Plaintiffs fail to prove knowledge or intent, they also cannot show that BoA

made any misstatements. The SPVs' claims are a clear attempt to hold BoA responsible for

misstatements and omissions *made by Parmalat.* The SPVs identify the following sources of

misstatements and omissions in connection with the PBrazil transaction: (a) the private

placement memorandum, (b) the Support and Inducement Agreements; and (c) a July 2000

email. *See Compl.* ¶¶ 174-92                                    [35] With the exception of the

July 2000 email, all of the alleged misstatements and omissions were made by either the SPVs

themselves or Parmalat, not BoA. BoA cannot be held liable for Parmalat's deception. *See, e.g.*,

*Wright* v. *Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) (holding "reliance only on

representations made by others cannot itself form the basis of [the defendant's] liability" for

securities fraud) (internal citation and quotations omitted) (first alteration in original); *236*

*Cannon Realty, LLC* v. *Ziss*, No. 02 Civ. 6693(WHP), 2005 WL 289752, at \*7 (S.D.N.Y. Feb. 8,

2005) (granting defendant summary judgment on RICO claim because plaintiff failed to attribute

the misstatements to defendant).

---

[34] Finally, there can be no arguing that BoA intended to deceive anyone through the PBrazil transaction, which this Court has repeatedly stated was not deceptive or misleading. *See In re Parmalat Sec. Litig.*, 570 F. Supp. 2d 521, 526 (S.D.N.Y. 2008); *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 433-434 (S.D.N.Y. 2006). As a result of the Guarantee, Parmalat had a contingent liability, which it disclosed on its annual and semi-annual financial statements. *See, e.g.*, DX-118, DX-119, DX-128.

[35] Plaintiffs also alleged in their Complaint to have relied on misstatements contained in the Note Purchase Agreements. *Compl.* ¶¶ 179, 190. Ironically, the statements at issue in the Note Purchase Agreements are the *SPVs'* own statements, not those of BoA. *E.g.*, PX-24 at 2032928-29 ("The Company [FHL] represents and warrants to you that: . . ."). The SPVs may not sue BoA over their own misrepresentations.

65

### 1.    The Alleged Misstatements In The Private Placement Memoranda Were Made By Parmalat, Not BoA.

The bulk of the misrepresentations alleged by the SPVs stem from the private placement memoranda ("PPMs") prepared in connection with the FHL private placement in 1999 and the DHL private placement in 2001. *Compl.* ¶¶ 176-79, 186                The SPVs seek to hold BoA responsible for representations it never made. The statements in the PPM were made by Parmalat.

Consistent with the industry practice in the private placement market, Parmalat assumed all responsibility for any offering materials, including the PPMs at issue. *Lau Testimony* ¶ 54; *Johnson Testimony* ¶¶ 53-58. Parmalat specifically represented to the Bank that the information in the PPMs was accurate. *Johnson Testimony* ¶ 57. Parmalat also indemnified the Bank against any claims stemming from any inaccuracies in the information contained in the PPMs and other offering materials. *Lau Testimony* ¶ 136; PX-47. Perhaps most importantly here, Parmalat specifically took responsibility for the information in the PPMs, the NPAs, and any other document involved in the PBrazil transaction in letters addressed to the SPVs' directors. In those letters, Parmalat both affirmed that the information was "in every material respect true and accurate and not misleading" and that "[t]here are no other facts in relation to such information the omission of which would . . . make any statement [in such documents] misleading in any material respect." DX-107, DX-114, DX-167.

By contrast, BoA's repeated, express disclaimers make clear that the information contained in the transaction documents came from Parmalat alone.

This disclaimer

accords with the industry's general practice, *Johnson Testimony* ¶ 58,

In these circumstances, no reader would

understand BoA to be speaking through the PPM. *See In re Refco, Inc. Sec. Litig.*, 609 F. Supp.

2d 304, 313-14 (S.D.N.Y. 2009) ("Even if the Mayer Brown Defendants played a substantial role

in drafting the statements at issue [in the offering memorandum], however, the relevant inquiry is

not simply the extent of their involvement viewed in hindsight, but whether, at the time,

plaintiffs reasonably understood Mayer Brown to be speaking through the release.").

### 2. The Alleged Misstatements In The Support And Inducement Agreements Were Made By Parmalat, Not BoA.

The second set of documents on which the SPVs try to rest their misrepresentation claims

are the Support and Inducement Agreements. *Compl.* ¶¶ 181-82, 191

This too is an attempt to hold the Bank accountable for Parmalat's statements to the

SPVs.

Furthermore, it was Parmalat that over the

course of the transaction sent letters directly to the SPVs' directors confirming its compliance

with those covenants. *See, e.g.*, DX-206, DX-257 and DX-259. In contrast, BoA is not even

mentioned in the document.

.

### 3.     The June 2000 Email Is Not Material To The SPVs' "Decision" To Enter Into The PBrazil Transaction.

Because none of the representations in the private placement memoranda, or the Support and Inducement Agreements (or the Note Purchase Agreements) are attributable to BoA, the SPVs are forced to hinge their misrepresentation claims on a single email exchange that allegedly occurred six months *after* the PBrazil transaction closed.

The emails are inadmissible.[36]  More fundamentally,

*Cf. Singer Co.* v. *Stott & Davis Motor Express, Inc.*, 79 A.D.2d 227, 233, 436 N.Y.S.2d 508, 511-12 (N.Y. App. Div. 1981) (dismissing negligent misrepresentation claim where alleged misstatements occurred after the fact).  Once the SPVs entered into the transaction, they were contractually bound by the terms set forth in the transaction documents.  It is well settled in New York that "one cannot be induced to tender a performance which is required as a part of a preexisting contractual obligation[;]" that is, "a plaintiff cannot claim to have been defrauded into doing what it already was legally bound to do."  *N.Y. State Urban Dev. Corp.* v. *Marcus Garvey Brownstone Houses, Inc.*, 98 A.D.2d 767, 469 N.Y.S.2d 789 (N.Y. App. Div. 1983) (internal quotation omitted).  Finally, even if the directors were aware of these emails – and there is no evidence that they were[37] –

---

[36] Plaintiffs, as the proponent of the evidence, bear the burden of establishing its admissibility.  *See, e.g.*, *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999) (holding proponent of evidence bears burden of authentication).  Hopkins was not deposed in this litigation, and the SPVs have made no attempt to authenticate either document, neither of which was produced by the Bank.

[37] The SPVs have provided no evidence that Hopkins ever relayed the contents of the emails to any of the directors of FHL or DHL, meaning the SPVs could not possibly have relied on them.

*(Footnote Continued)*

**D.      BoA Is Not Liable For Mistaken Opinions Or Predictions.**

Not only were the statements at issue not made by BoA, many of the alleged

misrepresentations are merely opinions or predictions of future events. For example, the crux of

the SPVs' claims is that they were misled to believe that the PBrazil shares were worth $300

million or that an IPO of Parmalat Brazil was likely. There is no evidence that BoA made, or

that the SPVs relied on, any representations about the value of PBrazil[39] or the prospects of an

IPO. But even if there were such statements, they are mere opinions or predictions of future

events that cannot provide a basis for a fraud or negligent misrepresentation claim. *See Hydro*

*Investors, Inc.* v. *Trafalgar Power Inc.*, 227 F.3d 8, 20-21 (2d Cir. 2000) (Opinions of value or

future expectations "may not form the basis of a claim for fraudulent and/or negligent

misrepresentation."); *Dooner* v. *Keefe, Bruyette & Woods, Inc.*, 157 F. Supp. 2d 265, 277-78

(S.D.N.Y. 2001) ("[R]epresent[ation] that the IPO was a 'sure thing' despite knowing that the

---

[39] There were no representations regarding the value of the PBrazil shares in the PPM or the transaction documents, and Plaintiffs have not identified a single instance where BoA made such a representation to the directors.

IPO would not occur" was not actionable because the alleged statement was not "a material false representation of existing fact" but rather a "classic example[] of speculative expression.").[40]

### E.    BoA Did Not Omit Any Information That Was Material To The SPVs.

The SPVs' allegations regarding omissions of material fact fare no better. The SPVs allege that had the directors been fully informed concerning what the Bank supposedly knew about the creditworthiness of Parmalat S.p.A., PCFL or PBrazil, they would not have approved the PBrazil transaction. This alleged failure to disclose is not only the basis for their fraud and negligent misrepresentation claims based on omissions, but also is the predicate for the SPVs' claims for breach of contract and breach of fiduciary duty.[41]

First, the SPVs' theory wrongly assumes that FHL and DHL actually conducted an analysis of the underlying credit risks of the transaction material to the determination whether to enter into the transaction. This simply is not the case.

---

[40] *See also Beltrone* v. *Gen. Schuyler & Co.*, 223 A.D.2d 938, 941, 636 N.Y.S.2d 917, 919 (N.Y. App. Div. 1996) ("[S]tatements concerning . . . predictions of hopeful future events cannot form the basis for a fraud cause of action."); *Yoss* v. *Sacks*, 26 A.D.2d 671, 672, 272 N.Y.S.2d 387, 389 (N.Y. App. Div. 1966) ("Misrepresentations as to value are not ordinarily to be treated as constituting fraud because they are generally to be regarded as mere expressions of opinion . . . involving a matter of judgment and estimation as to which men may differ.") (internal quotation marks omitted).

[41] Under New York law, fraud based on omissions is actionable only if the plaintiff proves a duty to disclose based on a fiduciary or confidential relationship between the parties. *Auchincloss* v. *Allen*, 211 A.D.2d 417, 417, 621 N.Y.S.2d 305, 306 (N.Y. App. Div. 1995) (citing *Lane* v. *McCallion*, 166 A.D.2d 688, 691, 561 N.Y.S.2d 273, 275-76 (N.Y. App. Div. 1990). As discussed below, *infra* at 83-90, BoA owed the SPVs no such duty. This alone is fatal to Plaintiffs' fraud and misrepresentation claims based on omissions.

Any claim that the underlying credit risks of the transaction or value of the

underlying assets were material to Baker is nothing more than *post hoc*, self-serving speculation.

Even as to the credit

analysis pertaining to the transaction that did occur, the SPVs do not and cannot identify any

basis to suggest that BoA was under a duty to share its internal credit analysis with the SPVs'

_____

directors.

Regardless, the claim that the Bank's iterative credit analysis was material to the directors makes no sense.

### F.    There Is No Evidence That The SPVs Reasonably Relied On Any Alleged Misrepresentation Or Omission.

Even assuming the SPVs can identify a material misstatement or omission that can be attributed to BoA, their claims would fail for want of proof of reasonable reliance.[44]

---

[44] To demonstrate reliance under New York law, a plaintiff must show that its reliance on the alleged misstatements/omissions was: (1) actual and direct, (2) reasonable, and (3) detrimental. *See, e.g., Golden Budha Corp.* v. *Can. Land Co. of Am., N.V.*, 931 F.2d 196, 202 (2d Cir. 1991); *Feinberg* v. *Katz*, No. 01 Civ. 2739 (CSH), 2007 WL 4562930, at *6 (S.D.N.Y. Dec. 21, 2007); *Nam Tai Elecs., Inc.* v. *UBS PaineWebber Inc.*, 46 A.D.3d 486, 488, 850 N.Y.S.2d 11 (N.Y. App. Div. 2007). "It is quite clear under New York law that 'the asserted reliance must be found to be justifiable under all the circumstances' in order [to] make out a claim of fraudulent inducement . . . ." *Continental Airlines, Inc.* v. *Lelakis*, 1997 WL 701363, at *3 (2d Cir. Nov. 10, 1997) (quoting *Danann Realty Corp.* v. *Harris*, 157 N.E.2d 597, 599-600, 184 N.Y.S.2d 599, 603 (N.Y. 1959)).

*See Maines Paper & Food Serv. Inc. v. Adel*, 256 A.D.2d 760, 761-62, 681 N.Y.S.2d 390, 391 (N.Y. App. Div. 1998) ("Having failed to read the agreement . . . defendant is precluded from asserting fraudulent inducement since there cannot be any justifiable reliance."); *Bullmore v. Ernst & Young Cayman Islands*, 20 Misc. 3d 667, 674, 861 N.Y.S.2d 578, 584 (N.Y. 2008) (holding that because the investment fund's directors did not attend any meetings, interact with the fund's administrator, or review any financial reports, the contention that the "Directors would have acted to stop the fraud" if alerted to accounting discrepancies was "speculative and unsupported by the factual record").

Moreover, liability does not attach by virtue of generalized assertions regarding transaction documents, but only attaches upon evidence of reliance on *actual misstatements or material omissions. Nam Tai Elecs., Inc.*, 46 A.D.3d at 488.    Plaintiffs offer no such evidence of actual reliance here.

Finally, even if the SPVs could show actual reliance, they could not show that it was reasonable.

---

[46] According to a 1999 brochure prepared by the SPVs' counsel at Maples and Calder, there were only three factors relevant to SPV directors' decisions to approve transactions: (1) the provision of a small fee for entering into the transaction; (2) contractually limited liability in the event of default; and (3) transaction documentation that provides for reimbursement of the SPV's ongoing expenses. DX-322. All three conditions were met here. *Stipulation* ¶¶ 153-57; *Baker Dep.* at 178:6-12.

See *T.T. Exclusive Cars, Inc.* v. *Christie's Inc.*, No. 96 Civ. 1650 LMN, 1996 WL 737204, at *6 (S.D.N.Y. Dec. 24, 1996) ("[U]nder New York law a party's specific disclaimer will preclude [the plaintiffs] from maintaining a claim for fraudulent misrepresentation."); *see also Emergent Capital Inv. Mgmt., LLC* v. *Stonepath Group, Inc.*, 343 F.3d 189, 195 (2d Cir. 2003) (holding plaintiff's reliance on alleged extra-contractual misrepresentations was unreasonable where disclaimer stated that "the seller was not making any representations beyond those listed in the agreement"); *Foxley* v. *Sotheby's Inc.*, 893 F. Supp. 1224, 1230 (S.D.N.Y. 1995) ("[E]ven if provenance were misrepresented, a fraud claim is precluded because the auction catalog stated that Sotheby's made no representations or warranties of provenance.").

## III.  THE SPVS' CLAIMS OTHER THAN FRAUD ARE PREEMPTED BY THE MARTIN ACT.

Each of the SPVs' common law claims, save for fraud, is preempted by New York's Martin Act.

The Martin Act, New York's "blue sky" law, N.Y. Gen Bus. Law, Art. 23-A, provides New York's Attorney General with the sole authority to regulate and enforce the state's securities laws, *see Sedona Corp.* v. *Ladenburg Thalmann & Co.*, 2005 WL 1902780, at *22-23 (S.D.N.Y. Aug. 9, 2005).  "It is well established that there exists no private right of action for claims that are within the purview of the Martin Act."  *Granite Partners, L.P.* v. *Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 291 (S.D.N.Y. 1998) (collecting cases).  This prohibition extends not

only to private causes of action brought under the Martin Act itself, but also to any common law claims based on conduct that is "covered" by the Martin Act. *See id.*; *see also Kassover* v. *UBS AG*, 619 F. Supp. 2d 28, 38 (S.D.N.Y. 2008); *Pro Bono Invs., Inc.* v. *Gerry*, No. 03 Civ. 4347 (JGK), 2005 WL 242 9787 (S.D.N.Y. Sept. 30, 2005). Thus, "private plaintiffs will not be permitted through artful pleading to press any claim based on the sort of wrong given over to the Attorney-General under the Martin Act." *Kramer* v. *W10Z/515 Real Estate Ltd. P'ship*, 44 A.D.3d 457, 459, 844 N.Y.S.2d 18 (N.Y. App. Div. 2007) (quoting *Whitehall Tenants Corp.* v. *Estate of Olnick*, 213 A.D.2d 200, 200, 623 N.Y.S.2d 585, 585 (N.Y. App. Div. 1995)).

Nearly all of the specific claims brought by FHL and DHL fall under the Martin Act preemption. *See Kassover*, 619 F. Supp. 2d at 3 (dismissing claims for, *inter alia*, negligent misrepresentation, breach of fiduciary duty, and breach of implied covenants of good faith and fair dealing, and suggesting that the preemption covers breach of contract claims); *Pro Bono Invs.*, 2005 WL 2429784, at *15-16 (dismissing claims for breach of fiduciary duty, conversion, unjust enrichment, negligence and negligent misrepresentation); *Nairobi Holdings Ltd.* v. *Brown Brothers Harriman & Co.*, No. 02 Civ. 1230 (LMM), 2002 WL 31027550, at *9-10 (S.D.N.Y. Sept. 10, 2002) (dismissing claims for negligent misrepresentation and breach of fiduciary duty). The primary exception to Martin Act preemption is fraud, which, unlike many other state law claims, requires a showing of scienter, distinguishing it from prohibited conduct under the Martin Act. *See Sedona*, 2005 WL 1902780, at *22. The SPVs' claims for unjust enrichment and negligent misrepresentation do not require proof of scienter and are wholly preempted by the

Martin Act. Furthermore, the SPVs' claims for breach of fiduciary duty and breach of contract are also preempted unless they require a showing of fraudulent knowledge and intent.[48]

The relevant conduct alleged by the SPVs also falls within the reach of the Martin Act. Courts apply the Martin Act to a wide array of securities-related conduct with varying degrees of relation to New York. The Act itself applies to any false "representation or statement . . . to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities . . . regardless of whether issuance, distribution, exchange, sale negotiation or purchase resulted." N.Y. Gen. Bus. Law § 352-c(1). Thus, "[t]he scope of the Martin Act . . . includes more [than] the actual purchase or sale of securities within or from New York." *Sedona*, 2005 WL 1902780 at *21.

Courts in this district have previously found a sufficient New York connection for Martin Act preemption when New York "ha[d] the most substantial interest in regulating [defendant's] conduct," even when the plaintiff was located overseas. *Dover Ltd.* v. *A.B. Watley, Inc.*, 423 F. Supp. 2d 303, 331 (S.D.N.Y. 2006) (finding Martin Act preemption to bar a claim brought by a Singapore-based "investment holding" company); *see also Sedona*, 2005 WL 1902780 at *21-22 (Martin Act preempted case in which a Pennsylvania company sued a company with offices in New York, for negligence, misrepresentation and breach of fiduciary duty in connection with investment advice and negotiations concerning securities). In assessing New York's interest in regulating the defendant's conduct, courts look to whether "'a substantial part of the events or

---

[48] *See Henneberry*, 415 F. Supp. at 450 (negligent misrepresentation); *In re Grumman Olson Indus.*, 329 B.R. 411, 427 (S.D.N.Y. 2005) (breach of fiduciary duty); *Posner* v. *Minn. Mining & Mfg. Co.*, 713 F. Supp. 562, 563 (E.D.N.Y. 1989) (breach of contract); *Universal City Studios, Inc.* v. *Nintendo Co.*, 797 F.2d 70, 79 (2d Cir. 1986) (unjust enrichment). As noted above, the SPVs' breach of fiduciary duty claim sounds in fraud – and if so limited would not be preempted. As noted below, the term of the Management Agreements on which the SPVs base their breach of contract claim requires a showing that BoA acted with gross negligence. To the extent the gross negligence standard is comparable to fraudulent intent – and BoA believes it is – then Martin Act preemption would also not apply to the SPV's breach of contract claim.

omissions giving rise to the claims . . . occurred in [New York].'" *Id.* at 22 (citation omitted); *see also Dover Ltd.*, 423 F. Supp. 2d at 331.[49]

For example, in *Granite Partners*, two of the three plaintiffs were Cayman Islands investment funds created to consolidate investments among offshore investors and domestic tax-exempt entities, including foundations and pension funds. *Granite Partners, L.P.*, 17 F. Supp. 2d at 282. Plaintiffs brought suit against a number of U.S. investment banks that allegedly took advantage of the SPVs' unsophisticated managers by selling the vehicles inappropriate securities in order to profit at the expense of the funds. *Id.* at 283-84. In reliance on the bank misrepresentations, the funds purchased certain securities that they otherwise would not have and "held onto securities that they would otherwise have sold." *Id.* at 286. The Court held that the Martin Act precluded the funds' breach of fiduciary duty and negligent misrepresentation claims. *Id.* at 291-92.

This case is directly on point with the above precedent. First, there is no dispute that New York law applies to Plaintiffs' claims. *See supra* n.18. In addition, the SPVs' Complaint is littered with allegations of conduct that occurred in New York. The SPVs alleged that all three BoA Defendants regularly transact business in New York. *Compl.* ¶¶ 18-20. They further alleged that all of the Bank of America defendants "conspired together and acted jointly to commit the wrongful conduct alleged herein, some of which occurred in New York." *Id.* ¶ 22. Finally, in a section titled "Other Substantial New York Contacts," the SPVs put to rest any question about whether Martin Act preemption is appropriate here. They alleged that many of FHL's and DHL's Noteholders are well-known U.S. financial institutions with significant

---

[49] *See also Nairobi Holdings Ltd.*, No. 02 Civ. 1230 (LMM), 2002 WL 31027550, at *9-10 (applying Martin Act preemption to a case brought by a Bermuda-based investment company (known as "NHL") against a New York investment bank that acted as its advisor and fraudulently induced the plaintiff to purchase nearly worthless shares of an Atlanta, Georgia-based telecommunications company).

presences in New York. *Id.* ¶ 51. They also alleged that BoA "actively marketed and sold FHL and DHL notes to these and other institutional investors" and that "[s]uch activities occurred, in part, in New York, where virtually all of the original noteholders were licensed to do business." *Id.* ¶ 52. Having relied on allegations of New York conduct to support their claims and to establish jurisdiction and venue, the SPVs cannot now avoid the defenses available under New York law.

The record evidence also establishes what is clear from Plaintiffs' complaint – a sufficient nexus between New York and the securities underlying the PBrazil transaction for Martin Act preemption.

This point was certainly not lost on FHL and DHL, which sought a declaratory judgment voiding BoA's claims in the SPVs' liquidation based on the application of New York law. *Compl.* ¶¶ 258-263. These contacts with New York are more than sufficient for Martin Act preemption here.

## IV.    THE EVIDENCE DOES NOT SUPPORT THE SPVS' CLAIM FOR BREACH OF CONTRACT.

The SPVs' breach of contract claim is based entirely upon the Management Agreements between each entity and BoA. *See Compl.* ¶¶ 238-245;



As a result, Plaintiffs must prove any alleged breach rose to the level of "'conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing.'" *AT&T Co.* v. *City of New York*, 83 F.3d 549, 556 (2d Cir. 1996) (quoting *Colnaghi, U.S.A., Ltd.* v. *Jewelers Prot. Servs., Ltd.*, 595 N.Y.S.2d 381, 383, 611 N.E.2d 282, 284 (N.Y. 1993)). The SPVs cannot satisfy that standard.

### A.    The SPVs Cannot Show That BoA Was Grossly Negligent Or That BoA Willfully Breached Any Obligation.

The SPVs specifically allege that BoA breached the Management Agreement in three ways.

---

All of the foregoing allegations assume that BoA actually knew the truth about Parmalat's financial situation, including that its financial statements were materially misstated. Because the SPVs cannot prove such knowledge, they cannot show that BoA's conduct amounted to a "willful" breach of any provision of the Management Agreement. For the same reason, the SPVs cannot show that BoA was "grossly negligent." Even if the SPVs could plausibly contend that BoA "should have known" of Parmalat's true financial state, that would not support a finding that BoA acted in "reckless disregard" of Plaintiffs' rights. *See, e.g., AT&T Co.*, 83 F.3d at 556 ("[A] mistake or a series of mistakes alone, without a showing of recklessness, is insufficient for a finding of gross negligence."); *Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 269-70 (2d Cir. 1996) (Allegations that defendant ignored "a host of red warning flags" about a subsidiary's profits, which turned out to be fictitious, do not constitute "circumstantial evidence of conscious misbehavior or recklessness.") (internal quotations omitted). Ultimately, Plaintiffs do little more than attempt to prove "fraud by hindsight," which, in this Circuit, is not "the kind of circumstantial evidence that would indicate conscious fraudulent behavior or recklessness." *Shields*, 25 F.3d at 1129.

## B.    BoA Did Not Breach The Management Agreement.

Were the Court to look past the SPVs' inability to prove that BoA acted willfully or grossly negligent, the SPVs' contract claims would still fail. First, their claim is predicated in part on an alleged failure by BoA to adequately advise the SPV directors *before* the PBrazil

81

transaction closed. *Compl.* ¶ 89;                             This amounts to an allegation

that BoA breached the contract before it was signed. *Stipulation* ¶¶ 206, 208 (Management

Agreements signed contemporaneously with the other transaction documents). It is axiomatic

that there cannot be a breach of a contract that does not exist.

Second, the SPVs' allegation that BoA failed to tell the directors in 2001 that no IPO

would occur, *Interrog. Resp.* # 5 (DX-325), is also meritless. The SPVs have not presented any

evidence showing that BoA knew that an IPO of PBrazil was not feasible starting at that time.

**C.**     **The SPVs Cannot Predicate Their Claim On Conduct That Occurred
           Subsequent To The Closing Of The PBrazil Transaction.**

---

[51] FHL's and DHL's directors had further evidence of the plan to extend the swaps underlying the PBrazil transaction as a result of their role as the directors of Cur Holdings. *See* DX-218.

At bottom, the SPVs' breach of contract claim amounts to a suggestion that had BoA fulfilled the terms of the Management Agreement, the SPVs could have taken steps to *mitigate* the harm that was locked in by the PBrazil transaction. *See Compl.* ¶ 135 ("Had [the SPVs] learned of Parmalat's financial condition . . .after [the PBrazil] transaction, any of [the SPVs'] Directors could have taken action to expose the scheme and attempt to recoup some portion of the funds invested."). This is pure speculation, and the SPVs do not even attempt to explain how such a mitigation could have occurred. *Cf. In re Parmalat*, 501 F. Supp. 2d at 577 (allegation that a Parmalat subsidiary would have been better off given earlier disclosure of the fraud does not rise above the speculative level); *see also V.S. Int'l, S.A. v. Boyden World Corp.*, No. 90 Civ. 4091 (PKL), 1993 WL 59399, at *7 (S.D.N.Y. Mar. 4, 1993) ("New York law does not countenance damage awards based on 'speculation or conjecture.'") (quoting *Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1010 (2d Cir. 1991)).

## V.    THE EVIDENCE DOES NOT SUPPORT THE SPVS' CLAIM FOR BREACH OF FIDUCIARY DUTY.

The essence of any fiduciary relationship is that the fiduciary must put the beneficiary's interests ahead of his own. *See, e.g., Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 544 (S.D.N.Y. 2001).

BoA is not just entitled to pursue its own interests in such situations, *In re Sharp Int'l Corp.*, 403 F.3d 43, 52 n.2 (2d Cir. 2005) (a bank owes no fiduciary duty to its borrower) (citing *Bank Leumi Trust Co.* v. *Block 3102 Corp.*, 180 A.D.2d 588, 589, 580 N.Y.S.2d 299, 301 (N.Y. App. Div. 1992)), but is legally obligated to do so, *see* 12 C.F.R. § 1.5(a) (mandating that any bank's investment considerations must focus on whether "the particular activities undertaken . . . [are] *appropriate for that bank*") (emphasis added).

In any event, to establish that BoA owed them a fiduciary duty, the SPVs must prove both that they reposed "trust and confidence" in BoA and that BoA accepted such trust to the extent that it gained "superiority or influence" over them. *Indep. Asset Mgmt. LLC* v. *Zanger*, 538 F. Supp. 2d 704, 709 (S.D.N.Y. 2008). The SPVs cannot make either showing.

## A.     The SPVs Reposed No Special Trust In BoA.

The necessary implication of the SPVs' claim is that *every* relationship between a transaction arranger and an SPV is a fiduciary one. There is not a single authority to support this proposition. The SPVs have not cited, and BoA has not found, any case, in the U.S., the Cayman Islands, or otherwise, suggesting that a transaction arranger owes a fiduciary obligation to the pass-through entities used to effectuate an investment actually made by the arranger and other parties.

In fact, the law is directly to the contrary. In New York, even an investment bank (as opposed to a lender) generally does not owe its clients fiduciary duties in ordinary transactions.[52] *See Walton* v. *Morgan Stanley & Co.*, 623 F.2d 796, 799 (2d Cir. 1980); *BNY Capital Mkts., Inc.* v. *Moltech Corp.*, No. 99 Civ., No. 11754 (GEL), 2001 WL 262675, at 9 (S.D.N.Y. Mar. 14, 2001); *Societe Nationale D'Exploitation Industrielle Des Tabacs Et Allumettes* v. *Salomon Bros. Int'l Ltd.*, 251 A.D.2d 137, 138, 674 N.Y.S.2d 648, 649 (N.Y. App. Div. 1998). An exception to this rule – not applicable here – is where an investment bank actually *assumes control* over its client's affairs. So long as the client retains decision-making authority, no fiduciary obligation arises. *Village on Canon* v. *Bankers Trust Co.*, 920 F. Supp. 520, 533 (S.D.N.Y. 1996) (no duty where bank lacked "authority to commit [plaintiff] to any proposal or to negotiate on [its] behalf"); *Societe Nationale*, 251 A.D.2d at 138 (no duty where plaintiff retained ultimate authority to "ratify" trades recommended by the bank); *AmBase Corp.* v. *SDG Inc.*, 2005 U.S. Dist. LEXIS 16164, at *81-83 (D. Conn. Aug. 3, 2005) (holding under Connecticut law that no fiduciary relationship existed between a company and its "exclusive investment banker and financial advisor," because the company "retained the absolute discretion to accept or reject any proposed transaction presented by [the bank], and thus did not commit raising capital solely to [the bank's] expertise and discretion.").

---

[52] It should be noted that there is no evidence of an investment banking relationship between the parties. While BoA may have served as private placement agent to *Parmalat*, it did not do the same for the SPVs for the simple reason that the SPVs had no investments to make.

Given these facts, there can be no claim that the transaction was anything other than arm's length, and therefore no fiduciary obligation arose. *See Henneberry*, 415 F. Supp. at 460 ("[P]arties dealing at arm's length in a commercial transaction lack the requisite level of trust or confidence between them necessary to give rise to a fiduciary obligation.").

These admissions are dispositive as to the SPVs' fiduciary duty claim. *See Village on Canon*, 920 F. Supp. at 533-34 (no fiduciary duty because bank "had no power to affect any legal relations of [the principal] and the prospective buyer that would propel the duties into the fiduciary-like sphere") (citation omitted) (alteration in original).

**B.**    **BoA Did Not Accept The Supposed Trust Or Confidence That Plaintiffs Claim To Have Placed In It.**

Even assuming *arguendo* that the SPVs reposed trust or confidence in BoA, the evidence will not support a finding that BoA accepted it. Under New York law, "[s]imply because one reposes trust or confidence in another does not give rise to a fiduciary duty; the trust must be accepted as well." *Regions Bank* v. *Wieder & Mastroianni, P.C.*, 423 F. Supp. 2d 265, 270 (S.D.N.Y. 2006); *see Societe Nationale,* 251 A.D.2d at 137 ("[P]laintiff's subjective claims of reliance on defendant's expertise did not give rise . . . to a confidential relationship"). Likewise, "'[t]he fact that one party trusts the other is insufficient. We trust most people with whom we choose to do business. The dominant party must accept the responsibility, accept the trust of the other party before a court can find a fiduciary relationship.'" *Adelphia Recovery Trust* v. *Bank of Am., N.A.*, 624 F. Supp. 2d 292, 323 n. 18 (S.D.N.Y. 2009) (quoting *Joyce* v. *Morgan Stanley & Co.*, 538 F.3d 797, 802 (7th Cir. 2008) (alteration in original).

Either individually or collectively, none of the foregoing is sufficient.

Mike Lau will testify that he did not consider FHL and DHL to be his clients, nor did he believe that he was providing any advice, assistance, or other services to FHL in

connection with the PBrazil transaction. *Lau Testimony* ¶¶ 136-37. Lau's testimony will show that the language in the Indemnification Agreement did not constitute agreement to any future trust or confidence that the yet-to-be-formed SPVs might repose in it. *Id.*

An unsigned fax cannot create a fiduciary duty.

T

Finally, it bears emphasis that BoA took affirmative steps to make clear that it was not providing any representations or warranties to any party to the PBrazil transaction. *See supra* at 75. Such disclaimers are on their face inconsistent with the existence of a fiduciary obligation.

## C.     A Contractual Relationship Is Not A Fiduciary One.

The SPVs' fiduciary duty argument also fails to the extent they claim that such a relationship continued after the execution of the PBrazil transaction. Once the transaction was executed, the relationship between the SPVs and BoA was governed by contracts – the Management Agreements FHL and DHL signed in December 1999.

The New York courts will not allow "[a] cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim [to] stand." *William Kaufman Org.* v. *Graham & James L.L.P.*, 269 A.D.2d 171, 173, 703 N.Y.S.2d 439 (N.Y. App. Div. 2000). "In fact, where a contract governs the relationship between two commercial parties, the assumption is that there is no fiduciary relationship unless the contract provides otherwise." *World Wrestling Entm't, Inc.* v. *Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 503-04 (S.D.N.Y. 2007), *aff'd,* No. 08-0118-cv, 2009 WL 1391807 (2d Cir. May 19, 2009) (citing *Calvin Klein Trademark Trust* v. *Wachner*, 123 F. Supp. 2d 731, 733-34 (S.D.N.Y. 2000)).

In this case, the Management Agreements were intended to delineate the relationship between the SPVs and BoA, and these agreements did not themselves impose a fiduciary duty on BoA. *See Joyce*, 538 F.3d at 802 (finding no fiduciary duty where contract between investment bank and client did not mention one);

Critically, the Management Agreements make no mention of a fiduciary duty, while simultaneously containing integration clauses providing that "[t]his Agreement sets forth the entire understanding and agreement between the parties as to the matters covered herein and supersedes and replaces any prior understanding, agreement, or statement of intent, in each case, written or oral, of any and

every nature with respect thereto."

As such, the Management Agreements made clear that the "relationship at issue here is to be determined by reference to the written contractual instrument" without the "imposition of extra-contractual obligations." *Broussard* v. *Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 347 (4th Cir. 1998) (applying North Carolina law).

### D.    Fiduciary Duties Should Not Be Recognized For Pass-Through Entities Such As These.

As noted, forcing a bank to observe a fiduciary obligation running to the SPV from whom it is purchasing securities runs counter to federal law. *See* 12 C.F.R. § 1.5(a). But the theory advocated by these SPVs would also force banks to prefer the "interests" of SPVs to those of their actual clients.[53] Here, BoA's client was Parmalat, not the SPVs. The SPVs knew full well that BoA was Parmalat's placement agent. Even that relationship was not a fiduciary one, *Walton*, 623 F.2d at 799, meaning that the recognition of a fiduciary relationship benefiting the SPVs would place their interests over those of BoA's own client. Second, a finding of a fiduciary duty here would have required BoA, which invested considerable funds in the PBrazil transaction, to put the interests of FHL and DHL ahead of its own. The SPVs cannot offer any justification for such a counterintuitive proposition.

### E.    The SPVs Cannot Show That BoA Breached Any Standard Of Care.

Assuming *arguendo* that BoA owed the SPVs a fiduciary duty – and it did not – then the SPVs must show BoA breached a duty of care. *See In re Grumman Olson Indus.*, 329 B.R. 411,

---

[53] It is difficult to determine precisely what the SPVs' interests in the transaction were in light of the fact that they derived no benefit from it and that the presence of enforceable limited liability provisions virtually eliminated any risk they had in the transaction. Indeed, the sole interest of an SPV in a transaction like the one at issue was that it "receive[d] a fee for undertaking the transaction." DX-322.

427 (S.D.N.Y. 2005). As discussed at length above, the SPVs cannot show that BoA was in any way negligent. *See supra* at 49.

Furthermore, if BoA did owe the SPVs a fiduciary duty it would be entitled to the protection of the business judgment rule. *Compare Compl.* ¶ 227 (alleging BoA was charged with a "broad responsibility for the general management and conduct of [the SPVs'] business"), *with In re Eugenia Vi Venture Holdings, Ltd.*, 2008 U.S. Dist. LEXIS 101703, at*57-58 (S.D.N.Y. Dec. 15, 2008) (business judgment rule protects a company's manager where it makes a "negligent but good faith decision to operate an insolvent business" from liability for deepening insolvency). To overcome that protection, the SPVs must show that BoA acted in bad faith or with fraudulent intent. *Id.* at *57. As the SPVs cannot show negligence, *a fortiori* they cannot show that BoA acted with fraudulent intent. *See supra* at 49.

## VI.    THE EVIDENCE DOES NOT SUPPORT THE SPVS' CLAIM FOR UNJUST ENRICHMENT.

To establish an unjust enrichment claim, the SPVs must prove not only that they performed services for BoA that resulted in BoA being unjustly enriched, *see Clark*, 300 A.D.2d at 732; *Kagan* v. *K-Tel Entm't, Inc.*, 172 A.D.2d 375, 568 N.Y.S.2d 756 (N.Y. App. Div. 1991), but also that BoA's enrichment was "at [their] expense," *Universal City Studios, Inc.*, 797 F.2d at 79; *accord Marketplace LaGuardia Ltd. P'ship* v. *Harkey Enters.*, No. 07-CV-1003 (CBA), 2008 WL 905188, at *6 (E.D.N.Y. Mar. 31, 2008) ("Where the defendant receives a benefit, but not at the plaintiff's expense, an unjust enrichment claim fails.") (citing *Giant Supply Corp.* v. *City of New York*, 248 A.D.2d 231, 235, 670 N.Y.S.2d 29 (N.Y. App. Div. 1998)). They have not made either showing.

At the outset of the litigation, Plaintiffs' unjust enrichment claim was predicated on the allegation that BoA came to hold part of the $300 million of financing that resulted from the

PBrazil transaction.

That allegation was, and always has been, completely false. After close to four years of litigation, the SPVs have absolutely no evidence that BoA received a single cent from the $300 million paid by BoA and the other investors to PBrazil.

Plaintiffs' unjust enrichment claim fails for the separate and independent reason that the entirety of the relationship between the SPVs and BoA was governed by contract, making an unjust enrichment claim improper. *See EBC I, Inc.* v. *Goldman, Sachs & Co.*, 5 N.Y.3d 11, 33, 832 N.E.2d 26, 34 (N.Y. 2005); *see also Trafalgar Power Inc.* v. *Aetna Life Ins. Co.*, 396 B.R. 584, 595 (N.D.N.Y. 2008). From the execution of the PBrazil transaction forward, the relationship between BoA and the SPVs was governed by the various contracts between them. As the SPVs' lead director put it, "[e]very foreseeable event was covered by a contractual obligation." *Baker Dep.* at 109:18-111:6.

## CONCLUSION

As set forth herein, Plaintiffs can neither prove the claims they allege nor the damages they seek. BoA respectfully submits that this case can be decided without a trial. If there is a trial, a verdict in favor of BoA should be issued rejecting all of Plaintiffs' claims.

New York, New York
Dated: August 31, 2009

Respectfully submitted,

By: _____

A. Robert Pietrzak (AP-6711)
Thomas McC. Souther (TS-6615)
Daniel A. McLaughlin (DM-2688)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York  10019
(212) 839-5300
(212) 839-5599 (fax)

Joseph B. Tompkins, Jr.
Alan C. Geolot
Mark P. Guerrera
Robert D. Keeling
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
(202) 736-8711 (fax)

*Attorneys for Bank of America Corporation,
Banc of America Securities, LLC, and Bank
of America, N.A.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of August, 2009, I, Elizabeth P. Williams, caused true and correct copies of the foregoing Defendant Bank of America's Trial Brief to be served by the Court's CM/ECF system and email upon all parties.

/s/ Elizabeth P. Williams
Elizabeth P. Williams