A. Robert Pietrzak (AP-6711)
Thomas McC. Souther (TS-6615)
Daniel A. McLaughlin (DM-2688)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300
(212) 839-5599 (fax)

Joseph B. Tompkins, Jr.
Alan C. Geolot
Mark P. Guerrera
David J. Lewis
Robert D. Keeling
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000
(202) 736-8711 (fax)

*Attorneys for Defendants Bank of America Corporation, Banc of America Securities LLC and Bank of America, N.A.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re PARMALAT SECURITIES LITIGATION | MASTER DOCKET |
| | 04 MD 1653 (LAK) ECF Case |
| This document relates to: 05 CV 9934 | |
| FOOD HOLDINGS LIMITED and DAIRY HOLDINGS LIMITED, acting by their Joint Official Liquidators, Gordon I. MacRae and G. James Cleaver, | BANK OF AMERICA'S POST-TRIAL BRIEF |
| Plaintiffs, | |
| v. | |
| BANK OF AMERICA CORPORATION, et al. | |
| Defendants. | |

## DEFENDANT BANK OF AMERICA'S POST-TRIAL BRIEF

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

**I.**   PLAINTIFFS HAVE NOT PROVEN AND CANNOT PROVE THEIR
       FIDUCIARY DUTY CLAIM. .............................................................................1

    **A.**   Fiduciary Duties Do Not Arise In Commercial Transactions Absent
       Extraordinary Circumstances...............................................................................1

        **1.**   No Extraordinary Circumstances Exist In This Case...........................2

        **2.**   Imposing A Fiduciary Duty Would Overturn The Allocations Of
       Responsibility Made By The Parties To The Transaction. ..................4

    **B.**   The SPVs Have Not Proven The Existence Of A Fiduciary Relationship. .................5

        **1.**   There Is No Evidence Of Reasonable Reliance. .................................5

        **2.**   BoA Did Not Accept Trust Or Assume Control Of The SPVs...........6

    **C.**   The SPVs Have Not Proven Any Breach Of Fiduciary Duty......................................8

        **1.**   BoA Disclosed All Material Information To The SPVs. .................................11

            **(a)**   An Important Structural Element Of The Transaction Was To
         Make Parmalat Brazil Immaterial. ........................................12

            **(b)**   Parmalat Brazil Was Not Material To The Lead Director. ....................14

        **2.**   BoA Acted With Due Care. .............................................................15

**II.**   PLAINTIFFS HAVE NOT PROVEN THEIR CONTRACT CLAIM. ..............................16

**III.**   TO THE EXTENT THERE WAS ANY ACTIONABLE BREACH OF
        FIDUCIARY DUTY OR CONTRACT, IT DID NOT CAUSE ANY HARM TO
        PLAINTIFFS..........................................................................................................17

    **A.**   Plaintiffs Have Not Proven Transaction Causation. ....................................18

    **B.**   Plaintiffs Have Not Proven Loss Causation Or Damages. ..........................19

**IV.**   RULE 19 REQUIRES JOINDER OF THE NOTEHOLDERS OR DISMISSAL...............24

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*330 Acquisition Co., LLC* v. *Regency Sav. Bank, F.S.B.*,
  306 A.D.2d 154, 761 N.Y.S. 2d 185 (N.Y. App. Div. 2003) ...............................7, 8

*Abercrombie* v. *Andrew College*,
  438 F. Supp. 2d 243 (S.D.N.Y. 2006).....................................................................3

*Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*,
  2009 WL 2828018 (S.D.N.Y. Sept. 2, 2009).........................................................17

*Addington* v. *Commissioner*,
  205 F.3d 54 (2d Cir. 2000)......................................................................................5

*All Boys Music, Ltd.* v. *DeGroot*,
  1992 WL 51502 (S.D.N.Y. Mar. 9, 1992) ...............................................................8

*Banco Espirito Santo de Investimento, S.A.* v. *Citibank, N.A.*,
  2003 WL 23018888 (S.D.N.Y. Dec. 22, 2003),
  *aff'd*, 110 Fed. App'x 191 (2d Cir. 2004) ...............................................................6

*Bomarko, Inc.* v. *Int'l Telecharge, Inc.*,
  794 A.2d 1161 (Del. Ch. 1999)................................................................................8

*Botti* v. *Russell*,
  180 A.D.2d 947, 580 N.Y.S. 2d 505 (N.Y. App. Div. 1992) ................................15

*Bullmore* v. *Ernst & Young Cayman Islands*,
  861 N.Y.S.2d 578 (N.Y. Sup. Ct. 2008) ...............................................................18

*Cafferty* v. *Scotti Bros. Records*,
  969 F. Supp. 193 (S.D.N.Y. 1997)...........................................................................3

*Chimblo* v. *Commissioner*,
  177 F.3d 119 (2d Cir. 1999)....................................................................................5

*Colnaghi, U.S.A., Ltd.* v. *Jewelers Prot. Servs., Ltd.*,
  611 N.E.2d 282 (N.Y. 1993)..................................................................................17

*Commercial Credit Corp.* v. *Wells*,
  228 A.D. 402, 240 N.Y.S. 139 (N.Y. App. Div. 1930) .........................................20

*Cresswell* v. *Sullivan & Cromwell*,
  704 F. Supp. 392 (S.D.N.Y. 1989).........................................................................11

*De Blasio* v. *Merrill Lynch & Co.*,
  2009 WL 2242605 (S.D.N.Y. July 27, 2009) ........................................................................1

*De Kwiatkowski* v. *Bear, Stearns & Co.*,
  306 F.3d 1293 (2d Cir. 2002)....................................................................................2, 9

*Deutsche Asset Mgmt.* v. *Callaghan*,
  2004 WL 758303 (S.D.N.Y. Apr. 7, 2004)..............................................................7

*Dooner* v. *Keefe, Bruyette & Woods, Inc.*,
  157 F. Supp. 2d 265 (S.D.N.Y. 2001)....................................................................22

*Dura Pharm., Inc.* v. *Broudo*,
  544 U.S. 336 (2005)..............................................................................................21

*Food Holdings Ltd.* v. *Bank of America Corp.*,
  477 F. Supp. 2d 602 (S.D.N.Y. 2007).....................................................................24

*Freeman* v. *Venner*,
  120 Mass. 424 (1876) ...........................................................................................21

*Gentry* v. *Smith*,
  487 F.2d 571 (5th Cir. 1973) ...............................................................................25

*Goldman* v. *Commissioner*,
  39 F.3d 402 (2d Cir. 1994)......................................................................................5

*Henneberry* v. *Sumitomo Corp. of Am.*,
  415 F. Supp. 2d 423 (S.D.N.Y. 2006).......................................................................5

*HF Mgmt. Servs.* v. *Pistone*,
  34 A.D.3d 82, 818 N.Y.S. 2d 40 (N.Y. App. Div. 2006) ........................................4

*Hotaling* v. *A.B. Leach & Co.*,
  247 NY 84, 159 N.E. 870 (1928).....................................................................21, 23

*Illes* v. *Commissioner*,
  982 F.2d 163 (6th Cir. 1992) ...................................................................................5

*In re Mid-Island Hosp.*,
  276 F.3d 123 (2d Cir. 2002).....................................................................................1

*In re Parmalat Sec. Litig.*,
  501 F. Supp. 2d 560 (S.D.N.Y. 2007)....................................................................18

*Jordan (Bermuda) Inv. Co.* v. *Hunter Green Invs. LLC*,
  2007 WL 2948115 (S.D.N.Y. Oct. 3, 2007) ...........................................................18

*Kassover* v. *UBS AG*,
    619 F. Supp. 2d 28 (S.D.N.Y. 2008)....................................................................17

*Kerrigan* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    450 F. Supp. 639 (S.D.N.Y. 1978).....................................................................18

*Kottler* v. *Deutsche Bank AG*,
    607 F. Supp. 2d 447 (S.D.N.Y. 2009)....................................................................5

*Laub* v. *Faessel*,
    297 A.D.2d 28, 745 N.Y.S. 2d 534 (N.Y. App. Div. 2002) ..........................17, 19

*LNC Invs. Inc.* v. *First Fidelity Bank, N.A. New Jersey*,
    173 F.3d 454 (2d Cir. 1999)..............................................................................17

*Louros* v. *Cyr*,
    175 F. Supp. 2d 497 (S.D.N.Y. 2001) ...................................................................8

*Malinowski* v. *N.Y. State Dep't of Labor*,
    156 F.3d 131 (2d Cir. 1998)..............................................................................24

*Mallis* v. *FDIC*,
    568 F.2d 824 (2d Cir. 1977)..............................................................................19

*Mendel* v. *Henry Phipps Plaza W., Inc.*,
    844 N.E.2d 748 (N.Y. App. Div. 2006) .................................................................7

*Merrill Lynch & Co., Inc.* v. *Allegheny Energy, Inc.*,
    500 F.3d 171 (2d Cir. 2007)..............................................................................21

*Moy* v. *Adelphi Inst., Inc.*
    866 F. Supp. 696 (E.D.N.Y. 1994) ....................................................................11

*Musalli Factory for Gold & Jewelry* v. *JPMorgan Chase Bank, N.A.*,
    2009 WL 860635 (S.D.N.Y. Mar. 31, 2009) .........................................................6

*Norlin Corp.* v. *Rooney, Pace Inc.*,
    744 F.2d 255 (2d Cir. 1984)..............................................................................15

*Nw. Nat'l Ins. Co. of Milwaukee, Wis.* v. *Alberts*,
    769 F. Supp. 498 (S.D.N.Y. 1991).......................................................................8

*Osofsky* v. *J. Ray McDermott & Co.*,
    725 F.2d 1057 (2d Cir. 1984)..............................................................................6

*Pereira* v. *Cogan*,
    2001 WL 243537 (S.D.N.Y. Mar. 8, 2001) ...........................................................8

*Primavera Familienstifung* v. *Askin*,
    130 F. Supp. 2d 450 (S.D.N.Y. 2001)...................................................................5, 9

*Reno* v. *Bull*,
    226 N.Y. 546, 124 N.E. 144 (1919)...................................................................21

*RSL Commc'ns PLC* v. *Bildirici*,
    2009 WL 2524614 (S.D.N.Y. Aug. 14, 2009) .......................................................18

*Rubin* v. *United States*,
    449 U.S. 424 (1981) ...................................................................19

*Sager* v. *Friedman*,
    270 N.Y. 472, 1 N.E.2d 971 (1936)...................................................................20

*Saks* v. *Franklin Covey Co.*,
    316 F.3d 337 (2d Cir. 2003)...................................................................17

*Sample* v. *Morgan*,
    914 A.2d 647 (Del. Ch. 2007)...................................................................8

*Schultz* v. *Stoner*,
    308 F. Supp. 2d 289 (S.D.N.Y. 2004)...................................................................15

*Sharma* v. *Skaarup Ship Mgmt. Corp.*,
    916 F.2d 820 (2d Cir. 1990)...................................................................21

*Smith* v. *Kessner*,
    183 F.R.D. 373 (S.D.N.Y. 1998) ...................................................................24

*Solutia Inc.* v. *FMC Corp.*,
    456 F. Supp. 2d 429 (S.D.N.Y. 2006)...................................................................3

*Thermal Imaging, Inc.*, v. *Sandgrain Sec., Inc.*,
    158 F. Supp. 2d 335 (S.D.N.Y. 2001)...................................................................4

*United States* v. *Brennan*,
    183 F.3d 139 (2d Cir. 1999)...................................................................6

*United States* v. *Chestman*,
    947 F.2d 551 (2d Cir. 1991)...................................................................6

*United States* v. *Skelly*,
    442 F.3d 94 (2d Cir. 2006)...................................................................1, 4

*Village on Canon* v. *Bankers Trust Co.*,
    920 F. Supp. 520 (S.D.N.Y. 1996)...................................................................7

*W. Union Tel. Co.* v. *Pennsylvania*,
368 U.S. 71 (1961) .......................................................................................24

*Wallingford Shopping, L.L.C.* v. *Lowe's Home Ctrs., Inc.*,
2001 WL 96373 (S.D.N.Y. Feb. 5, 2001) ............................................................8

*World Wrestling Entm't, Inc.* v. *Jakks Pac., Inc.*,
530 F. Supp. 2d 486 (S.D.N.Y. 2007), *aff'd*, 2009 WL 1391807 (2d Cir. May 19,
2009) .........................................................................................................6

## STATUTES AND RULES

12 C.F.R. § 1.5(a-c) .......................................................................................16

§ 4.6(a)...........................................................................................16

§ 4.32(b)(1)(vi)...............................................................................16

§ 4.36(c)..........................................................................................16

§ 4.37(b)(ii) .....................................................................................16

Fed. R. Civ. P. 4 ...........................................................................................25

Fed. R. Civ. P. 12(h)(2)..................................................................................17

## OTHER AUTHORITIES

4 James Wm. Moore et al., *Moore's Federal Practice-Civil*, § 19.03[4] (3d ed. 2006) ......... 24-25

Alan Clendenning, *Two Key Brazilian Parmalat Units File for Bankruptcy Protection*,
Associated Press Worldstream, Jan. 28, 2004 ......................................................23

*Restatement (Third) of Agency* § 8.11......................................................................9, 11

Plaintiffs failed to carry their burden on their fraud and negligent misrepresentation claims. *See Trial Transcript* ("*Tr.*") at 324:5-326:8. For example, Plaintiffs failed to prove that Bank of America ("BoA") knew or should have known of Parmalat's true financial condition in Italy, Brazil or anywhere else, or that BoA acted with fraudulent intent. *See BoA Trial Br.* at 31-65. Plaintiffs also failed to prove their breach of fiduciary duty and contract claims, which are the focus of this Post-Trial Brief. As demonstrated herein, as well as in BoA's Trial Brief and at trial, judgment should be entered for BoA.

I.    **PLAINTIFFS HAVE NOT PROVEN AND CANNOT PROVE THEIR FIDUCIARY DUTY CLAIM.**

The SPVs bore the burden of proving: (1) BoA owed them a fiduciary duty; (2) BoA breached that duty; and (3) the breach caused them damages. *De Blasio* v. *Merrill Lynch & Co.*, 2009 WL 2242605, at *27-28 (S.D.N.Y. July 27, 2009). The SPVs have not carried their burden.

A.    **Fiduciary Duties Do Not Arise In Commercial Transactions Absent Extraordinary Circumstances.**

Plaintiffs' suit is premised on a single structured finance transaction in which "[e]very foreseeable event" that could occur "was covered by a contractual obligation." *Baker Dep.* at 109:18-111:6. The Second Circuit has written that in such a commercial transaction, a fiduciary relationship does not arise "absent extraordinary circumstances." *In re Mid-Island Hosp.*, 276 F.3d 123, 130 (2d Cir. 2002). The Second Circuit has also cautioned that a fiduciary relationship "is not to be lightly implied" because "[t]o label someone a fiduciary is to impose on that person obligations additional, and often contrary, to the ordinary allocations of responsibility that govern commercial transactions." *United States* v. *Skelly*, 442 F.3d 94, 98 (2d Cir. 2006).

Plaintiffs attempt to avoid this well-settled doctrine by portraying themselves as helpless neophytes. *See Tr.* at 383:14-18. For example, Plaintiffs claim that the SPVs had just 24 hours to review the transaction documents. *Id.* at 383:18-21. Such claims are demonstrably false.

Maples & Calder ("Maples"), the SPVs' counsel, received and reviewed those documents *months* before closing. *See* PX-183; PX-185; DX-91; DX-97; DX-102. Contrary to Plaintiffs' claims, this was a typical transaction for Cayman SPVs, whose participation was guided by the leading law firm in the field. *See* PX-285; PX-289; DX-303; DX-322.

### 1. No Extraordinary Circumstances Exist In This Case.

To show "transformative" circumstances justifying the imposition of a fiduciary duty, the SPVs must show that they suffered from "impaired faculties, or . . . [had] a closer than arms-length relationship with [BoA], or [that they are] so lacking in sophistication that *de facto* control [of their affairs] . . . is deemed to rest [with BoA]." *De Kwiatkowski* v. *Bear, Stearns & Co.*, 306 F.3d 1293, 1308 (2d Cir. 2002) (citing as an example "a 77-year-old widow").

In this case, Plaintiffs claim to be typical corporations with the rights and responsibilities that come with incorporation. *E.g.*, *Tr.* at 24:11-25:18, 331:1-9, 375:24-376:13. Plaintiffs were set up and advised by a subsidiary of Maples. *Stipulation* ¶¶ 7-8, 147; *Baker Dep.* at 29:15-25, 30:2-10; *Tr.* at 133:21-134:12. Maples had extensive prior experience with Parmalat, both through establishing PCFL and through serving as counsel for more than $1 billion of Parmalat's securities issuances. *Stipulation* ¶ 148; DX-35 at JL0007979; DX-48 at P02106027. Maples also had decades of expertise in the establishment, use, and corporate governance of SPVs, as well as in "banking, capital markets, structured debt, securitization, . . . [and] international equity offerings and listings." DX-322 at 4; PX-289; PX-285; DX-303 at P00159074.

Maples served as the SPVs' legal counsel. PX-196; PX-195; *Baker Dep.* at 71:5-72:16, 364:2-17; PX-185 (instruction from Mayer Brown that the SPVs "should receive the full package of assistance offered by Maples & Calder and QSPV"). Maples was the primary point of contact between the SPVs and BoA and had the opportunity to make any inquiry it thought necessary or important. *Tr.* at 56:22-57:19, 60:6-9. Maples reviewed the transaction documents, understood

the elements of the transaction, and advised the SPV directors about its key terms.  *Stipulation* ¶ 152; DX-91; DX-97; DX-102; *Baker Dep.* at 50:19-52:18, 57:14-59:16.  Maples also notably negotiated the terms and language it deemed important to protect the SPVs' interest, including obtaining a comfort letter from Parmalat S.p.A. regarding the accuracy of Parmalat S.p.A.'s financial information.  *Compare* DX-91 at ¶ 1, *with* DX-107.  The presence of experienced counsel negotiating on behalf of the SPVs with BoA and Parmalat at arm's length is dispositive of any claim of a fiduciary relationship.  *See Solutia Inc.* v. *FMC Corp.*, 456 F. Supp. 2d 429, 447 (S.D.N.Y. 2006); *Abercrombie* v. *Andrew College*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006); *Cafferty* v. *Scotti Bros. Records*, 969 F. Supp. 193, 206 (S.D.N.Y. 1997).

The SPVs were also advised by the Maples subsidiary that created them.  QSPV Ltd., later known as Maples Finance ("QSPV"), was and is in the business of establishing and administering SPVs and providing experienced professionals to serve as directors for SPVs and to "review and approve transactions" on their behalf.  *Baker Dep.* at 30:11-23, 31:6-25.[1]  Like its parent, QSPV claimed specific experience in structured finance (including securitizations, emerging market debt, and synthetic instruments).  *See* DX-303 at P00159074-76.

Nothing about this transaction was extraordinary or unusual from the perspective of the SPV directors, Maples, or QSPV.  *See Baker Dep.* at 64:24-65:12, 263:5-17, 355:24-356:4.  There is certainly nothing "transformative" that would make it categorically different from the other 2000 structured finance / SPV transactions that Maples and QSPV had executed before this deal or the $1 billion in Parmalat transactions in which Maples previously participated.  *See* DX-

---

[1] Much has been said about the SPV directors, *see, e.g., Tr.* at 325:21-326:5, but it *cannot* be said that these individuals were *incapable* of conducting due diligence, administering the SPVs' affairs, or assessing this transaction.  Baker had been a corporate finance attorney since at least 1985 and had his own consulting practice advising financial services clients.  DX-303 at P00159081.  Couch had been a banker since 1972 with extensive experience in capital markets transactions.  *Id.*  Thompson had been a certified accountant since 1993, held a degree in finance, and had worked for at least four different banks.  *Id.* at P00159080.  Hinds had at least eight years experience at various financial institutions, with a focus on structured finance.  *Id.*

303 at P00159074. This Court should reject the unfounded assertion that *this* is the one deal out of thousands where the ordinary and regular rules do not apply. *See Tr.* at 394-96.

### 2.    Imposing A Fiduciary Duty Would Overturn The Allocations Of Responsibility Made By The Parties To The Transaction.

The Second Circuit's concern that importing fiduciary obligations into the commercial setting would upset "the ordinary allocations of responsibility" in place is also on point. *Skelly*, 442 F.3d at 98. Even if, as the SPVs contend, this transaction reduces to a simple sale of stock, Parmalat was the seller, and the SPV directors knew BoA to be Parmalat's agent in the transaction and that Parmalat was paying BoA a $4.5 million commission for its work on this transaction.[2] The SPVs also knew that BoA was a significant investor in the transaction as well as a lender to the SPVs through the swaps used to pay the interest on the notes. The SPVs and BoA thus stood in two distinct, known and apparent conflicts-of-interest. *Tr.* at 70:4-14.

Despite being aware that BoA's allocated responsibility in this transaction was to work diligently on behalf of Parmalat to close the deal, the SPVs now claim that BoA should have put the SPVs' interests ahead of its actual client's. That is not the law. *See Thermal Imaging, Inc.*, v. *Sandgrain Sec., Inc.*, 158 F. Supp. 2d 335, 344 (S.D.N.Y. 2001) (finding that a financial institution owes no fiduciary duty to "parties asserting claims adverse to the [institution's] own customers"); *HF Mgmt. Servs.* v. *Pistone*, 34 A.D.3d 82, 86, 818 N.Y.S. 2d 40 (N.Y. App. Div. 2006) (recognizing that the seller cannot impose fiduciary obligations on a party that owes duties to the potential buyers). BoA has not found any case stating that a paid representative of the *seller* in a securities transaction could be deemed a fiduciary for the *buyer*.

---

[2] *See Pl. Trial Br.* at 45; *Baker Dep.* at 313:13-314:4 (acknowledging that BoA "acted on behalf of Parmalat"); *June 1999 PPM* (PX-22 at BOFA-2048354) (BoA acted "as Parmalat's placement agent with respect to the securities offered herein."); *see also Lau Testimony* ¶¶ 134-138 (BoA's client was Parmalat, not the SPVs). Importantly, BoA was not an underwriter within the meaning of the U.S. securities laws in any Parmalat transaction, and therefore did not have any obligations or duties of an underwriter. *See, e.g.*, *Johnson Testimony* ¶ 9 (identifying the services typically provided by a private placement agent, none of which include any underwriting activities).

**B.    The SPVs Have Not Proven The Existence Of A Fiduciary Relationship.**

Putting aside the issue of whether a fiduciary relationship is appropriate in this setting, the SPVs still bore the burden of proving the elements of such a claim.  They failed.

**1.    There Is No Evidence Of Reasonable Reliance.**

The SPVs were required to show that they *reasonably* relied on BoA's expertise.  *See*, *e.g.*, *Kottler* v. *Deutsche Bank AG*, 607 F. Supp. 2d 447, 465 (S.D.N.Y. 2009).  The existence of known conflicts-of-interest made any reliance the SPV directors might have placed on BoA distinctly unreasonable.  Tax cases in which reasonable reliance is a defense are illustrative.  In that context, the Second Circuit has unequivocally stated that it is unreasonable to rely on an advisor known to have a conflicting economic interest, *Addington* v. *Commissioner*, 205 F.3d 54, 58 (2d Cir. 2000); *Chimblo* v. *Commissioner*, 177 F.3d 119, 126 (2d Cir. 1999); *Goldman* v. *Commissioner*, 39 F.3d 402, 406 (2d Cir. 1994), and the Sixth Circuit has rejected an investor's reliance on a fund's promoter as a basis for investing because the promoter was "not a disinterested source" of advice.  *Illes* v. *Commissioner*, 982 F.2d 163, 166 (6th Cir. 1992).

In any event, it is the SPVs' burden to show that they reposed the "special" trust or confidence in BoA that would give rise to a fiduciary duty.  *Henneberry* v. *Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 459 (S.D.N.Y. 2006).  This level of trust must rise to an expectation that the obligor will sublimate its own interests in favor of those of the beneficiary.  *See*, *e.g.*, *Primavera Familienstifung* v. *Askin*, 130 F. Supp. 2d 450, 544 (S.D.N.Y. 2001).  Baker, the only SPV director to actually do any work on this transaction, testified that he had no expectation that BoA would do so.  *Baker Dep.* at 427:9-429:18; *id.* at 33:9-40:23, 41:3-42:12, 96:11-97:9; *see also Thompson Dep.* at 60:18-61:6, 61:22-62:18; *Couch Dep.* at 62:21-64:8.  The fact that the SPVs' "lead" director had no expectation that BoA would serve as the SPVs' fiduciary is direct evidence that they did not repose the requisite special trust and confidence.

### 2.    BoA Did Not Accept Trust Or Assume Control Of The SPVs.

The SPVs also must prove that BoA accepted any trust reposed in it.  *See, e.g.*, *Musalli Factory for Gold & Jewelry* v. *JPMorgan Chase Bank, N.A.*, 2009 WL 860635, at *12-13 (S.D.N.Y. Mar. 31, 2009).  To establish the requisite acceptance, Plaintiffs had to prove that BoA assumed a level of influence over the SPVs that amounted to "*de facto* control and dominance."  *United States* v. *Chestman*, 947 F.2d 551, 568 (2d Cir. 1991); *Osofsky* v. *J. Ray McDermott & Co.*, 725 F.2d 1057, 1060 (2d Cir. 1984); *United States* v. *Brennan*, 183 F.3d 139, 150 (2d Cir. 1999).  The SPVs made no such showing, nor could they.

QSPV, not BoA, created the SPVs.  *Stipulation* ¶¶ 7-8.  QSPV, not BoA, determined which QSPV employees would serve as the SPVs' directors.  *Baker Dep.* at 130:14-21.  Maples, not BoA, reviewed the transaction documents on the SPVs' behalf.  *Stipulation* ¶ 152; PX-183; DX-91; DX-97; DX-102.  The SPVs were in no way controlled by BoA, *see id.* at 364:18-367:2; PX-61, and that is dispositive, *see Chestman*, 947 F.2d at 569.

Plaintiffs' counsel instead point to four documents that they contend could evidence the requisite level of acceptance or control.  At most, however, those documents evidence only the sort of "acceptance" that gives rise to *contractual* obligations, which cannot establish a fiduciary relationship.  *See World Wrestling Entm't, Inc.* v. *Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 503-04 (S.D.N.Y. 2007) ("[W]here a contract governs the relationship between two commercial parties, the assumption is that there is no fiduciary relationship unless the contract provides otherwise."), *aff'd*, 2009 WL 1391807 (2d Cir. May 19, 2009); *Banco Espirito Santo de Investimento, S.A.* v. *Citibank, N.A.*, 2003 WL 23018888, at *15-16 (S.D.N.Y. Dec. 22, 2003), *aff'd*, 110 Fed. App'x 191 (2d Cir. 2004).  Specifically:

- **The Indemnification Agreement (PX-47)** predates not just the SPVs' incorporation, and the deal's circling, but even BoA's initial marketing efforts. *See Stipulation* ¶ 7, DX-327; PX-311. There is no legitimate basis for the SPVs to claim any benefit from an agreement in which Parmalat agreed to hold BoA harmless.[3] But even if there were, a contractual agreement to "advise and assist" does not give rise to a fiduciary obligation. *See Village on Canon* v. *Bankers Trust Co.*, 920 F. Supp. 520, 532-33 (S.D.N.Y. 1996) (no fiduciary duty arises from an agreement to market a client's debt even with a long-standing advisory relationship and a written Financial Advisor Agreement).

- **The October 1999 fee quote letter (PX-12)** was sent by Baker to attorneys at Maples and forwarded to BoA via Mayer Brown, *see* PX-310; however Plaintiffs cannot prove that BoA accepted QSPV's unilateral terms. *See Deutsche Asset Mgmt.* v. *Callaghan*, 2004 WL 758303 (S.D.N.Y. Apr. 7, 2004) (acceptance must comply with the terms of the offer and be clear, unambiguous, and unequivocal). In fact, the evidence is to the contrary. Baker's letter was primarily a list of QSPV's fees. *See* PX-310 at 1. The parties' agreement on that score was embodied in an Expense Agreement drafted by Maples, and that document contains absolutely no language incorporating Baker's proposed conditions. *See* PX-36. Thus, the *actual contracts* belie Plaintiffs' position.[4]

- **The Management Agreements (PX-33, PX-34)** each post-date the SPV directors' decision to enter the transaction by a matter of *days*. *See* PX-61; PX-62; DX-113. They were executed at the same closing as the other transaction documents.[5] They explicitly state that they created only forward-looking obligations. *E.g.*, PX-33 at Clause 2. Baker testified that they were intended to govern issues that arose *after* the transaction closed. *See Baker Dep.* at 37:22-38:16, 96:11-97:9. There is no basis in the record to suggest that the Management Agreements *retroactively* imposed any obligation. They certainly did not impose a fiduciary one given the parties' agreement that BoA need use only "reasonable efforts," PX-33 at Clause 2, that BoA's liability would be limited to gross negligence, *id.* at Clause 10.2, and that the document represented the parties' entire agreement, *id.* at Clause 13.3. *See 330 Acquisition Co., LLC* v. *Regency Sav. Bank, F.S.B.*, 306 A.D.2d 154, 155, 761 N.Y.S. 2d 185 (N.Y. App. Div. 2003) (limiting liability

---

[3] If the SPVs want to claim beneficiary status, they must prove *both* that the Indemnification Agreement was intended for the SPVs' benefit *and* that the benefit to the SPVs was sufficiently apparent to indicate that BoA willingly assumed a duty to compensate the SPVs if a breach occurred. *See, e.g., Mendel* v. *Henry Phipps Plaza W., Inc.*, 844 N.E.2d 748, 751 (N.Y. App. Div. 2006). Here, they have proven neither.

[4] One point of Baker's letter was to raise the issue of the availability of *cash flows* so the SPVs would not, under the structure of the transaction, be assuming uncovered obligations. *See* PX-12 at Clause H. Here, the investment funds came from the Noteholders, not the SPVs. The interest payments flowed from BoA, not the SPVs. Repayment of both was to take place either from the market (if an IPO occurred) or from Parmalat (through the Put/Guarantee), not the SPVs. Every possibility was covered, subject to the risk that Parmalat was not creditworthy.

[5] In response to the Court's question, *Tr.* at 442:21-443:9, it is not reasonable to assume that the Management Agreements were executed before the operative documents. Plaintiffs bore the burden of proof. Here, the opening words of the Management Agreements speak of the operative documents in the past tense, noting that the SPVs had already "acquired various rights and benefits and assumed various obligations." PX-33 at Preamble A. Moreover, the indices for the transaction list the Management Agreements as the 33rd entry out of 42, and deem them ancillary, non-operative documents. PX-286.

to gross negligence "is plainly inconsistent with the creation of a fiduciary relationship"); *Wallingford Shopping, L.L.C.* v. *Lowe's Home Ctrs., Inc.*, 2001 WL 96373, at \*11-12 (S.D.N.Y. Feb. 5, 2001) (an entire agreement clause is inconsistent with the imposition of a fiduciary duty).

- Powers of Attorney (PX-303 at BOFA-0011631-33) like those granted to BoA employees for the purpose of executing the transaction documents are routinely used in SPV transactions to permit closings outside the Cayman Islands. *Baker Dep.* at 409:15-410:5, 412:2-6; PX-289 at part IV(4). Here, the SPV directors approved the transaction before granting any power of attorney, and the designated individuals were just "following [the SPV directors'] instructions." *Thompson Dep.* at 65:17-66:23. Such powers of attorney carry with them no fiduciary obligation. *See 330 Acquisition Co.*, 306 A.D.2d at 155; *Louros* v. *Cyr*, 175 F. Supp. 2d 497, 516 (S.D.N.Y. 2001); *Nw. Nat'l Ins. Co. of Milwaukee, Wis.* v. *Alberts*, 769 F. Supp. 498, 508 (S.D.N.Y. 1991).

Because Plaintiffs have not proven the existence of trust reposed or accepted, because reposing fiduciary trust in BoA would have been manifestly unreasonable, and because the extraordinary or transformative circumstances required by Second Circuit precedent do not exist in this case, Plaintiffs cannot show that BoA owed these SPVs a fiduciary duty.

### C.    The SPVs Have Not Proven Any Breach Of Fiduciary Duty.

Even if a fiduciary relationship could be shown, Plaintiffs have not proven that BoA breached any alleged fiduciary duty. The scope of a fiduciary duty "is determined by the scope of the agency relationship." *All Boys Music, Ltd.* v. *DeGroot*, 1992 WL 51502, at \*12 (S.D.N.Y. Mar. 9, 1992). If BoA were a fiduciary to the SPVs, its duty was to disclose material information of which it was aware to the SPVs.[6] That duty was satisfied by providing the SPVs

---

[6] Any contention that BoA owed the SPVs a duty to conduct their affairs would be inconsistent with the facts. The Plaintiffs base their fiduciary duty claim on an unsavory characterization of corporate governance and responsibility, *i.e.*, that it is acceptable for experienced directors to willfully and deliberately reject all responsibility (even to read the transaction documents) by simultaneously limiting their own liability to the corporation and delegating their responsibility to others. Although the parties disagree whether the SPV directors actually delegated any responsibility to BoA, there is no dispute that the directors maintained ultimate authority to approve or reject the SPVs' participation in the transaction. Under New York or Delaware law, delegating that responsibility would constitute an impermissible abdication of the directors' responsibility, and would be a breach of their fiduciary duties to the SPVs. *See Bomarko, Inc.* v. *Int'l Telecharge, Inc.*, 794 A.2d 1161, 1178 (Del. Ch. 1999); *Pereira* v. *Cogan*, 2001 WL 243537, at \*8 (S.D.N.Y. Mar. 8, 2001). Impermissible delegations are not enforceable. *See Sample* v. *Morgan*, 914 A.2d 647, 673 (Del. Ch. 2007).

*(Footnote Continued)*

with the transaction documents, including the same PPM provided to the note purchasers, and then responding to the SPVs' counsel's questions.  These disclosures conformed to customary industry practice, as established by Maples itself, and therefore satisfied any fiduciary obligation BoA allegedly had.  *See Restatement (Third) of Agency* § 8.11, cmt. a.  "If an agent lacks notice that a principal wishes to receive advice or information beyond the information customarily provided by an agent in a particular position, the agent is not subject to a duty to provide such advice or information."  *Id.* § 8.11, cmt. c.

Once it was determined that SPVs would be required to effectuate the PBrazil transaction, BoA took its cues from Maples, the expert on Cayman Islands SPVs, about what information was required.  *See* PX-183; *Baker Dep.* at 185:14-186:5.  Maples served as the liaison and directed the flow of information between BoA and the SPV directors.  *See, e.g.*, PX-185, DX-91, DX-97, DX-102, DX-109.  Counsel for BoA provided Maples with a summary of the transaction and specifically informed Maples that the SPVs would be expected to purchase shares of Parmalat Brazil using funds raised through a note issuance.  PX-183.  BoA's counsel also provided Maples with drafts of the transaction documents, including the Put Agreement, the Guarantee, the Subscription Agreement and the Note Purchase Agreement.  *Id.*  Maples provided comments on the transaction documents, raised questions, and requested additional information as it needed.  *See* DX-91, DX-97.  Despite being on notice that the SPVs would be purchasing shares as a part of the transaction, Maples did not request a formal valuation of the shares, and

---

Even assuming BoA was tasked with decision-making authority for the SPVs, the scope of any ensuing fiduciary obligation would be to exercise due care and to act in the interests of the SPVs.  *See, e.g.*, *De Kwiatkowski*, 306 F.3d at 1307; *Primavera*, 130 F. Supp. 2d at 544.  That is, BoA would have had to treat the SPVs' investment decision as if it were BoA's own.  There can be no doubt that BoA did this.  It conducted extensive due diligence on the transaction, and BoA's decision to invest its own money in the transaction proves that it met any applicable fiduciary duty in regard to the SPVs' investment decision.

In any event, the directors' liability to the SPVs was limited to "willful neglect or default."  PX-302 at BOFA-2071460.  If the directors abdicated their decision-making responsibilities to BoA, BoA could not be held to a higher level of care than the directors themselves in the exercise of the same responsibilities.

neither did their clients. Maples nevertheless drafted the board minutes that identified the documents that it considered necessary for the directors to review in order to meet their obligations. *Baker Dep.* at 208:2-209:21; DX-113 at JL0005869-70; DX-191.

If anything, BoA's disclosures were over-inclusive. Among the documents provided by BoA and identified in the board minutes was the June 1999 PPM. *See* PX-196 at 2. The 200+ page PPM contained extensive information about Parmalat S.p.A. and the proposed transaction; it focused principally on Parmalat S.p.A.'s financial condition, as the parent was the principal source of repayment, but it also explained the significance of Parmalat Brazil to the transaction. For example, the PPM disclosed that in 1998 Parmalat Brazil's revenue comprised 40% of the total revenues for consolidated Parmalat S.p.A. *See* PX-22 at 4, 42. The PPM also described the financial crisis and Brazilian devaluation in late 1998 and early 1999, and its expected impact on Parmalat Brazil's performance. *Id.* at 44-45. Also, the 1998 financial statements of Parmalat's main operating subsidiary in Brazil and forecasts of 1999 results for that entity were attached to the Subscription Agreements that were provided to Maples and the SPV directors. *See* PX-40, PX-41.[7] There is no evidence any documents requested by Maples or the directors were not provided or that any inquiries went unanswered. To the contrary, Maples was sufficiently comfortable with the transaction to issue opinion letters on behalf of FHL and DHL in support of the transaction, *see, e.g.*, DX-109 at 2-3, and the SPVs were sufficiently comfortable to state in the Note Purchase Agreements that the documents provided to the Note Purchasers "do not

---

[7] Plaintiffs make much of the fact that those forecasts contained an EBIT figure that was less than the projection used by both Deloitte and NMS in their valuations of PBrazil. The 1999 projections represented estimated results for one year – 1999. *See* PX-41 at 2048488. The figures do not account for future growth of PBrazil and do not purport to predict PBrazil's future results. They certainly were not normalized to account for the anomalous year experienced by Brazil in 1999. *Huber Testimony* ¶¶ 15-16, 33-34, 36-38, 43, 47. Thus, there is no meaningful comparison between the two sets of numbers, and Plaintiffs cannot possibly show a knowing breach of fiduciary duty by arguing from hindsight that such a comparison should have been made.

contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements herein and therein not misleading . . . ."  PX-24 at ¶ 5.3; PX-25 at ¶ 5.3.

Furthermore, the documents BoA provided to Maples were consistent with standard Cayman practice.  *Galloway Decl.* ¶¶ 40, 44.  Maples' own marketing materials stated that there are only three factors relevant to a Cayman Islands SPV director's decision to approve a transaction: (1) the provision of a small fee for entering into the transaction; (2) contractually limited liability in the event of default; and (3) transaction documentation that provides for reimbursement of the SPVs' ongoing expenses.  DX-322.  All three conditions were met here – the SPVs received their fee, recourse was limited, and high-quality transaction documents were presented to the directors.  *See, e.g.*, *Stipulation* ¶¶ 153-57; *Baker Dep.* at 37:7-21, 151:6-17, 178:2-12, 216:24-217:19.  BoA was therefore entitled to assume that its provision of the standard transaction documents satisfied any obligations.  *Restatement (Third) of Agency* § 8.11, cmt c. Given that Maples both created the playing field and established the rules, this Court should not allow two of its creations to claim that the rules do not apply to them.

### 1.    BoA Disclosed All Material Information To The SPVs.

Materiality depends on whether the information is "reasonably certain to have a substantial effect" on a "reasonable person in plaintiff's position."  *Moy* v. *Adelphi Inst., Inc.* 866 F. Supp. 696, 705-06 (E.D.N.Y. 1994); *Cresswell* v. *Sullivan & Cromwell*, 704 F. Supp. 392, 408 (S.D.N.Y. 1989).  The SPV directors were being asked to approve a transaction in which the principal source of repayment was a guaranteed Put from Parmalat S.p.A.  The information provided was consistent with the view of all parties that Parmalat S.p.A. was the principal source of repayment and information on other issues simply was not material.

**(a)      An Important Structural Element Of The Transaction Was To Make Parmalat Brazil Immaterial.**

By hinging their case on Parmalat Brazil, Plaintiffs are essentially seeking to rewrite history.  In 1999 neither Maples nor the directors expressed any interest in a real-time valuation of PBrazil.  *See*, *e.g.*, DX-91, DX-97; *Baker Dep.* at 57:14-58:6, 58:24-60:8, 135:2-136:6, 435:11-14.  It is only now that Plaintiffs contend that BoA had a duty to disclose information about the pricing of the transaction, including specifically the valuations that Plaintiffs claim were no longer current.  *Tr.* at 344:23-25.

Plaintiffs' argument is based on an unfounded premise.  The price of the transaction – specifically the percentage of PBrazil that was purchased with the $300 million – was the result of negotiations between Parmalat and BoA and was not based on a third-party valuation of PBrazil.  *Lau Testimony* ¶ 111.  Similarly, "the only valuation that mattered to investors was the price at which Parmalat S.p.A. agreed to purchase the shares of Parmalat Admin."  *Id.*; *see also id.* ¶¶ 116-17.  That price and the percentage of PBrazil purchased with the $300 million were the result of negotiations between two commercial parties with opposite interests, and the Deloitte and NMS valuations were merely data points supporting the reasonableness of the price.  *Id.* ¶ 115.  The key figure clearly was disclosed to the SPVs – the price at which Parmalat, an investment grade credit, agreed to repurchase the shares through the guaranteed Put.[8]

During closing arguments, counsel for FHL/DHL rhetorically asked the Court, "[w]ho would go to market on a $300 million deal without a current valuation?"  *Tr.* at 344:23-24.  The answer is self-evident: it depends on the transaction.  Tellingly, Plaintiffs have presented no

---

[8] Plaintiffs' claim that BoA's disclosures were deficient also ignores that BoA did not make specific disclosure of the *positive* news about PBrazil in its files, including the results of Lau's due diligence trips and Parmalat's opportunities to capture market share in the downturn, DX-58, DX-70; the "stress tests" performed by the Bank showing that Parmalat could pay off the obligation with no contribution from PBrazil, DX-65, DX-66; the recovery of the Bovespa index, *Stipulations* ¶ 136; DX-67; and the 50% decline in Brazilian interest rates during 1999 after the January-March 1999 spike brought on by the Real devaluation, *Stipulations* ¶ 138.

evidence that *any* valuation was required for *this* transaction to proceed. To the contrary, the parties to the transaction considered a valuation of the shares alone irrelevant in light of the Put and the Guarantee, which set a floor price for the shares reflecting what a knowledgeable and pre-determined buyer would pay for the shares if there were no IPO. *Lau Testimony* ¶¶ 115-117; *see also Baker Dep.* at 437:4-11. A valuation of PBrazil, especially based on the anomalous year of 1999, was not a necessary precursor to an IPO within four years. *Huber Testimony* ¶¶ 32, 43.

The sophisticated private placement investors who participated in the PBrazil transaction and did their own due diligence understood this fact. *Lau Testimony* ¶¶ 104-07. There is no evidence that any of these investors requested to see BoA's internal credit discussions or to receive any valuations of PBrazil. To the contrary, they recognized that because IPOs are inherently unreliable, the credit risk in the transaction was Parmalat S.p.A. *See Schwartz Testimony* ¶ 17 (citing DX-149 at PRUD00684 ("While we acknowledge that there is some value to the 10% equity interest in Parmalat Brazil, we really look through to Parmalat as our credit for this transaction.")); *see also* DX-117 ("This deal effectively gives us Parmalat exposure . . ."); *Johnson Testimony* ¶ 85. IPOs are simply not reliable sources of credit. *See* DX-221 ("Credit shouldn't/wouldn't approve a loan with the primary source of repayment, an IPO"); *Tr.* at 64:3-65:2, 246:9-19; *Chalk Testimony* ¶ 84.[9] Furthermore, the investors were given the opportunity to take a due diligence trip to Brazil but declined and visited Parmalat Italy instead. *Lau Testimony* ¶ 105. The actual analysis conducted by the private placement investors establishes that BoA's

---

[9] That the transaction contained no covenants related to the financial ratios of Parmalat Brazil, *Stipulations* ¶ 186, and that the transaction was priced consistent with Parmalat S.p.A. debt issuances, *see Schwartz Testimony* ¶¶ 23-29, are further proof that the only relevant Parmalat entity was Parmalat S.p.A., not Parmalat Brazil. In fact, the value of PBrazil was considered so immaterial to the SPVs that the consolidated net worth of PBrazil could dip to R$580 million (then equivalent to US$319 million, or less than 25% of the $1.35 billion value implied by the Put Agreement) before a "put event" would occur. PX-26 at 9-10. Similarly, Maples asked for and received comfort letters from Parmalat S.p.A. (DX-91, DX-97, DX-105, DX-106, DX-114), but never once asked for comfort letters from PBrazil, which is further proof that the SPVs never considered PBrazil to be material.

prior credit analyses and share valuations were not material to a reasonable investor.  The lack of materiality is further supported by the fact that David Chalk, who was aware of the existence of both the Deloitte valuation and prior credit declinations, nonetheless approved the Bank's own investment in the transaction.  *Chalk Testimony* ¶¶ 83-88; *Tr.* at 248:18-249:19.

Plaintiffs argue that their interests diverged from those of the investors because the investors bought notes and the SPVs bought shares.  This is a distinction with no economic difference.  The economic interests of the SPVs were perfectly aligned with the investors.  *Schwartz Testimony* ¶¶ 35-37.  The structure of the transaction was such that the Note Purchasers were completely reliant on the assets of the SPVs for repayment.  The only assets held by the SPVs were the right to sell the shares of PBrazil, either through an IPO or directly to Parmalat.  Those assets were immediately pledged as collateral to a trustee acting on behalf of the Note Purchasers.  *Stipulations* ¶¶ 192-93; PX-31, PX-32, PX-42, PX-43.  The Note Purchasers thus depended on the exact same source of repayment as the SPVs.[10]

### (b)    Parmalat Brazil Was Not Material To The Lead Director.

Baker, a lawyer who had worked on "hundreds" of transactions involving SPVs, *Baker Dep.* at 32:9-19, was the only SPV director who arguably reviewed anything, *Couch Dep.* at 21:18-24:23, 39:23-42:16; *Hinds Dep.* at 28:24-29:11, 32:24-33:30; *Thompson Dep.* at 46:14-25, 74:9-25, 91:9-92:5; *Stipulations* ¶ 169.  Baker focused on: his own limited liability, *Baker Dep.* at 151:6-17, 165:20-25; advice from his counsel, *id.* at 71:5-72:16; 37:12-21; Parmalat's Guarantee, *id. at* 344:3-18; 58:24-59:16; and the reputation of the parties, including the reputation of Parmalat, *id.* at 55:25-56:14; 158:1-8; 165:20-25.

---

[10] As established above, to the extent the SPVs' interests diverged from BoA, that would preclude a finding of a fiduciary duty.  *See supra* at § I(A).  To the extent the SPVs' interests were aligned with BoA, then the Bank's own decision to invest in the transaction shows that any duty that existed was fulfilled.

Baker had "no concern" about PBrazil because he "felt good about the guarantee being in place as a protection for the financial interests of the company." *Id.* at 58:24-60:8. He had no discussions with anyone about PBrazil; nor did he ask a single question about the company or its value. *Id.* at 435:11-19; 57:14-17; 339:18-24. According to Baker, once he learned the SPVs had no risk, "there was no reason to carry out detailed business analysis . . . [w]e had limited recourse, we had a put, we had a guarantee." *Id.* at 178:1-12. Having disclaimed any interest in receiving information about Parmalat Brazil, the SPVs cannot now claim that BoA's failure to disclose such information constituted a breach.[11]

### 2.    BoA Acted With Due Care.

As demonstrated above, BoA had no fiduciary obligation to conduct due diligence on the SPVs' behalf. Even if such a duty is assumed, that duty was fulfilled.[12] For example, Lau and Johnson testified at length about their due diligence regarding Parmalat generally, *Lau Testimony* ¶¶ 30-74, *Johnson Testimony* ¶¶ 32-49, and Parmalat Brazil specifically, *Lau Testimony* ¶¶ 99-129, and Lau documented on three separate occasions in 1999 his belief that a sale of the shares through an IPO would result in significant upside for the Bank, *see* DX-72, DX-79, DX-94; *see also Lau Testimony* ¶¶ 130-33; *Johnson Testimony* ¶ 91.[13] There is no evidence that anyone at

---

[11] The directors were aware by 2002 that an IPO of PAdmin was extremely unlikely by the end of 2003. *BoA Trial Br.* at 18-19, 82. In fact, Parmalat made public announcements to that effect. DX-235 at P04702930. However, at that point in time none of the directors or their counsel called a default, nor did they seek to bring a claim for damages. This is yet another example showing that Plaintiffs' current claim that PBrazil was material to the directors' decision-making is inconsistent with the directors' pre-litigation behavior.

[12] Breach of fiduciary claims are not subject to strict liability. *Schultz* v. *Stoner*, 308 F. Supp. 2d 289, 303 (S.D.N.Y. 2004). At the very least, Plaintiffs were required to prove that BoA had both knowledge of the facts that the SPVs claim were not disclosed, and reason to believe those facts were material. *Botti* v. *Russell*, 180 A.D.2d 947, 580 N.Y.S. 2d 505 (N.Y. App. Div. 1992). This standard is akin to negligence. *Norlin Corp.* v. *Rooney, Pace Inc.*, 744 F.2d 255, 264 (2d Cir. 1984). None of the evidence adduced at trial supports such a finding.

[13] Lau's optimism was shared by the market. For example, a February 1999 article titled "Parmalat Conquers Brazil," sung the praises of PBrazil, and in particular its marketing efforts that allowed it to grow from sales of $30 million in the early 90s to sales of almost $2 billion by 1999. DX-69. Other mainstream media articles noted the dramatic rebound in the Brazilian economy. *See, e.g.*, DX-98, DX-99, DX-103, DX-110.

BoA considering the 1999 transaction held a different view. The due diligence on the credit side was similarly robust and favorable. *Chalk Testimony* ¶¶ 12, 15-17; *Tr.* at 237:7-13. BoA also monitored the Brazilian stock market as part of its on-going due diligence and was aware that despite the dip in the Brazilian economy, the outlook was promising. *See* DX-68, PX-311 at 1.

Nor is there evidence that BoA's failure to provide the directors with its internal credit analysis performed in 1998 violated the standard of care. First, such disclosure would have violated Bank policy. *Lau Testimony* ¶ 98.[14] Second, David Chalk's testimony supports that this information was not material to the 1999 PBrazil transaction. Chalk stated that he was aware of prior rejections of the transaction but considered the terms of the 1999 version – and the conditions in the market at the time of his approval – to be materially different from the scenario in 1998. *Chalk Testimony* ¶¶ 76-79 ("Nor were the previous declinations material to my approval of the Bank's acquisition of the FHL and DHL notes."); *Tr.* at 254:12-255:6 ("So the whole environment was different as well as the deals being different.").[15]

## II.    PLAINTIFFS HAVE NOT PROVEN THEIR CONTRACT CLAIM.

Plaintiffs also contend that BoA owed them contractual "duties of disclosure" under the Management Agreements.[16] *See, e.g.*, *Pl. Trial Br.* at 57, 69-70. Setting aside the fact that the SPVs cannot actually show any fault with BoA's due diligence, their breach of contract claim

---

[14] BoA's Global Corporate & Investment Banking Credit Policy Guide forbade the disclosure of any documents that included BoA's internal risk rating to third-parties (such as the SPVs). *See* PX-102 at BOFA-1843640. BoA's policy and federal regulations also prohibited the disclosure of the contents of any non-public OCC information, including confidential information regarding BoA's operations. *Id.*; 12 C.F.R. §§ 4.32(b)(1)(vi), 4.36(c), 4.37(b)(ii). Notably, BoA's credit approval memoranda (in addition to serving as the focal point of the BoA's credit analysis), were required by law to be retained for annual exams conducted by the OCC. *See* 12 C.F.R. §§ 1.5(a-c); 4.6(a).

[15] In any event, the basis for certain BoA officer's rejections of earlier iterations of the deal was information that was in the public sphere and was disclosed to the directors in the PPM, *see supra* at 11. Lau also testified at trial that he was aware of this information and did not view it as a concern. *Tr.* at 289:2-14.

[16] The only contracts identified in Plaintiffs' Complaint and its Response to BoA's Interrogatories are the Management Agreements. *Compl.* ¶¶ 237-245; *FHL/DHL Resp. to Interrog.* #5. Any attempt by the SPVs to now seek to enforce contractual rights claimed under the Indemnification Agreement or the fee quote letter, or the powers of attorney, *see, e.g.*, *Pl. Trial Br.* at 10-11, are thus illegitimate.

remains baseless.  *First*, as discussed above, the Management Agreements post-date the SPV directors' approval of the transactions and only apply to the parties' relations *after* closing.  *See supra* at 7 & n.5.  Any breach of those agreements therefore could not have caused the SPVs' alleged damages.  *See BoA Tr. Br.* at 82-83.  **Second**, the Management Agreements state: "[BoA] shall not be liable to the [SPVs] by reason of any act, neglect or default hereunder *except in respect of any gross negligence or willful breach of duty*."  PX-33 at Clause 10.2 (emphasis added).  "New York law generally enforces contractual provisions absolving a party from its own negligence."  *Colnaghi, U.S.A., Ltd.* v. *Jewelers Prot. Servs., Ltd.*, 611 N.E.2d 282, 283-84 (N.Y. 1993).  As a result, the SPVs were required to prove that BoA acted with "a reckless disregard for the rights of others" that "smacks" of intentional wrongdoing.  *See id.* at 284.  They have not satisfied this standard.  *Cf. Tr.* at 324:2-326:12.[17]

**III.    TO THE EXTENT THERE WAS ANY ACTIONABLE BREACH OF FIDUCIARY DUTY OR CONTRACT, IT DID NOT CAUSE ANY HARM TO PLAINTIFFS.**

In order to show damages, Plaintiffs must prove that BoA's alleged breach – the failure to disclose material information – both induced the Plaintiffs to engage in the transaction (transaction causation) and directly caused the loss about which they complain (loss causation). *See Laub* v. *Faessel*, 297 A.D.2d 28, 31, 745 N.Y.S. 2d 534 (N.Y. App. Div. 2002); *LNC Invs.*

---

[17] Plaintiffs cannot actually state a claim for breach of fiduciary duty, negligent misrepresentation, breach of contract, or unjust enrichment under New York law.  The Martin Act supersedes common-law claims in the securities context that do not require a showing of deceitful intent.  *See BoA Trial Br.* at 75-80; *Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 2009 WL 2828018, at *7, *13-14 (S.D.N.Y. Sept. 2, 2009).  Having chosen this forum and affirmatively argued that New York law governs, the SPVs must limit their case to fraud.

Plaintiffs claim that the Martin Act is waived, but they are mistaken.  Martin Act "preemption" differs materially from federal preemption insofar as the Martin Act affects neither jurisdiction (*i.e.*, who should hear a claim) nor choice-of-law (*i.e.*, whether, under the Supremacy Clause, federal or state law should govern).  *Cf. Saks* v. *Franklin Covey Co.*, 316 F.3d 337, 349 (2d Cir. 2003).  Rather, the Martin Act represents the legislative choice that only the New York Attorney General may bring claims arising from the sale of securities without proving scienter.  *See, e.g.*, *Kassover* v. *UBS AG*, 619 F. Supp. 2d 28, 36 (S.D.N.Y. 2008).  Thus, common-law claims that do not require scienter no longer exist in New York in the securities context, which is just another way of saying that plaintiffs cannot state a viable claim for relief.  By rule, such issues can be raised as late as trial.  Fed. R. Civ. P. 12(h)(2).

*Inc.* v. *First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 465 (2d Cir. 1999); *In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 578 (S.D.N.Y. 2007).

> **A.    Plaintiffs Have Not Proven Transaction Causation.**

There is no credible evidence to support a finding that the SPVs would have rejected the transaction even if they had access to all information available to BoA.  Plaintiffs therefore cannot show transaction causation.  *See Kerrigan* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 450 F. Supp. 639, 643 (S.D.N.Y. 1978) ("[I]f a defendant can show that the investment decision by the plaintiff would not have changed under any circumstances, then the necessary causal link between the alleged nondisclosure and the decision to buy or sell is not present."); *RSL Commc'ns PLC* v. *Bildirici*, 2009 WL 2524614, at *26 (S.D.N.Y. Aug. 14, 2009) ("the conclusion that Plaintiff draws . . . that Defendants 'might have' caused [the company] to sell its subsidiaries . . . is fatally speculative in terms of establishing factual causation").

*First*, even if BoA provided every CAM, Call Memo, and valuation in its files to the directors, there is no evidence to suggest that the directors would have read them.  This fact alone is fatal to Plaintiffs' claim.  *Cf. Bullmore* v. *Ernst & Young Cayman Islands*, 861 N.Y.S.2d 578, 584 (N.Y. Sup. Ct. 2008) (rejecting Cayman liquidator's claim that directors of a Cayman investment fund would have taken action as "speculative and unsupported by the factual record" where the directors did not hold a single meeting, did not receive financial reports, did not monitor the fund's investments, did not review the fund's financial statements and in general spent only a few hours on the fund's business); *Jordan (Bermuda) Inv. Co.* v. *Hunter Green Invs. LLC*, 2007 WL 2948115, at *22 (S.D.N.Y. Oct. 3, 2007).  *Second*, even assuming that the SPV directors would have read any additional information that BoA provided, there is no evidence that they would have reconsidered their decision.  Baker was concerned about limited liability, the Put, the Guarantee and "the quality of the participants in this transaction."  *Baker Dep.* at

- 18 -

55:15-56:14.[18]  He simply was not interested in the valuation of PBrazil or further details about the substance of the transaction.  ***Third***, despite having considered hundreds of transactions as a director of SPVs created by QSPV and Maples, Baker could not identify a single one he had turned down.  *Id.* at 37:7-21.  It is inconceivable that the directors would have singled out *this* transaction and rejected it when BoA, based on the same information, was willing to purchase $165 million of notes and make a swap commitment of more than $50 million.[19]

**B.      Plaintiffs Have Not Proven Loss Causation Or Damages.**

Plaintiffs must also prove that any loss was the proximate result of the breach that induced the investment.  *See Laub*, 297 A.D.2d at 31 ("Loss causation is the fundamental core of the common-law concept of proximate cause.").  Here, the alleged breach relates to disclosure of information regarding Parmalat Brazil.  Plaintiffs' position is that they were damaged in the amount of $300 million "right out of the box" because the PBrazil shares they purchased were worthless.  *Tr.* at 112:2-8.  This claim fails for at least two separate reasons: (1) it is based on an incorrect measure of loss; and (2) it ignores the overriding effect of the Parmalat fraud.[20]

---

[18] *Baker Dep.* at 58:24-59:16 (as long as Parmalat could make good on the guarantee, Baker had "[n]o concern" about the PAdmin IPO), 344:13-18 (the notes would have been paid regardless of the IPO because of the Put and the Guarantee); *Couch Dep.* at 53:20-54:10 ("relied on the guarantees from [PCFL] and Parmalat").

[19] Plaintiffs' theory ultimately asks this Court to speculate that, in the few hours the directors spent reviewing the transaction, they would have determined that the investment was not worth $300 million and that they therefore would have rejected the transaction *even though Parmalat had provided a Put and a Guarantee.*  Thus, Plaintiffs ask the Court to speculate that the SPV directors would have discovered that Parmalat would not be able to honor its Guarantee – something that BoA and the private placement investors both missed, along with S&P, CONSOB, numerous equity analysts, and more than 70 financial institutions that did business with Parmalat.

[20] As discussed in BoA's Trial Brief, the SPVs were not damaged because they had no economic interest in the shares and no other business or prospects that could be impaired.  *See BoA Trial Br.* at 25-27.  Unlike the home mortgage example that the Court gave, *Tr.* at 406:17-24, the SPVs did not possess or control the use of the property, could never have owned it free and clear of the encumbrance and would not receive any proceeds from a sale of the property.  In these circumstances, the mere fact that the shares were in the name of the SPVs is of no economic significance, and should not be determinative of whether the SPVs were injured.  *Cf. Rubin* v. *United States*, 449 U.S. 424, 429-30 (1981) (holding that stock pledge constitutes a "sale" for purposes of Section 10(b) and that "[i]t is not essential under the terms of the Act that full title pass to a transferee for the transaction to be an 'offer' or a 'sale'"); *Mallis* v. *FDIC*, 568 F.2d 824, 829 (2d Cir. 1977).

Plaintiffs' measurement of loss based solely on the value of the PBrazil shares cannot stand. The $300 million that the SPVs paid was not just for PBrazil shares, but for a bundle of assets that also included the Put and Guarantee. *Tr.* at 83:12-15. Even Plaintiffs' damages expert, Patricia Caldwell, acknowledged that the guaranteed Put had value, *Tr.* at 85:23-86:8, yet she failed to value the Put or the Guarantee. *Id.* at 83:16-18, 83:23-25, 114:17-24. Instead of valuing the Plaintiffs' entire investment, therefore, she valued only some of it.[21]

The error in this approach was made clear by the New York Court of Appeals in *Sager* v. *Friedman*, 270 N.Y. 472, 1 N.E.2d 971 (1936). There, plaintiff alleged he had been fraudulently induced into making a loan as a result of misrepresentations by the defendant as to the value of collateral. To establish a loss, the court held that plaintiff had to show not only that the collateral was inadequate, but also that the loan could not be collected from a third party guarantor. *Id.* at 482 (holding "[p]roof of deficiency in the value of the collateral would not show that the plaintiff suffered a loss through the fraudulent inducement to make the contract for a loan, unless it is accompanied by proof that the loan could not be collected by suit against a solvent guarantor"); *see also Commercial Credit Corp.* v. *Wells*, 228 A.D. 402, 406, 240 N.Y.S. 139, 143-45 (N.Y. App. Div. 1930) (recognizing that value of sales contract that had been purchased depended not only on the value of the collateral, but on the personal guarantees that had been made).

---

[21] Putting aside Caldwell's inexplicable failure to value the Put and Guarantee, there is no credible evidence that the shares by themselves were "worthless." Prepared eight years after the events at issue, Caldwell's enterprise value of $350-550 million, *Caldwell Decl.* ¶ 92, is fundamentally inconsistent with enterprise valuations for Parmalat Brazil ranging from $1.2-1.5 billion prepared by independent parties with no incentive to skew their valuation. *See* DX-29 (Schroders valuation of $1.5 billion prior to Batavia/Etti acquisitions), DX-93 (Morgan Stanley enterprise valuation of €1.19 billion of Parmalat Brazil based on Parmalat South American valuation of €2.092 billion and Brazil's 57% share of South American revenues (DX-77)). Caldwell carried out a valuation that relied on a static snapshot of Parmalat Brazil taken at the depths of Brazil's currency crisis, but that snapshot failed to take into account the recovery of the Brazilian market or its dynamic nature. *Huber Testimony* ¶¶ 35-48. This omission is most glaring in Caldwell's decision to rely on multiples from transactions in mature and low-growth markets such as the U.S. and Europe. If Caldwell had used the more comparable transaction multiple of the Brazilian ice cream maker Kibon, the valuation of Parmalat Brazil would have been $2.0 billion. *Id.* ¶¶ 50-56.

At the time of the transaction, the bundle of assets Plaintiffs acquired was in fact worth what they paid – $300 million.  Well-seasoned investors, including BoA, bought the FHL/DHL notes on the express premise that the collateral package held by the SPVs would be sufficient for full repayment of the notes, plus interest.  This *ex ante* price constitutes "what knowledgeable investors anticipated the future conditions and performance would be at the time of the breach," and, accordingly, the value of what Plaintiffs received at the time of the transaction.[22]  *Sharma* v. *Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 826 (2d Cir. 1990) (internal quotation marks omitted).  Because there was no difference between the price paid and the value received, Plaintiffs suffered no loss or damages at the time of the transaction.  *See Reno* v. *Bull*, 226 N.Y. 546, 552-53, 124 N.E. 144 (1919) (damages determined based on stock value at time of sale); *see also Merrill Lynch & Co., Inc.* v. *Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007).

If Plaintiffs suffered any loss at all, it was not until December 2003 when Parmalat defaulted on the Guarantee and went into bankruptcy.[23]  That event resulted from the discovery of Parmalat's fraud, however, and was unrelated to the 1999 value of PBrazil.  There is no evidence that anyone at BoA knew about the larger Parmalat fraud at the time the transaction was executed.  *See Tr.* at 324:2-326:12.  When a plaintiff's loss is "caused by subsequent events not connected with [the breach]," the defendant is not held liable.  *Hotaling* v. *A.B. Leach & Co.*, 247 N.Y. 84, 88, 159 N.E. 870, 871 (1928); *see Sharma*, 916 F.2d at 826 (internal quotation

---

[22] The pricing of the notes to the investors, including the interest rate that the SPVs agreed to pay, reflected the investors' assessment of the credit risk they were taking on, including the risk of default by Parmalat S.p.A. on its Guarantee obligations.  *See Schwartz Testimony* ¶¶ 23-24.  The $300 million purchase price for the notes thus reflected the investors' estimate of the net present value of the promise by Parmalat S.p.A. to buy the PBrazil shares four years later for $300 million plus accrued interest.

[23] Even though there had been no IPO as of December 2003, the SPVs suffered no arguable harm until Parmalat defaulted on the Guarantee and the SPVs were unable to pay off the notes they had issued.  *See Freeman* v. *Venner*, 120 Mass. 424, 426 (1876), cited in *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 344 (2005), for the proposition that "a mortgagee cannot bring a tort action for damages stemming from a fraudulent note that a misrepresentation led him to execute unless and until the note has to be paid."

marks omitted) ("New York courts . . . have rejected awards based on what the actual economic conditions and performance were in light of hindsight.").

During trial, the Court questioned whether the Parmalat fraud would have mattered if the shares had been worth $300 million and thus could have been sold in an IPO prior to the time the Put and Guarantee were to be exercised. *Tr.* 38:4-7. However, the intrinsic value of PBrazil in 1999 is not determinative of whether there could have been an IPO and does not lessen the causative significance of the Parmalat fraud. As courts in this district and Plaintiffs' own experts recognize, "[t]he fulfillment of plans for any IPO is never a certainty." *Dooner* v. *Keefe, Bruyette & Woods, Inc.*, 157 F. Supp. 2d 265, 278 (S.D.N.Y. 2001); *see also Tr.* at 64:10-12, 95:22-24. Here, the decision on whether to proceed with an IPO resided with Parmalat – not the SPVs – and depended on not just the underlying value of the PBrazil shares, but the vagaries of the equity market conditions and the economy in Brazil. PX-44 ¶ 4.1. Equity market conditions in Brazil after 1999 turned out not to be conducive for an IPO of PBrazil,[24] and Plaintiffs have produced no evidence of how the shares could have otherwise been sold, regardless of their underlying value. The evidence indicates that the only source of repayment that any of the participants in the transaction looked to with any degree of certainty was the guaranteed Put, *Lau Testimony* ¶¶ 72, 104-08; *Johnson Testimony* ¶ 84; *Baker Dep.* at 58:24-59:16, 344:13-18; DX-88, DX-117, DX-149, and it was the failure of that mechanism that caused the alleged loss.

Further, once the Parmalat fraud was revealed, the valuation of PBrazil as of 1998 or 1999 simply did not matter. As Plaintiffs have recognized and argued, PBrazil was part of

---

[24] *See, e.g.*, *Johnson Testimony* ¶ 94 ("Brazilian equity markets had fallen along with world equity markets after the collapse of the Internet bubble in 2000, declining by roughly half during the 2000-2002 time period."); *Chalk Testimony* ¶ 93 ("By early 2002, it was clear that the state of the Brazilian equity markets would not allow an IPO prior to the end of 2003.").

Parmalat's worldwide fraud.[25]  Clearly, an IPO could not have occurred if PBrazil's fraudulent statements were revealed to the market.  Regardless of its value in 1999, PBrazil could not have survived Parmalat's fraud.  Indeed, PBrazil's holding company and operating company went into bankruptcy almost immediately after the disclosure of the larger Parmalat fraud.  *See* Alan Clendenning, *Two Key Brazilian Parmalat Units File for Bankruptcy Protection*, Associated Press Worldstream, Jan. 28, 2004.  That an IPO of PBrazil could have gone forward after the Parmalat fraud was revealed is purely speculative and unsupported by any evidence.

Finally, even if a breach by BoA were determined to be the proximate cause of the Plaintiffs' alleged losses, and even if those losses were measured on the basis of investment value left after the Parmalat fraud was revealed, the evidence does not support a conclusion that the SPVs assets at that time were "worthless."  *Tr.* at 409:10-12.  The Parmalat Guarantee had substantial value and resulted in distributions from the Parmalat bankruptcy of $122 million, *Mayer Testimony* ¶ 12 & n.14, which must be taken into account.[26]  *See Hotaling*, 247 N.Y. at 87.  As MacRae testified, the SPVs were working "in cooperation with" the trustee to obtain these distributions.  *Tr.* at 143:9-20.  The distributions were for the exact same losses claimed in this case and must be deducted from any damages award.  *Mayer Testimony* ¶¶ 25-26.[27]

---

[25] Plaintiffs admit that the 2000, 2001 and 2002 audited financial statements of Parmalat Admin were "false and misleading."  *Plaintiffs' Opp'n to Motion of Deloitte Touche Tohmatsu to Dismiss the Compl.* at 1.  *See also Compl.* ¶¶ 37, 156-158, 269, 279.  These inaccurate financial statements became part of the consolidated financial statements for Parmalat S.p.A. and Parmalat Finanziaria.  *Plaintiffs' Opp'n* at 1; *Cmpl* ¶ 158.  These consolidated financial statements in turn served as one of the key factors enabling Parmalat's fraud.  *Chalk Testimony* ¶¶ 39-40; *Lau Testimony* ¶¶ 35-36; *Johnson Testimony* ¶¶ 39-40, *Botta Dep.* at 13:14-14:24, 23:16-20; *Casalini Dep.* at 14:5-15:6, 93:16-24; *Neri Dep.* at 8:18-9:18, 13:19-14:6, 34:20-36:2; DX-323 at PRUD 03281.

[26] As shown in Ms. Caldwell's Exhibits 13-14 (PX-313), the $122 million consists of distributions of $64.036 million and $16.237 million in connection with the FHL notes and distributions of $41.383 million and $.363 million in connection with the DHL notes.  $93.2 million of the distributions went to noteholders and the remainder went to BoA in connection with the swaps.  *Id.*

[27] If the Court awards Plaintiffs any damages, BoA is also entitled to reduce such an award by the amount it has lost in the transaction under theories of recoupment and setoff.  Recoupment is an equitable doctrine that "permits a transaction which is made the subject of suit by a plaintiff to be examined in all its aspects, and judgment to be

*(Footnote Continued)*

## IV.    RULE 19 REQUIRES JOINDER OF THE NOTEHOLDERS OR DISMISSAL.

Wholly apart from issues of liability and damages, this case also fails under Federal Rule of Civil Procedure 19(a)(2)(ii).  This Court has recognized that "[t]he structure of the Note transactions has left multiple parties with claims against BoA for what is essentially the same debt."  *Food Holdings Ltd.* v. *Bank of America Corp.*, 477 F. Supp. 2d 602, 614 (S.D.N.Y. 2007).[28]  Plaintiffs, in pursuing damages on the transaction collateral – *i.e.*, the PBrazil shares, Puts and Guarantees – seek to recover for the benefit of the Noteholders.  *See MacRae Decl.* ¶ 20; *Tr.* 146:1-24.; DX-329; DX-330.  Noteholders, however, have also sued BoA directly to obtain payment on their FHL/DHL notes.  This is precisely the sort of double liability situation that the Rule is designed to prevent.  *See Smith* v. *Kessner*, 183 F.R.D. 373, 375 (S.D.N.Y. 1998); *W. Union Tel. Co.* v. *Pennsylvania*, 368 U.S. 71, 75 (1961).[29]

If joinder of the Noteholders is infeasible, then this action must be dismissed pursuant Rule 19(b).  Noteholders have in fact brought suit against BoA, and thus, the prejudice to BoA is real and substantial.  On the other hand, "any harm to the plaintiff caused by its structuring of the litigation is self-inflicted.  Thus, such potential harm to the plaintiff is rarely relevant."  4 James

---

rendered that does justice in view of the one transaction as a whole."  *Malinowski* v. *N.Y. State Dep't of Labor*, 156 F.3d 131, 133 (2d Cir. 1998).  Similarly, "the right of setoff allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A."  *Id.*  At the time of Parmalat's collapse, BoA owned $15 million of FHL notes and $39.5 million of DHL notes, and was owed $56.47 million and $41.93 million pursuant to swap agreements with FHL and DHL, respectively.  *Stipulations* ¶¶ 223, 225-26.  BoA subsequently acquired $40 million in FHL notes.  *Id.* ¶ 224.  After distributions in Parmalat's bankruptcy, BoA is still owed $40.131 million on its original FHL/DHL notes, $24.665 million on its later-purchased FHL notes and $69.589 million on the swaps.  *See* DX-299.  If the Plaintiffs are awarded any damages, the only way to do justice with regard to this transaction is to allow setoff or recoupment of BoA's damages.

[28] The Court has observed: "At the bottom of the chain, the Noteholders claim damages because the Notes were not repaid.  The [SPVs], which issued the Notes, are liable to the Noteholders for payment due on the Notes."  *Id.*  In this vein, the Court reasoned, "the Bank faces multiple claims resulting from one debt."  *Id.*

[29] It is undisputed that the SPVs' third-party funder stands to take a substantial cut of any recovery by the SPVs.  *See Mayer Testimony* ¶ 21; DX-316.  Even if the Noteholders' claims legally may be reduced by the amount they receive from the SPVs' liquidation estates, that reduction would be far less than their pro rata share of any judgment.

Wm. Moore et al., *Moore's Federal Practice-Civil*, § 19.03[4][a] (3d ed. 2006).[30]  In addition, dismissal of the SPVs' suit would not leave them without an adequate forum insofar as the SPVs may seek to recover by intervening in the already-pending MDL actions.

      In the alternative, if this Court finds BoA liable, it may join the Noteholders to *this* action for purposes of apportioning the SPVs' damages and protecting all parties' interests.[31]  *See Gentry* v. *Smith*, 487 F.2d 571, 580 (5th Cir. 1973).  In such a case, a hearing should be held at which the Noteholders and FHL/DHL would submit evidence on their alleged damages, and the Court would determine whether multiple obligations exist and fashion a remedy to protect BoA from multiple liability for the same loss.  Such a remedy might include, after deducting an amount representing the recoveries already received by creditors from the Parmalat bankruptcy proceeding, providing the Noteholders with the option of either participating in the Cayman Islands proceedings or waiving their rights to such participation and pursuing their own claims (resulting in a corresponding reduction of the amount of damages in the FHL/DHL suit).  Such a remedy would allow each Noteholder to choose its forum for pursuing its claim, protect BoA against multiple obligations, and would not prejudice the SPVs because the Cayman liquidator has not yet established a bar date for claims.

---

[30] Because FHL and DHL are in liquidation and will not retain any damages award received in this action, they will suffer no direct harm from dismissal.  The investors who purchased the FHL and DHL notes prior to December 2003 also would not be adversely affected by dismissal.  A number of these investors (Pacific Life, PCFL, New York Life, Principal) have sold their notes and have no claim in the FHL/DHL liquidation proceedings, while those who have filed their own lawsuits against BoA (Allstate, Monumental, Transamerica, Prudential, Hartford) can protect their interests in their separate suits.  *See Tr.* at 150:2-20; *see also* DX-329; DX-330; *Stipulations* ¶¶ 245-248.  The entities who would be most directly affected would be Deutsche Bank, *see* DX-316, and the distressed debt investors such as DK Acquisition who purchased notes at a discount after they were in default in the hopes of achieving a windfall.  *See Tr.* at 152:17-154:23; DX-329, DX-330.  These entities were not involved in the original transactions and were not injured by the conduct at issue in this case.  *Mayer Testimony* ¶¶ 20-22.

[31] The Court would have subject matter jurisdiction over the Noteholder claims under the Edge Act, and the Noteholders are plainly subject to process.  *See* Fed. R. Civ. P. 4(e), (f), (h).  As such, the Noteholders "must be joined" as parties to this action.  Although this Court recently dismissed in its entirety the case brought against BoA by Parmalat Capital Finance Limited, certain of PCFL's claims are identical to the Noteholders and FHL/DHL, and if PCFL elects to appeal this Court's decision and is successful, its claim will also need to be joined.

New York, New York
Dated: September 29, 2009

Respectfully submitted,


A. Robert Pietrzak (AP-6711)
Thomas McC. Souther (TS-6615)
Daniel A. McLaughlin (DM-2688)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York  10019
(212) 839-5300
(212) 839-5599 (fax)

By:  __s/ Joseph B. Tompkins, Jr.__
    Joseph B. Tompkins, Jr.
    Alan C. Geolot
    Mark P. Guerrera
    David. J. Lewis
    Robert D. Keeling
    SIDLEY AUSTIN LLP
    1501 K Street, N.W.
    Washington, D.C. 20005
    (202) 736-8000
    (202) 736-8711 (fax)

    *Attorneys for Bank of America Corporation,*
    *Banc of America Securities LLC, and Bank of*
    *America, N.A.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of September, 2009, I caused true and correct copies of the foregoing Bank of America's Post-Trial Brief to be served by the Court's CM/ECF system and by email upon all service parties.


/s/ Corban S. Rhodes_____

Corban S. Rhodes (CR-2397)